Jeffrey Trousdale (14814)
**Cohne Kinghorn, P.C.**
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Email: jtrousdale@ck.law

Attorneys for debtor-in-possession
Opulent Vacations, Inc.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re | Bankruptcy No. 23-21941 |
| OPULENT VACATIONS, INC., | Chapter 11 (Subchapter V) |
| Debtor. | Hon. Joel T. Marker |

---

## MOTION FOR AN ORDER (A) AUTHORIZING THE SALE OF THE DEBTOR'S PARK CITY ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) WAIVING THE 14-DAY STAY PERIOD AND (D) GRANTING RELATED RELIEF

---

Opulent Vacations, Inc., debtor and debtor-in-possession (the "**Debtor**") in the above-caption chapter 11 case under subchapter V (the "**Case**"), moves (the "**Motion**") the Court for entry of an order (a) approving an Asset Purchase Agreement (the "**Purchase Agreement**"), subject to higher and better offers,[1] by and between the Debtor, as seller, and REBL Utah, LLC, as buyer ("**Buyer**"), (b) approving the proposed sale (the "**Sale**") of substantially all of the Debtor's Park

---

[1] A copy of the proposed Purchase Agreement is attached hereto as **Exhibit "A"**. If not otherwise defined herein, capitalized terms shall have the meaning provided in the Purchase Agreement. Between the filing of this Motion and the entry of an order on the Motion, the Debtor will file an updated version of the Purchase Agreement with additional schedules filled in.

City Operations and related assets (collectively and as more particularly identified in the Purchase

Agreement, the "**Acquired Assets**" or, as sometimes used herein, the "**Assets**"), and an option for

Buyer to acquire the Debtor's Lake Tahoe Operations thereafter, and the assumption and

assignment of certain executory contracts, as more particularly identified in the Purchase Agreement

pursuant to an order in substantially the form attached hereto as **Exhibit "B"** (the "**Sale Order**"),

(c) waiving the fourteen day stay otherwise applicable under Federal Rules of Civil Procedure

6004(h) and 6006(d), and (d) granting related relief.

## MOTION

A succinct statement of the precise relief sought and the specific grounds for the Motion is

as follows.

*A.* The Debtor requests entry of the Sale Order, which shall include: (a) approval of the

form of the Purchase Agreement; (b) approval of the assumption and assignment of the Assumed

Contracts (defined below), *provided, however,* that Owner consents shall be an express condition

precedent to the assumption and assignment of any Service Rental Marketing Agreement; (c)

authority for the Debtor to sell the Acquired Assets to Buyer (or to a bidder submitting a higher or

better offer) free and clear of all other liens, claims, encumbrances and interests; and (d) authority

for the Debtor to provide an option to Buyer to purchase the Lake Tahoe Operations for $1,250,000,

subject to higher or better offers.

*B.* The Debtor has determined, in the exercise of its business judgment, that the

proposed Sale is in the best interests of creditors and the bankruptcy estate.

*C.* A sound business reason exists for the proposed transaction.  Without limitation, the

Debtor does not anticipate that its Park City Operations will remain viable in the near term or the

long term, particularly given the pre-Petition Date issues the Debtor had with its Park City

Operations.  The Debtor desires to provide its Park City Owners with an exit strategy that

maximizes their returns for the assignment of Service Rental Marketing Agreements and reduces

the overall pool of unsecured claims against the Debtor's estate. Because the assumption and assignment of the Assumed Contracts contemplates that an agreed upon cure amount (as that term is used pursuant to Bankruptcy Code § 365) will be paid to the Park City Owners, the impact on the Debtor's estate should be quite significant.

D.    The proposed Sale of the Assets as a going concern to Buyer (or a higher bidder) will maximize the value of the Assets and the estate and enhance the possibility of a meaningful distribution to creditors.

E.    Buyer is paying fair and reasonable consideration to the Debtor for the Assets, and Buyer's acquisition of the Assets is a critical part of Buyer's interest in purchasing the Lake Tahoe Operations. The Debtor's sale of the Lake Tahoe Operations is the Debtor's best means of proposing a return to creditors in this Case.

F.    The Sale has been negotiated at arm's-length and in good faith by the Debtor and Buyer, following thorough consideration of all possible alternatives by the Debtor.  There is no evidence of collusion or unfair dealing.

G.    The Debtor has provided and/or will provide adequate and reasonable notice of the Motion and the proposed Sale.

H.    Good cause exists to waive the fourteen-day stay otherwise applicable under Rules 6004(h) and 6006(d).  Among other reasons, the Debtor's Park City Operations are on their "last leg" under current management, and the Debtor risks losing any remaining goodwill with Park City Owners the longer a sale is delayed.  As such, it is critical that a closing of the Sale occurs as soon as possible.

## MEMORANDUM OF POINTS AND AUTHORITIES

In further support of the motion and the relief requested, the Debtor respectfully states as follows.

## I.    JURISDICTION AND VENUE

1.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.    The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.    Venue of the Case and the contested matter presented by the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.    The legal predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Rules**"), and corresponding Local Rules.

## II.    PROCEDURAL BACKGROUND

5.    On May 15, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby initiating the Case.

6.    The Debtor has elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code. Accordingly, this is a "Sub-V" case, and the provisions of Bankruptcy Code §§ 1181 – 1195 are applicable to this Case.

7.    The Debtor continues to manage its affairs and property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1182 and 1184.

8.    Consistent with Bankruptcy Code § 1183, a "small business" trustee, D. Ray Strong (the "**Trustee**"), is appointed in the Case.

### III.    RELEVANT FACTS

*Background of the Company and Its Business*

9.    The Debtor is a high-end vacation home rental agency and property management company headquartered in Park City, Utah, and has operated since 2011. The Debtor manages properties primarily in Park City, Utah, Lake Tahoe (Nevada and California), and La Jolla, California. The Debtor also manages properties in Hawaii, Arizona, and other parts of California. The Debtor has segregated bank accounts and separately tracks the income it receives from the various "regions" in which it operates, and generally treats the various regions as different divisions of its operation.

10.    For the guests that book rentals with properties managed by the Debtor (collectively, the "**guests**"), the Debtor specializes in curating a selection of luxury homes, arranging "full service" rentals (*e.g.*, no "chore lists" when booking out, offering concierge services, etc.), and providing other luxury amenities so that guests can fully relax and maximize their time on vacation.

11.    For the homeowners with whom the Debtor has "**Service Rental Marketing Agreements**" or similar such contracts (collectively, the "**Owners**" or, if specific to the Park City Operations, the "**Park City Owners**"), the Debtor offers expertise in maximizing rental rates and reservation values for luxury properties, achieving higher revenues with lower occupancy, and minimizing risk and wear and tear on homeowners' properties.

12.    The Debtor is paid an average commission between 26% - 35% per booking for its services to homeowners. In exchange, the Debtor handles every aspect of booking, collections, and property management for the homeowners with whom it has contracts.

13.    In 2021, the Debtor hired a new President to oversee operations and growth (the "**Former President**"). The Former President was the former CEO of a major hospitality company and had experienced success in that role.

14. Unfortunately, the Former President overspent, underperformed, and did the opposite of what the Debtor had hired him to do. After approximately a year at the Debtor's helm, the Debtor discovered that the Former President had put the Debtor in a substantial deficit regarding amounts owed to homeowners and failed to achieve the sales results or growth that the Debtor expected. Among the issues the Debtor discovered (over time) were: (i) the Former President hired a large and expensive group of employees from his former employer, whose salaries the Debtor did not have the revenues to maintain, and whose contributions to the Debtor were minimal; (ii) the Former President spent hundreds of thousands of dollars to "develop technology" that was supposed to improve operations, but only made operations less efficient; (iii) the Former President transitioned the Debtor from a fully integrated and automated financial system to a system that required complicated manual entries, auditing, and other time-intensive processes; (iv) the Former President spent hundreds of thousands of dollars on relatively pointless products, marketing, and technology; and (v) when the Debtor finally fired him, in September of 2022, the Former President held the Debtor hostage for $25,000 by refusing to turn over website control, passwords and other proprietary information.

15. The Former President's involvement with the Debtor came at the worst time possible. In 2021, the Debtor achieved gross revenues of approximately $17.5 million. But in 2022, the Debtor's gross revenues fell to approximately $14.2 million. Because the Former President had taken the Debtor from a fully-automated accounting system to a manual platform, the Debtor failed to "course correct" as quickly as it could have. Moreover, while the Debtor's accounting staff was able to keep up with the manual accounting processes implemented by the Former President until about June 2022, the accounting staff fell behind on reconciling financials after certain key employees left.

16. The Debtor's longest-running operations were in Park City, Utah. As of the Petition Date, the Debtor had Service Rental Marketing Agreements with approximately 40 Owners in Park

City, Utah. The Debtor also has two leases (office and storage), miscellaneous personal property, such as linens and a vehicle, intellectual property, and other "going-concern" type assets related to Park City. As described in more detail in the Purchase Agreement, the Debtor's assets and operations related to Park City are defined herein as the "**Park City Operations**."

17.    More recently, the Debtor acquired assets from a property management company in Lake Tahoe (Nevada and California), including several Owner agreements and other going concern assets. The Debtor's Lake Tahoe assets and operations are defined herein as the "**Lake Tahoe Operations**." The Lake Tahoe Operations are run as a separate division of the Debtor, and have remained profitable and sustainable both pre- and post-Petition Date. Except for the filing of this Case (which raised alarm bells for Owners in Lake Tahoe), the Debtor maintains a good reputation in Lake Tahoe and views the Lake Tahoe Operations as its most valuable asset.

18.    Unfortunately, the Park City Operations suffered the most due to the Former President's various issues, and the Debtor owes substantial pre-Petition Date amounts to the Park City Owners.

19.    At the time of the filing, the Debtor was subject to at least one lawsuit, as listed in the Statement of Financial Affairs, and anticipated several more lawsuits imminently.  The bankruptcy case has afforded the Debtor a breathing spell and the opportunity to permit it to devote its limited financial and personnel resources to an orderly liquidation of its business as a going concern, while maintaining business operations in the interim period.

20.    The Debtor has explored multiple options for providing repayment to creditors. After considering all practicable alternatives, the Debtor has entered into the Purchase Agreement and has filed this Motion for approval of a sale of its assets as a going concern to a stalking horse buyer, or any qualified bidder making a higher or better offer, to monetize and preserve the value of the Debtor's existing business and assets for the benefit of creditors.

*Liens and Encumbrances Against the Assets*

21.     The United States Small Business Administration (the "**SBA**") and the Utah State Tax Commission (the "**USTC**") have asserted "all assets" liens against the Debtor.

22.     Pursuant to the *Final Order Approving Stipulation Permitting Use of Cash Collateral and Providing for Adequate Protection* [Docket No. 49] (the "**Cash Collateral Order**"), authorizing use of cash collateral, the above-referenced creditors may or do hold "replacement liens" upon the post-petition assets of the Debtor to the extent of any post-Petition Date diminution in their collateral.

23.     Upon information and belief, the SBA and USTC are the only persons who, as of the Petition Date, had filed UCC financing statements against the Debtor in the State of Utah and/or had held or may hold perfected and enforceable liens against the Debtor's assets.

*Unexpired Leases and Executory Contracts*

24.     As listed on Schedule G of record in this Case [Docket No. 50], the Debtor is party to several unexpired leases and executory contracts.

25.     As described in section 2.2 of the Purchase Agreement, the Debtor is proposing to "assume" and to "assign" to the Buyer the Assumed Contracts listed on Schedule 2.2.[2]  To be clear, the Debtor anticipates assuming and assigning as many of the Park City Owners' Service Rental Marketing Agreements as it can. Subject to the notice requirements under the Bankruptcy Code, the Buyer may modify the list of Assumed Contracts through Closing (a) by electing not to take an assignment of some or all of leases and contracts listed on Schedule 2.2, and/or (b) by identifying additional leases and contracts to be assigned to it as Assumed Contracts.

26.     Under the Purchase Agreement, the Buyer is obligated to pay any "cure" amount and to satisfy any other "cure" obligation that may be applicable under section 365 of the

---

[2] Because the Assumed Contracts will require Owner Consent, this list will be updated in a later filing as Owner Consents are obtained.

Bankruptcy Code, *provided, however*, that to the extent the Buyer assumes a Service Rental

Marketing Agreement for a Park City Owner, the "cure" amount shall be no more than 75% of the

total pre-Petition Date debt owed to such Owner, or such other lesser amount as may be agreed

upon by the Buyer and the Park City Owner. Put another way, Buyer's determination whether to

treat a particular Service Rental Marketing Agreement as an Assumed Contract likely will turn on

whether the counterparty insists on payment of a "cure amount" that is greater than 75% of the pre-

Petition Date debt as a condition of the Debtor's assumption and assignment of the contract.

Another factor will be the counterparty's willingness to enter into a new, extended agreement with

the Buyer for services related to Owner's home.

27.     For the avoidance of doubt, the Debtor will not assume (under this Motion) any

executory contract or lease that is not being assigned to the Buyer. And if any agreement is assumed

and assigned as an "Assumed Contract," the assumption and assignment shall be deemed (by

consent of the Owner, each an "**Owner Consent**") to be in full satisfaction and cure of any default

pursuant to Bankruptcy Code § 365(b)(1)(A). The Debtor and Buyer anticipate contacting all Park

City Owners shortly after the filing of this Motion to determine if they will enter into an Owner

Consent.

<u>The Proposed Sale of Assets</u>

28.     The Debtor has determined that it is in the best interests of its estate and creditors to

conduct an orderly liquidation of its Assets.  To maximize the potential return to creditors, it is

critical that the Debtor sell all or substantially all of its assets as a "going concern," as opposed to a

piecemeal liquidation.

29.     Further, if the Debtor's operations cease and its assets are liquidated, all parties

would suffer substantial losses, including the secured creditors, priority creditors, unsecured

creditors, equity holders and the Debtor's guests who have booked vacations with Owners. Asset

values would be substantially diminished if operations are terminated and assets are sold at

liquidation, because most of the Debtor's value lies within its operations as a going concern (it is, at its core, a service business).  The value of the Debtor's intangible assets and its enterprise value may erode rapidly and/or completely evaporate.

30.     The Debtor, however, cannot continue with "business as usual" for much longer. As such, the Debtor must pursue a sale and close the sale as soon as possible to realize the value of the Assets and to maximize potential distributions to creditors.

31.     Accordingly, the Debtor intends to continue operations as necessary to protect estate assets, service customers and maximize the value of its Assets for the benefit of its estate and creditors, until a sale of the Assets (and, subsequently, a sale of the Lake Tahoe Operations) is approved by the Court.

<u>The Debtor's Pre- and Post-Petition Marketing Efforts</u>

32.     The Debtor has been looking for investors for its business for the last year or two. More recently, and shortly before the Petition Date, the Debtor began engaging in serious efforts to sell its operations as a going concern. The Debtor and its management actively contacted persons and companies that may be interested in purchasing the Assets.  The Debtor has entered into non-disclosure agreements and provided due diligence information to several parties.  Other than the offer of the Buyer, however, all resulting offers were rejected by the Park City Owners, whose consents are critical to any sale.

33.     The Debtor will make additional good faith efforts to identify persons who might have interest in the Assets and the Lake Tahoe Operations and to take steps reasonably calculated to expose the Assets and the Lake Tahoe Operations to the market.

## IV.     RELIEF REQUESTED

### A.     General Statement of Relief Requested

34.     By this Motion, the Debtor requests that the Court enter the Sale Order, (i) authorizing the sale of the Assets to Buyer (or if the Debtor receives a higher or better offer, to such

party), "free and clear" of all liens, claims, encumbrances and interests, (ii) authorizing the

assumption and assignment to Buyer (or a party with a higher or better offer) of certain executory

contracts and unexpired leases associated with the Debtor's business (*i.e.*, the Assumed Contracts),

(iii) authorizing Buyer to pay the amounts, if any, necessary to cure existing defaults or arrearages

under the Assumed Contracts, provided, however, that as to Service Rental Marketing Agreements,

such amounts shall be no greater than 75% of the pre-Petition Date amounts owed to Owners, and

(iv) granting related relief.

35.    As stated above, the Debtor desires to sell its Park City Operations and, thereafter,

its Lake Tahoe Operations, as a going concern in order to maximize the value of its assets and

receive the highest possible consideration therefrom.

36.    Accordingly, the Debtor entered into arms-length negotiations with Buyer for the

sale of the Assets on terms which the Debtor believes to be fair and reasonable.  The Purchase

Agreement is the result of these good faith negotiations.

37.    The Purchase Agreement contemplates the sale of the Assets to Buyer, subject to

higher and better offers. The Purchase Agreement also contemplates granting Buyer a four-month

option to purchase the Lake Tahoe Operations for a price of $1,250,000, subject to higher and better

offers.

38.    It is essential that the Sale be approved quickly, so that the Debtor does not lose its

remaining going concern value.

**B.    The Purchase Agreement**

39.    Pursuant to the Purchase Agreement, the Debtor will (i) sell the Assets "free and

clear" of all liens, claims, interests and encumbrances (except for ongoing obligations to

counterparties of Assumed Contracts) and (ii) assume and assign to Buyer, or a party that makes a

higher or better offer, the Assumed Contracts.

40.     The Purchase Agreement was negotiated at arm's-length and in good faith by the Debtor and Buyer, following thorough consideration of all possible alternatives by the Debtor.  The Debtor believes that the price to be received from the Sale, as set forth in the Purchase Agreement, and subject to the ability of interested parties to submit overbids for the Assets at the Auction, will result in the highest and best value for the Debtor's estate, creditors and interest holders.

41.     A summary of the key terms of the Purchase Agreement follows.[3]

a.      <u>Purchase Price</u>.  As described in section 3 of the Purchase Agreement, the total consideration to be paid by Buyer to Seller for the Assets, *i.e.*, the Purchase Price, includes:

i.      a Cash Payment in the amount of $25,000, which includes a $5,000 non-refundable deposit (only refundable if the Debtor accepts a higher or better offer); and

ii.      release and/or satisfaction of the pre-petition and post-petition claims of all Park City Owners who agree that their Service Rental Marketing Agreements shall be assumed and assigned as Assumed Contracts (value to the estate could be in the hundreds of thousands of dollars, depending on how many Owners provide Owner Consents);

b.      <u>Assets</u>.  The Assets to be sold and assigned to Buyer at Closing consist of substantially all of the assets of the Debtor which relate to the Park City Operations. Necessarily, this includes Assumed Contracts, substantially all of the Debtor's vehicles, equipment and other tangible personal property in its Park City office and warehouse (and the Debtor's two leases in Park City), the Debtor's technology and systems used for its Park

---

[3]     To the extent this summary of the Purchase Agreement differs in any way from the terms of the Purchase Agreement, the Purchase Agreement controls.

City Operations, and all of the Debtor's intellectual property (including patents, marks, client lists and any trade secrets).

c.    <u>Excluded Assets</u>.  The Debtor is not selling or assigning to Buyer any of the Excluded Assets, as defined in section 2.1(c) of the Purchase Agreement.  The Excluded Assets encompass, without limitation, (i) the cash payment related to the Sale, and any other cash held by the Debtor (except cash held in trust related to the Park City Operations), (ii) all Chapter 5 Claims, and (iii) the Lake Tahoe Operations.

d.    <u>No Representations or Warranties</u>.  As described in section 4.5 of the Purchase Agreement, the Debtor is selling the assets subject to all faults except as otherwise disclosed in the Purchase Agreement or in writing to Buyer.

e.    <u>Sale Free and Clear</u>.  The Assets will be sold, transferred and assigned to Buyer free and clear of all other liens, claims, encumbrances and interests.

f.    <u>Assumption of Executory Contracts and Leases</u>.  The Debtor will assume and assign to Buyer all executory contracts and unexpired leases designated by Buyer as Assumed Contracts.  (As of the date of this Motion, the executory contracts and leases presently designated as Assumed Contracts are listed on Schedule 2.2 to the Purchase Agreement.)  Buyer must pay all amounts necessary under section 365(b)(1)(A) of the Bankruptcy Code, subject to Owner Consents and the limitations set forth in the Purchase Agreement, for the Debtor to assume the Assumed Contracts, and will provide adequate assurance of future performance under the Assumed Contracts.

g.    <u>Sale Subject to 20 Owners' Consent</u>.  The Sale is conditioned on, among other things, no less than twenty (20) Park City Owners agreeing to extend the terms of their Service Rental Marketing Agreements with Buyer for a period of not less than two or three years. As of the date of this Motion, the Debtor has tentatively received commitments from

approximately 14 Owners. The Debtor and Buyer will diligently work to obtain Owner

Consents from at least twenty Owners to ensure that the Sale is finalized.

      h.    <u>Breakup Fee</u>. If the Debtor accepts a higher or better offer, the Debtor will

be subject to a breakup fee of $50,000.

### C.    Higher and Better Offers

42.    The Purchase Agreement is subject to higher and better offers. The Debtor will reach

out to existing contacts and parties who previously expressed interest in purchasing the Assets (and

the Lake Tahoe Operations) in an effort to market the Assets. If the Debtor receives a Higher or

Better Offer (as defined in the Purchase Agreement), then the Debtor will ask the Court to approve

auction procedures for a public auction of the Assets.

43.    The Debtor believes any additional extended marketing effort with respect to the

Assets will not produce additional bidders or result in tangible benefit to the Debtor's estate, and

likely will lead to a dangerous and perhaps fatal erosion of the Debtor's business.  Further, the

Debtor will re-contact all parties who have previously expressed any interest in the Assets to inform

them of the sale and their opportunity to submit a Higher or Better Offer.

44.    The Debtor may determine, in its business judgment, whether an offer is a higher or

otherwise better offer and reject any offer that it determines is not a higher or better offer.

### E.    Assumption and Assignment of Executory Contracts and Unexpired Leases

45.    As part of the Motion, the Debtor seeks authority to assume and assign the Assumed

Contracts to Buyer.

46.    With respect to the Assumed Contracts, the Debtor will serve this Motion on each

non-Debtor party to an Assumed Contract. To the extent that a party to an Assumed Contract is not

an Owner that has executed an Owner Consent, the Debtor shall also serve notice of the Debtor's

intention to assume and assign that party's contract (the "**Assignment Notice**").  The Debtor will

mail the Assignment Notice no later than ten (10) business days prior to the Approval Hearing.  The

Assignment Notice will state the cure amount necessary to assume the Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**") and provide the contracting parties with an opportunity to object to such Cure Amount, by filing and serving a written objection no later than four (4) business days prior to the Approval Hearing.  If no objection is timely filed and served, the Cure Amount set forth in the Assignment Notice will be controlling notwithstanding anything to the contrary in any Assumed Contract or any other document, and the non-Debtor party to the Assumed Contract will be forever barred from asserting any other claim arising prior to the assignment against the Debtor or Buyer (or the Successful Bidder) as to such Assumed Contract.

47.     The effective date of any assumption and assignment of any Assumed Contract shall be the date on which the Sale closes, *i.e.*, Closing.  Accordingly, any Cure Amounts to be paid under any Assumed Contract will, unless a deferred payment agreement has been reached (*e.g.*, via an Owner Consent), be paid simultaneously with Closing.

## IV.    BASIS FOR RELIEF

### A.    The Sale Is within the Debtor's Sound Business Judgment.

48.     Under the Bankruptcy Code, "[t]he Trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Furthermore, the Bankruptcy Code gives this Court the authority, in its discretion, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

49.     As the Collier on Bankruptcy treatise notes:

> Historically, there was disagreement on the issue of whether and under what circumstances a chapter 11 debtor may sell substantial assets under section 363.  It is now generally accepted that section 363 allows such sales in chapter 11, even where there is no emergency requiring immediate action.

3 Collier on Bankruptcy ¶363.02[3], at 363-16 (Alan N. Resnick & Henry J. Sommer Eds., 16th ed.).

50.     A sale of a debtor's assets should be authorized pursuant to Bankruptcy Code section 363 if a sound business purpose exists for doing so.  See, e.g., In re Med. Software Solutions, 286 B.R. 431, 440-41 (Bankr. D. Utah 2002); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Martin, 91 F.3d 395 (3d Cir. 1996); In re Titusville Country Club, 128 B.R. 396 (W.D. Pa. 1991); In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15 (E.D. Pa. 1987); In re Ancor Exploration Co., 30 B.R. 802, 808 (N.D.Okl. 1983) (bankruptcy court has wide-latitude in approving sale of substantially all of the estate assets under section 363(b)); In re Allison, 39 B.R. 300, 301-02 (D.N.M. 1984) ("The clear weight of authority authorizes the sale of all or substantially all of the debtor's assets pursuant to Section 363(b) in a chapter 11 proceeding, even absent a disclosure statement, plan, and vote of the creditors.")  The respected treatise Collier on Bankruptcy explains:

> [T]he more recent cases tend to focus on whether the sale is supported by a *sound business reason* and is based on a *sound exercise of business judgment*…. [T]he bankruptcy court reviews the trustee's (or debtor in possession's) business judgment to determine independently whether the judgment is a reasonable one.  The court should not substitute its judgment for the trustee's but should determine only whether the trustee's judgment was reasonable and whether a sound business justification exists supporting the sale and its terms.

Id. ¶363.02[4], at 363-18 (emphasis added).

51.     Where a proposed sale of assets prior to confirmation of a plan encompasses substantially all of the assets of the bankruptcy estate, courts sometimes have considered four factors in determining whether the proposed sale constitutes a sound and reasonable exercise of business judgment: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice is provided. See Med. Software Solutions, 286 B.R. at 440 (explaining and analyzing factors); Lionel Corp., 722 F.2d at 1071 (identifying the "sound business purpose" test); In re Abbotts Dairies of Penn., Inc.,

788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the articulated business justification test of

Lionel, and adding the "good faith" requirement); In re Delaware & Hudson Ry. Co., 124 B.R. 169,

176 (D. Del. 1991) (adopting Lionel).

52.     The immediate consummation of the Sale is the best way – and perhaps only way –

to preserve the enterprise value of the Assets, thereby maximizing the value of the Debtor's estate

for the benefit of the Debtor's creditors.  Uncertainty as to the future of the Debtor's business will

cause continued downward pressure upon its value, and the Debtor cannot continue to operate

without buy-in from Owners and guests.  Accordingly, it is imperative that a clear signal be given as

to the Debtor's plans for its business, *i.e.*, its orderly liquidation.

*(1)     A sound business reason exists for the proposed sale.*

53.     There is more than adequate business justification to sell the Assets to Buyer on an

expedited basis.  In the instant Case, the best way to maximize the value of the Debtor's estate is to

sell its assets as a going business concern, thereby preserving the substantial goodwill of the

business, maintaining guest and owner relationships and avoiding a liquidation sale of the Assets.

While the Debtor remains a debtor-in-possession under chapter 11, it will be difficult for the Debtor

to instill confidence in owners and guests.  A sale of the Debtor's business as a going concern to a

stable, financially sound and qualified bidder eliminates these uncertainties, and maximizes the

value of the Debtor's business and its Assets.

54.     The Debtor's value as a going concern is significantly greater than the total value of

all its disparate parts.

a.     Much of the Debtor's equipment and other tangible personal property has a

relatively small, or nominal, liquidation value.

b.     Further, there is significant value in (i) the Debtor's Owner base and

contracts, but only for a qualified buyer that can assume operations, (ii) the Debtor's

specialized employees, and (iii) the Debtor's goodwill, marks, customer relationships, trade

secrets and other intellectual property.  This enterprise or "going concern" value may be lost or substantially eroded if the Debtor ceases business operations.

55.    Additionally, as time passes, the Debtor's administrative expenses and other post-petition liabilities increase.

56.    Finally, the Debtor's assets are encumbered by liens in favor of the SBA and USTC. Any equity remaining in the Assets is eroding through continuing accrual of interest and loan charges pursuant to section 506(b) of the Bankruptcy Code.

57.    Accordingly, to preserve as much of the value of the Debtor's business as possible, it is necessary that the Debtor's business and substantially all of its assets be sold as a going concern on an expedited basis.

58.    Moreover, Buyer has offered substantial value for the Assets and is anxious to close as soon as possible. The purchase of the Assets is also a necessary condition of Buyer's desire to purchase the Lake Tahoe Operations. The Debtor fears that any delay of the Sale creates a risk to the Debtor's ability to receive such value.  Moreover, by selling the Assets now, the Debtor will relieve itself of certain ongoing costs and expenses, thereby minimizing administrative expenses. Accordingly, well-articulated business reasons exist for approving the Sale, such that the "business purpose" test under section 363 of the Bankruptcy Code is met.  See Lionel, 722 F.2d at 1071 ("most important[] perhaps, [is] whether the asset is increasing or decreasing in value").

*(2)    The Buyer is providing fair and reasonable consideration for the Assets.*

59.    A sale of the Assets pursuant to the Purchase Agreement will provide fair and reasonable consideration to the Debtor's estate.  To dispel any doubts, the sale of the Assets to Buyer is subject to competing bids, thereby enhancing the Debtor's ability to receive the highest and best value for the Assets.  The fairness and reasonableness of the consideration to be received by the Debtor ultimately will be demonstrated by a "market check" and, if other offers are obtained, an

auction process—the best means for establishing whether a fair and reasonable price is being paid. Consequently, the consideration to be paid for the Assets will be both fair and reasonable.

<em>(3)    <u>The sale of the Assets has been proposed, and the Purchase Agreement has been negotiated, in good faith</u>.</em>

60.      The Purchase Agreement is the product of extensive arm's-length negotiations between Buyer and the Debtor.  These negotiations have involved substantial time and energy by the parties and their professionals, and the Purchase Agreement reflects give-and-take and compromises by both sides.

61.      Moreover, the Debtor's ability to market the Assets for higher and better offers ensure that a prospective purchaser will not be able to exert any undue influence over the Debtor. Under the circumstances, this Court should find that (a) the sale of the Assets is the result of good faith arm's-length negotiations, and (b) Buyer (or a successful bidder) is entitled to all of the protections of section 363(m) of the Bankruptcy Code.

<em>(4)    <u>Adequate and reasonable notice of the Sale is being provided</u>.</em>

62.      The final consideration for the approval of a sale under section 363 of the Bankruptcy Code is the requirement that interested parties receive adequate notice.  The Debtor is providing notice of the Motion to all creditors, equity security holders, and Owners.

63.      Such far-reaching notice is reasonable and appropriate pursuant to Federal Rule of Bankruptcy Procedure 2002, because it provides all parties-in-interest with notice of the proposed sale and of the Bidding Procedures, while at the same time enabling the Debtor to comply with the deadlines set forth in the Purchase Agreement.

**C.      The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

64.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, encumbrance or other interest in such property if:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to approve the sale of the Assets free and clear of liens, claims, encumbrances, and other interests (collectively, the "**Interests**").  See 11 U.S.C. § 363(f); Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343 (E.D. Pa. 1988) (same).

65.    The Debtor believes that the only entities holding a valid lien against the Assets are the SBA and the USTC. Toyota Financial Services also holds a lien on the Toyota Truck that is being sold as part of the Sale, and that lien shall remain on the Toyota Truck. Upon information and belief, none of these creditors opposes the Sale on the terms described in the Purchase Agreement.

66.    To the extent other alleged liens exist, they are in bona fide dispute and/or the holders of the liens could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of the Interest.

67.    Absent an objection, the Debtor requests entry of an order declaring not only that the sale of the Assets is "free and clear" of all Interests (excepting only the Assumed Obligations), but that the cash proceeds of the Sale will be received and held by the Debtor "free and clear" of any liens or interest.

68.    To the extent any possible holder of an "interest" objects to the Sale and provides legal and factual evidence that its Interest is valid and not avoidable, such interest will be adequately

protected by having it attach to the net proceeds of the sale, subject to any claims and defenses the

Debtor may possess with respect thereto.

69.     In summary, the Debtor should be authorized to sell the Assets free of all liens,

claims and interests pursuant to section 363(f) of the Bankruptcy Code.

> **D.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

70.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if—
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

71.     Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

Section 365(b)(1) of the Bankruptcy Code, in turn, describes the requirements for assuming an

unexpired lease or executory contract of a debtor.  This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)   cures, or provides adequate assurance that the trustee will promptly cure, such default …;
>
> (B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

72.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Env. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)  ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

73.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

74.     As set forth in the Purchase Agreement, to the extent any defaults exist under any executory contract or unexpired lease that is designated as an Assumed Contract, Buyer will obtain an Owner Consent (if such contract is a Service Rental Marketing Agreement) or, if such contract is not a Service Rental Marketing Agreement, cure any such default prior to the assumption and assignment.

75.     Moreover, to the extent that any counter-party to an Assumed Contract objects, the Debtor is prepared to adduce facts at the Approval Hearing to show the financial credibility of Buyer and its willingness and ability to perform under the Assumed Contracts.

76.     The Approval Hearing, therefore, will provide the Court and parties-in-interest the opportunity to evaluate and, if necessary, challenge the ability of Buyer to provide adequate assurance of future performance under the contracts to be assumed, as required under section

365(b)(1)(C) of the Bankruptcy Code.  The Court, accordingly, should authorize the Debtor to assume and assign the Assumed Contracts.

## VI.    CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter an order substantially in the form attached hereto as <u>Exhibit B</u> (a) approving the form and general terms of the Purchase Agreement, (b) authorizing the sale of the Assets to Buyer, subject only to the Assumed Obligations, free and clear of all other liens, claims, encumbrances and interests, (c) authorizing the assumption and assignment of the Assumed Contracts, and (d) granting related relief.

DATED this 29th day of June, 2023.

COHNE KINGHORN, P.C.


/s/ Jeffrey Trousdale
JEFFREY TROUSDALE
*Attorneys for* debtor-in-possession
Opulent Vacations, Inc.

# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**by and between**

**REBL UTAH, LLC, a Nevada limited liability company ("Buyer")**

**and**

**OPULENT VACATIONS, INC., a Utah corporation ("Seller")**

**June 29, 2023**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT, dated as of June 29, 2023 ("**Effective Date**") (collectively with the Exhibits and Schedules attached hereto, the "**Agreement**"), is made by and between OPULENT VACATIONS, INC., a Utah corporation (the "**Seller**"), and REBL UTAH, LLC, a Nevada limited liability company (the "**Buyer**"). Each of Buyer and Seller is referred to herein individually as a "**Party**" and collectively as the "**Parties.**"

### Background

A.      Seller operates a vacation rental property management business (the "**Business**").

B.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Acquired Assets (as defined below) of Seller related to the Business, and Buyer desires to receive an assignment of the Assumed Contracts (as defined below), all on the terms and subject to the conditions set forth in this Agreement.

### Agreement

Intending to be legally bound, incorporating the foregoing, in consideration of the mutual covenants and agreements contained herein and subject to the satisfaction of the terms and conditions set forth herein, the Parties hereby agree as follows:

1.      Defined Terms

Certain defined terms used in this Agreement and not specifically defined in context are defined in this Section 1 as follows:

1.1.      "Acquired Assets" has the meaning specified in Section 2.1(a).

1.2.      "Affiliate" means, with respect to a particular Party, any Person or entity controlling, controlled by or under common control with that Party, and any majority-owned entity of that Party and of its other Affiliates. For the purposes of the foregoing, control shall mean the ownership, directly or indirectly, of fifty percent (50%) of the voting stock or other equity interest.

1.3.      "Agreement" has the meaning specified in the Preamble.

1.4.      "Allocation Statement" has the meaning specified in Section 9.

1.5.      "Assumed Contracts" means the Contracts set forth on **Schedule 2.2**, as such schedule may be amended by Buyer prior to Closing. Schedule 2.2 includes a list of all contracts and leases which Buyer may elect prior to Closing to be assumed by the Seller and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code and the Consent of Owners, and in each instance an amount determined by the Seller in good faith and after reasonable investigation, which Seller believes represents the amount, if any, required to cure any defaults under each of the Assumed Contracts pursuant to section 365(b)(1) of the Bankruptcy Code and as limited by the Consent of Owners.

1.6.      "Assumed Obligations" has the meaning specified in Section 2.3.

1.7.      "Bankruptcy Case" and "Case" shall mean and refer to the bankruptcy case styled as *In re Opulent Vacations, Inc.*, Bankr. No. 23-21941, which is filed and pending in the Bankruptcy Court.

1.8.      "Bankruptcy Code" means 11 U.S.C. sections 101 et seq.

1.9.      "Bankruptcy Court" means the United States Bankruptcy Court for the District of Utah, where the Bankruptcy Case is pending.

1.10. "Business Day" means any day, excluding Saturday, Sunday and any other day on which commercial banks in Salt Lake City, Utah, are authorized or required by Law to close.

1.11. "Buyer" has the meaning specified in the Preamble.

1.12. "Business" has the meaning specified in the Recitals.

1.13. "Closing" has the meaning specified in Section 8.1.

1.14. "Commercial Leases" means the following commercial leases in which Seller is the tenant: (i) *Office Lease between Shrewd Minnow Sidewinder, LLC as Landlord and Utopian LVH, Inc. as Tenant, dated September 30, 2019*; and (ii) *KBC V Business Commons Lease Agreement, between RVH KBC 5, LLC as Landlord and Opulent Vacations, Inc. as Tenant*.

1.15. "Consent" means any consent, approval, order or authorization of, or any declaration, filing or registration with, or any application, notice or report to, or any waiver by, or any other action (whether similar or dissimilar to any of the foregoing) of, by or with, any Person which is necessary in order to take a specified action or actions in a specified manner and/or to achieve a specified result.

1.16. "Contract" means any contract, agreement, instrument, order, arrangement, commitment or understanding of any nature including sales orders, purchase orders, leases, subleases, data processing agreements, maintenance agreements, license agreements, sublicense agreements, loan agreements, promissory notes, security agreements, pledge agreements, deeds, mortgages, guaranties, indemnities, warranties, employment agreements, consulting agreements, sales representative agreements, joint venture agreements, buy-sell agreements, options or warrants.

1.17. "Contract Rights" means any right, power or remedy of any nature under any Contract including rights to receive property or services or otherwise derive benefits from the payment, satisfaction or performance of another party's Obligations, rights to demand that another party accept property or services or take any other actions, and rights to pursue or exercise remedies or options.

1.18. "Default" means (a) a breach, default or violation, (b) the occurrence of an event that with or without the passage of time or the giving of notice, or both, would constitute a breach, default or violation or cause an Encumbrance to arise, or (c) with respect to any Contract, the occurrence of an event that with or without the passage of time or the giving of notice, or both, would give rise to a right of termination, cancellation, amendment, modification, renegotiation or acceleration or a right to receive damages or a payment of penalties or the loss of any benefit or right of indemnification.

1.19. "Effective Date" has the meaning specified in the first paragraph of the Agreement.

1.20. "Encumbrance" means any interest, consensual or otherwise, in property securing a monetary obligation owed to, or a claim by, a Person other than the owners of the subject property, whether such interest is based on the common law, statute or Contract, or any lien, security interest, pledge, right of first refusal, mortgage, easement, covenant, restriction, reservation, conditional sale, prior assignment, or other encumbrance, claim, burden or charge of any nature.

1.21. "Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity.

1.22. "Excluded Assets" has the meaning specified in Section 2.1(c).

1.23. "Estate" shall mean the estate(s) of Seller arising and existing in connection with the Case pursuant to section 541 of the Bankruptcy Code.

1.24. "Governmental Body" means any: (a) nation, principality, republic, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multi-national organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

1.25. "Intellectual Property Assignment" has the meaning specified in Section 8.2(a).

1.26. "Intellectual Property" means all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice), registered and unregistered trademarks, service marks, trade names, and copyrights, unique or patentable chemical compounds, internet uniform resource locators, domain names, know-how, trade secrets, customer lists, vendor lists, improvements, proprietary information, technology, licenses, proprietary software, original works of authorship (including computer software) and similar rights to any of the foregoing anywhere in the world, all applications for any of the foregoing, and the right to prosecute, enforce, obtain damages relating to, settle or release any past, present, or future infringement thereof.

1.27. "Judgment" means any order, writ, injunction, citation, award, decree or other judgment of any nature of any Governmental Body.

1.28. "Knowledge" means actual knowledge of any of (a) Jeffrey Jenson, (b) any director or officer of Seller or (c) any current employee of Seller involved in the Business.

1.29. "Law" means any provision of any foreign, federal, state or local law, statute, ordinance, charter, constitution, treaty, code, rule, regulation or guideline.

1.30. "Non-Assignable Contract(s)" has the meaning specified in Section 2.1(a)(ii).

1.31. "Obligation" means any debt, liability or obligation of any nature, whether secured, unsecured, recourse, nonrecourse, liquidated, unliquidated, accrued, absolute, fixed, contingent, ascertained, unascertained, known, unknown or otherwise.

1.32. "Owner" means a homeowner that has executed a Service Rental Marketing Agreement.

1.33. The "Park City Operations" means and refers to Seller's Business, including all properties managed for Owners, in and within a 100 mile radius of Park City, Utah.

1.34. "Party(ies)" has the meaning specified in first paragraph of the Agreement.

1.35. "Person" means any individual, Entity or Governmental Body.

1.36. "Petition Date" means and refers to May 15, 2023 – the day on which Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.37. "Purchased Prepaid Contracts" means the Contracts set forth on **Schedule 2.1(b)**, as such schedule may be amended by Buyer prior to Closing.

1.38. "Proceeding" means any demand, claim, suit, action, litigation, audit, investigation, arbitration, administrative hearing or other proceeding of any nature.

1.39. "Sale Order" means an order by the Bankruptcy Court that (a) approves the sale of all of the Acquired Assets to Buyer and the assumption and assignment of all Assumed Contracts free and clear of all Encumbrances pursuant to Sections 363(b) and 363(f) of the United States Bankruptcy Code; (b) contains findings of fact and rulings that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the United States Bankruptcy Code and (c) contains findings of fact and rulings that Buyer is not a successor, for purposes of success liability claims, of Seller.

1.40. "Seller" has the meaning specified in the Preamble.

1.41. "Service Rental Marketing Agreements" means those certain "Opulent Vacations Full Service Rental Marketing Agreements" that were executed by Seller, as "Opulent Vacations" and homeowners, as "Owner", that are set forth on the attached **Schedule 1.40**.

1.42. "Tangible Property" means any furniture, fixtures, leasehold improvements, vehicles, office equipment, computer equipment, other equipment, inventories of raw materials and supplies, including all chemical libraries and chemical stocks, manufactured and purchased goods, parts, works-in-process and finished goods, machinery, tools, forms, supplies or other tangible personal property of any nature.

1.43. "Transaction Documents" means this Agreement and all other documents executed in connection herewith or therewith, including all Exhibits and Schedules hereto and thereto.

1.44. "Vehicle Lease" means the lease agreement by which Seller leases a 2022 Toyota truck.

2.    The Transaction.

  2.1.    Sale and Purchase of Acquired Assets.

    (a)    Subject to the terms and conditions of this Agreement and the Sale Order, at Closing, Seller shall sell, transfer, assign and convey to Buyer, free and clear of any and all Encumbrances, and Buyer shall assume and purchase, free and clear of any and all Encumbrances, all right, title and interest in and to the assets of Seller relating to the Business (excluding the Excluded Assets) set forth below (the "Acquired Assets"), and Seller shall assign to Buyer, and Buyer shall assume, the Assumed Obligations:

    (i)    All of the assets of Seller (tangible or intangible) related to Seller's Park City Operations, including but not limited to those assets set forth on **Schedule 2.1(a)**, the Purchased Prepaid Contracts listed on **Schedule 2.1(b)** and all Intellectual Property and goodwill related thereto;

    (ii)    Seller's Contract Rights under the Assumed Contracts, excluding Contract Rights under (A) this Agreement and any other Contracts entered into by Seller with Buyer in connection with the transactions contemplated by this Agreement; and (B) all Contract Rights under any Assumed Contracts requiring a Consent that is not obtained on or before the Effective Date or is not otherwise assigned to Buyer pursuant to the Bankruptcy Court order approving this Agreement ("**Non-Assignable Contract(s)**"); *provided* that, once such Consent is obtained, the Contract Rights under such Assumed Contract shall be deemed, automatically and without further action by the Parties, to be included in the Acquired Assets as of the date such Consent is delivered to Buyer;

    (iii)    Seller's files relating to the Acquired Assets including all documents related to Seller's Business, but excluding (A) Seller's minute books, stock books

and related organizational documents and (B) Seller's files, books and records relating to the Excluded Assets or to Seller's Obligations not included in the Assumed Obligations;

(iv) All licenses, permits, approvals, qualifications, consents and other authorizations of any Governmental Body necessary for the lawful ownership and operation of the Acquired Assets to the extent Seller possesses such licenses, permits, approvals, qualifications, consents and other authorizations and the same are transferable and may be assumed and assigned;

(v) All rights and claims of Seller against any third parties, directly arising from or directly related to the Acquired Assets; and

(vi) The goodwill related to, or arising out of, the Park City Operations.

(b) Seller and Buyer shall cooperate with each other to the extent reasonably requested and legally permitted so as to minimize any sales taxes. Unless otherwise agreed between the parties, Buyer shall take possession of the Acquired Assets upon Closing.

(c) Notwithstanding anything to the contrary contained in Section 2.1(a) or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the transactions contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of Seller after the Closing:

(i) All assets set forth on **Schedule 2.1(c)(i)**.

(ii) All of Seller's rights to insurance proceeds or other insurance contract recoveries in respect of any of the Excluded Assets;

(iii) All causes of action and claims under Chapter 5 of the Bankruptcy Code;

(iv) All of Seller's rights under leases and executory contracts which are not included in the Assumed Contracts;

(v) All of Seller's rights under prepaid contracts which are not included in the Purchased Prepaid Contracts;

(vi) Except to the extent listed on Schedule 2.1(b), all of Seller's pre-paid expenses, rights to refunds and related rights to recover overpayment, pre-payments, refunds, return premiums, etc., including without limitation those listed on **Schedule 2.1(c)(vii)**;

(vii) All rights of Seller under this Agreement and all agreements contemplated hereby;

(viii) All cash on hand and funds in Seller's bank accounts, excepting funds that are held in Trust for Owners related to the Park City Operations;

(ix) All of Seller's assets and contracts related to its "Buckingham Luxury Vacation Rentals" (Lake Tahoe) operations and its operations in Hawaii; and

(x) All of Seller's claims, causes of action and other legal rights and remedies (A) against Buyer with respect to the transactions contemplated by this Agreement and (B) relating to the Excluded Assets or to Seller's Obligations not included in the Assumed Obligations.

2.2. Assignment of Assumed Contracts. On the Closing Date, Seller shall assign, and Buyer shall assume, each of the Assumed Contracts set forth on **Schedule 2.2** which Buyer elects in writing prior to Closing to have assigned to Buyer, subject to Owner

Consent, which Consent shall include Owner's agreement to be paid its proportionate share of the Purchase Price as the full satisfaction of any "cure" amount owed under section 365 of the Bankruptcy Code. The assignment and assumption shall be pursuant to an Assignment and Assumption Agreement substantially in the form of **Exhibit B**. Seller shall assign the Assumed Contracts to Buyer pursuant to the Sale Order, to the fullest extent possible under section 365(f) of the Bankruptcy Code. Buyer's payment of the Purchase Price applicable to any Service Rental Marketing Agreement that becomes an Assumed Contract shall be in full satisfaction of any cure amount or obligation owed to the counterparty to the Assumed Contract. To the extent that any Owner does not agree to accept the pro rata portion of the Purchase Price applicable to such Owner's Service Rental Marketing Agreement, Buyer may inform the Seller that Buyer elects not to take an assignment of said Contract, at Buyer's option. In no event shall the "cure" owed to any Owner exceed the pro rata portion Purchase Price applicable to an Owner's Service Rental Marketing Agreement. Except as otherwise set forth herein, Seller is not assigning, and Buyer is not assuming, any contracts or leases other than the Assumed Contracts.

2.3. <u>No Other Obligations</u>. Notwithstanding any other provisions of this Agreement, Buyer shall not acquire the Acquired Assets subject to, and Buyer shall not in any manner assume or be liable or responsible for, any Obligations of Seller other than (a) the post-Petition Date, pre-Closing Obligations referenced below, (b) Seller's remaining loan obligations to Toyota Financial Services which relate to the 2022 Toyota truck that Seller is selling to Buyer pursuant to this Agreement, and (b) the post-Closing obligations under the Assumed Contracts (collectively, the "<u>Assumed Obligations</u>"). All other Obligations of Seller shall remain the sole responsibility of Seller. Further, no provision in this agreement shall be construed to make Buyer liable for any obligations of Seller under an executory contract or unexpired lease which is not an Assumed Contract.

2.4. <u>Consent of Third Parties</u>. Nothing in this Agreement shall be construed as an attempt by Seller to assign to Buyer pursuant to this Agreement any Non-Assignable Contract included in the Acquired Assets that is, by its terms or by Law, nonassignable without the consent of any other required party or parties, unless such consent or approval shall have been given or the Bankruptcy Court shall have authorized the assignment of such Contract.

3. <u>Purchase Price</u>. The purchase price to be paid by Buyer to Seller in consideration of the Acquired Assets and Assumed Obligations (the "**<u>Purchase Price</u>**") shall be the assumption of up to 75% of the amounts owed by Seller under the Rental Marketing Services Agreements that Buyer assumes with the consent of the applicable Owner pursuant to the terms of this Agreement and the assumption of the obligations of Seller under the Commercial Leases and Vehicle Lease, plus cash consideration of $25,000, which shall be paid by Buyer to Seller only upon Closing (the "**<u>Cash Consideration</u>**"), including a $5,000 non-refundable deposit to be paid upon the filing of a motion to approve this Agreement (the "**<u>Cash Deposit</u>**"); provided, however, that the Cash Deposit shall be refundable if the Seller accepts a Higher or Better Offer (as defined herein) for the Purchased Assets, and Seller shall pay to Buyer a breakup fee of $50,000 in consideration for Buyer's time and investment in pursuing the transactions contemplated by this Agreement. Upon the Closing, the amount of the Cash Deposit shall be credited towards the Cash Consideration.

4. <u>Representations of Seller</u>.

As a material inducement to Buyer to enter into this Agreement, knowing that Buyer is relying thereon, and to carry out the transactions contemplated hereunder, Seller represents and warrants to Buyer that, except as specifically referenced in the schedule of exceptions attached to this Agreement as <u>Schedule 4</u> (the "**<u>Schedule of Exceptions</u>**"),

which exceptions shall be deemed to be part of the representations and warranties as if stated therein:

4.1. <u>Organization</u>. Seller is a Utah corporation, duly organized, validly existing and in good standing under the laws of Utah. Subject to the Bankruptcy Court's authorization, Seller possesses the corporate power and authority to own, lease and operate its assets, conduct its business as and where such business is presently conducted, and enter into this Agreement and the other Transaction Documents to which it is a party and to perform its Obligations hereunder and thereunder.

4.2. <u>Enforceability</u>. Subject to the entry of the Sale Order, this Agreement constitutes the valid and legally binding agreement of Seller, enforceable against Seller in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

4.3. <u>Non-contravention</u>. Subject to the entry of the Sale Order, neither the execution and delivery of this Agreement by Seller, nor the consummation or performance by Seller of the transactions contemplated by this Agreement, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any Governmental Body to which Seller is subject or any provision of its certificate of incorporation, bylaws or other governing documents or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to declare a Default, accelerate, terminate, modify, or cancel, require any notice or consent or exercise any remedy under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of the Acquired Assets are subject (or result in the imposition of any Lien upon any of the Acquired Assets). Other than the actions required to obtain entry of the Sale Order, Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Body in order for the parties to consummate the transactions contemplated by this Agreement.

4.4. <u>Legal Compliance</u>. To the best of Seller's knowledge, and except as otherwise disclosed in writing to Buyer, Seller has complied with all applicable Laws relating to the ownership or use of the Acquired Assets, and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against it alleging any failure to so comply.

4.5. <u>Disclaimer of Other Representations and Warranties</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS <u>SECTION 4</u>, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF ITS ASSETS (INCLUDING, WITHOUT LIMITATION, THE ACQUIRED ASSETS), LIABILITIES OR OPERATIONS, INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.

5.   <u>Representations and Warranties of Buyer</u>.

Knowing that Seller is relying thereon, Buyer represents and warrants to Seller, as follows:

5.1. <u>Organization</u>. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Nevada. Buyer possesses the power and authority to own, lease and operate its assets, conduct its business as and where such business is presently conducted, and enter into this Agreement and the other

Transaction Documents to which it is a party and to perform its Obligations hereunder and thereunder.

5.2. <u>Authorization; Compliance with Other Instruments and Laws; and Effect of Agreement and Other Transaction Documents</u>. Buyer's execution, delivery and performance of this Agreement, and its consummation of the transactions contemplated by this Agreement, (a) have been duly authorized by all necessary actions by its board of directors; (b) do not constitute a violation of or Default under its certificate of incorporation, bylaws or other governing documents; (c) do not constitute a Default under any Contract to which Buyer is a party or by which Buyer is bound; and (d) do not constitute a violation of any Law or Judgment that is applicable to it or to its businesses or assets, or to the transactions contemplated by this Agreement. Assuming the due authorization, execution and delivery hereof by Seller, this Agreement constitutes the valid and legally binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by Laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

5.3. <u>Availability of Funds</u>. Buyer has made arrangements to secure sufficient funds to permit Buyer to pay the Purchase Price in accordance with the requirements set forth in <u>Section 3</u> hereof, provided, however, that if financial commitments made by third parties to Buyer are not honored such that Buyer is not able to obtain sufficient funds to pay the Purchase Price on the date of the intended Closing, Buyer and Seller shall cooperate to accomplish the transactions contemplated herein as soon as practicable following such date.

5.4. <u>Brokers and Finders</u>. Buyer and its officers and agents have incurred no Obligation for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement.

6. <u>Covenants and Agreements</u>.

6.1. <u>Transition and Cooperation</u>. From and after the Effective Date, (a) Seller shall not take any action, alone or together with others, which obstructs or impairs the smooth transition and transfer to Buyer of the Acquired Assets; (b) Seller shall promptly provide access to Buyer to all correspondence, papers, documents and other items and materials received by Seller found to be in its possession which pertain to the Acquired Assets; and (c) Seller shall cooperating with and assist Buyer in contacting and negotiation with an Owner an extension of such Owner's Service Rental Marketing Agreement. In accordance with <u>Section 2.1(b)</u>, Buyer shall be responsible for the transfer of all the Acquired Assets and shall pay all packaging, freight, services, insurance and other fees and expenses associated with the transfer of the Acquired Assets. Without limiting the foregoing, Seller may engage independent contractors, at Buyer's expense, to provide services related to the preparation and transfer of the Acquired Assets to Buyer. For thirty (30) days after the Closing, or such longer period as mutually agreed by the Parties, Seller shall provide reasonable cooperation to affect all transfers of Acquired Assets that require special handling or packaging and Seller shall maintain all sensitive components of the Acquired Assets in proper storage so as to preserve the same until such transfers are accomplished.

6.2. <u>Pre-Closing Assistance to Buyer</u>. Seller shall identify all licenses, permits, client approvals, master agreements, governmental approvals, certifications and all other similar qualifications, consents or approvals that may be necessary or advisable for Buyer to continue operating the Business after Closing and/or to continue providing services to Seller's clients under current and anticipated contracts after Closing. As partial consideration for the Purchase Price, Seller shall designate one or more employees or

officers to assist Buyer in applying for, and/or to obtain, all such licenses, permits, client approvals, master agreements, governmental approvals, certifications, etc.

6.3.   Further Assurances.  After the Effective Date, at Buyer's request and expense, Seller shall promptly execute and deliver all such further agreements, certificates, instruments and documents, and perform such further actions, as Buyer may reasonably request in order to fully consummate the transactions contemplated hereby and carry out the purposes and intent of this Agreement, including, without limitation, taking all action necessary to assign the Non-Assignable Contracts to Buyer.

6.4.   Transfer Taxes.  Buyer shall pay all sales, use, stamp, recording or other similar transfer taxes required to be paid in connection with the transfer of the Acquired Assets pursuant to this Agreement.  Seller shall be responsible for and shall pay any and all taxes arising or resulting from or in connection with the ownership of the Acquired Assets or operation of the Business attributable to any taxable period preceding and ending on the Effective Date or, in the case of any taxable period which includes but does not end on the Effective Date, the portion of such taxable period up to and including the Effective Date.  In the case of any taxes other than income taxes, such portion shall be the amount of such tax (including any increase or additions to such tax) for such taxable period multiplied by a fraction the numerator of which is the number of days in such taxable period which occur on or before the Effective Date and the denominator of which is the number of days in the entire taxable period.  Buyer shall be responsible for and shall pay any and all taxes arising or resulting from or in connection with the ownership or use of the Acquired Assets or operation of the Business by Purchaser attributable to any taxable period beginning after the Effective Date or, in the case of any taxable period which includes but does not end on the Effective Date, the portion of such taxable period beginning on the day after the Effective Date.

7.   Conditions Precedent; Bankruptcy Process for Obtaining Approval of the Sale.

7.1.   Best Efforts.  Subject to section 7.7, below, Seller agrees to use its best efforts to secure entry of the Sale Order on or before June __, 2023.  Promptly after full execution of this Agreement by all Parties, Seller shall prepare and file a motion requesting approval of this Agreement and the transactions contemplated hereby, and entry of the Sale Order.

7.2.   Contingent Upon Court Approval.  This Agreement shall be binding upon the Parties as of the date when each of the Parties has executed this Agreement, but the obligations of the Parties, other than Seller's obligation under section 7.1, are subject to and contingent upon the entry of the Approval Order.

7.3.   Not Subject to Buyer's Due Diligence.  Buyer completed all inspections and other due diligence regarding the Business and the Acquired Assets that it deemed prudent and necessary before executing this Agreement.  This Agreement is not subject to Buyer's due diligence.

7.4.   Owner to Consent to Assumption of Minimum Number of Service Rental Marketing Agreements.  This Agreement is subject to not less than twenty (20) of the Owners executing agreements with Buyer pursuant to which: (i) such Owners extend the term of their respective Service Rental Marketing Agreement for a period of not less than two (2) or three (3) years (as determined by Buyer) from the Closing Date, or, in the alternative, agree to such new terms with Buyer as Buyer deems reasonably acceptable, and (ii) such Owners agree that the portion of the past due amounts owned for rent only under such Service Rental Marketing Agreement with an Owner that is assumed by Buyer is an amount not to exceed 75% of the past due amount for rent only (as determined by Buyer) with Buyer being obligated to make such payments on each anniversary of the

Closing Date, the amount of which payments on such anniversary date shall be equal to the amounts payable by Buyer of such past due amount divided by the number of years that the term of such Service Rental Marketing Agreement is extended for; provided, however, in Buyer's discretion for a particular Owner, Buyer may elect to pay such amounts at such accelerated rate as Buyer may determine appropriate. For avoidance of doubt, in no event shall Buyer assume any past due amounts under such Service Rental Marketing Agreement for any amounts other than rent. As part of the assumption of such Service Rental Marketing Agreements, Buyer shall receive all future reservations and advance deposits applicable to such Service Rental Marketing Agreements so assumed.

7.5. Commercial Leases and Vehicle Lease. This Agreement is subject to each landlord under the Commercial Leases confirming the assumption by Buyer of the obligations of Seller under such Commercial Leases and the counterparty to the Vehicle Lease confirming the assumption by Buyer of the obligations of Seller under the Vehicle Lease.

7.6. Seller Employees. This Agreement is subject to: (i) Seller's best efforts to cause its employees to agree to become employees of Buyer on such terms and conditions as Buyer determines appropriate in Buyer's reasonable business judgment, and (ii) the assignment to Buyer by Seller of all rights of Seller under all employment agreements with any current or former employee of Seller.

7.7. Buckingham Luxury Vacation Rentals (Lake Tahoe). Subject to the successful Closing of this Agreement, and subject to higher and better offers and Bankruptcy Court approval, Buyer shall have an option for a period of four (4) months after the Closing Date to acquire Seller's "Buckingham Luxury Vacation Rentals" business for $1,250,000 (which purchase price is based on all 70 homeowners that are part of Seller's "Buckingham Luxury Vacation Rentals" business agreeing to a long term extension of their respective service rental marketing agreements with Buyer resulting in an allocation of $17,857.14 per homeowner). The agreement documenting such option agreement shall include the concept of Buyer not having to close on the purchase of such business unless and until at least twenty (20) homeowners execute a long term extension of such homeowners service rental marketing agreements on terms that are acceptable to Buyer in its business judgment with the amount of the purchase price payable by Buyer at closing equal to the number of homeowners executing such long term extensions of such homeowners service rental marketing agreements multiplied by $17,857.14, with the balance of the purchase price placed in an escrow holdback account for a period of six (6) months that provides for: (i) a periodic release from such holdback account of $17,857.14 to Seller for each additional homeowner during such six (6) month period that executes a service rental marketing agreement with Buyer, and (ii) a release from such holdback account to Buyer any funds remaining in such holdback account at the end of such six (6) month period.

7.8. Implementing Agreement. The Parties will use their best efforts in good faith to perform and fulfill all conditions and obligations to be fulfilled or performed by them hereunder, to the end that the transactions contemplated hereby will be fully and timely consummated.

7.9. Consents and Approvals. The Parties will use their reasonable best efforts to obtain all necessary consents and approvals to the performance of its obligations under this Agreement and the transactions contemplated hereby. The Parties will make all filings, applications, statements and reports to all Governmental Authorities which are required to be made prior to the Closing Date pursuant to any applicable statute, rule or regulation in connection with this Agreement and the transactions contemplated hereby.

7.10. Access to Information. Seller shall give Buyer and Buyer's representatives full access during normal business hours, to all of the facilities, properties, books, contracts,

DocuSign Envelope ID: 53DE577D-82BF-4928-A9C0-846F6B38A346

commitments and records of Seller.  In order that the Buyer may have full opportunity to make such examination and investigation as it may desire of the business and affairs of the Seller, the Seller will furnish the Buyer and its representatives during such period with all such information as such representatives may reasonably request.

7.11.  <u>Subject to Higher and Better Offers</u>.  This sale and the transactions contemplated by this Agreement are subject to higher and better offers.  If another buyer is willing to purchase the assets of the Seller for consideration which the Seller, in the exercise of its business judgment, determines is a higher or better offer (a "<u>Higher or Better Offer</u>"), then Seller has the right to accept the Higher or Better Offer.  Further, to the extent Seller receives a Higher or Better Offer from a third party, Seller will provide Buyer an opportunity to exceed the Higher or Better Offer and to purchase the Acquired Assets (and/or other assets of the Seller) pursuant to an even higher or better offer.  Seller intends to publicize the sale of the Acquired Assets, and to provide other parties with access to information concerning the Acquired Assets and other assets of the Seller; provided, however, that any party provided access to information concerning the Seller's assets first shall have executed an appropriate non-disclosure agreement.  Subject to Seller's receipt of at least one qualified competing offer for the Acquired Assets, Seller will ask the Bankruptcy Court to approve a public auction sale of the Seller's assets to be conducted as soon as practicable, subject to Bankruptcy Court approval of auction procedures proposed by Seller.

7.12.  <u>Seller Has No Liability</u>.  Buyer acknowledges and understands that there is a reasonable likelihood that the Closing may not occur because, among other reasons: (a) the contingencies described in <u>Section 7.2</u> do not occur; and/or (b) Seller might elect to accept a higher or better offer as described in <u>Section 7.7</u>.  As such, Seller shall have no liability to Buyer or any obligation to reimburse Buyer for any costs or expenses Buyer incurs in connection with this Agreement or the transactions contemplated hereunder, including Buyer's costs or expenses in completing due diligence, in connection with obtaining financing, or otherwise.

7.13.  <u>Continued Operations</u>.  Subject to any restrictions and obligations imposed by the Bankruptcy Code and the Bankruptcy Court and its orders, through the earlier of (a) the Closing Date or (b) the date of termination of this Agreement pursuant to Section 10, Seller will continue to operate the Business and shall not engage in any practice, take any action, or enter into any transaction outside the ordinary course of business without the prior written consent of Buyer.

8.    <u>Closing.</u>

8.1.  <u>Closing</u>.  The closing of the sale of the Acquired Assets and assumption by Buyer of the Assumed Obligations (the "**Closing**") shall take place on: (a) the later of (i) two business days after the Sale Order has been entered, or (ii) the first business day on which the Sale Order is no longer subject to a stay under Federal Rule of Bankruptcy Procedure 6004(g), a stay applicable by order of the Bankruptcy Court or by order of another court with jurisdiction to stay an order entered in this Case, or otherwise; or (b) such other date mutually agreeable to Seller and Buyer.

8.2.  <u>Closing Deliverables of Seller</u>.  The obligations of Buyer under this Agreement are subject to the delivery by Seller at the Closing of each of the following (any one or more of which may be waived in whole or in part by Buyer at its sole option and which conditions are set out herein for the exclusive benefit of Buyer):

(a)    Intellectual Property.  Assignment of Acquired Assets constituting Intellectual Property in the form attached hereto as Exhibit "A" (the "Intellectual Property Assignment"), duly executed by Seller;

(b)    Bankruptcy Court Order.  An Order of the Bankruptcy Court pursuant Section 363 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Buyer, approving this Agreement and authorizing Seller to transfer the Acquired Assets to Buyer free and clear of any and all Encumbrances and which contains a finding that Buyer has purchased the Acquired Assets in good faith under Section 363(m) of the Bankruptcy Code;

(c)    Assignment and Assumption Agreement.    An assignment and assumption agreement, in the form attached hereto as Exhibit B (the "Assumption Agreement"), duly executed by Seller and which has been approved by an Order of the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code; and

(d)    Other Documents.  Such other agreements, certificates, instruments and documents reasonably requested by Buyer in order to fully consummate the transactions contemplated by this Agreement and carry out the purposes and intent of this Agreement.

8.3.    Closing Deliverables of Buyer.  The obligations of Seller to proceed with the Closing hereunder are subject to the delivery by Buyer at the Closing of each of the following (any one or more or which may be waived in whole or in part by Seller at their sole option and which conditions are set out herein for the exclusive benefit of Seller):

(a)    Intellectual Property Assignment.    The Intellectual Property Assignment, duly executed by Buyer;

(b)    Officer's Certificate.  A certificate of an officer of Buyer (A) certifying and attaching all requisite resolutions or actions of Buyer's approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (B) certifying to the incumbency and signatures of the officers of Buyer executing this Agreement and any other Transaction Document;

(c)    Assignment and Assumption Agreement.  The Assumption Agreement, duly executed by Buyer; and

(d)    Other Documents.  Such other agreements, certificates, instruments and documents reasonably requested by Seller in order to fully consummate the transactions contemplated by this Agreement and carry out the purposes and intent of this Agreement.

9.    Allocation of Purchase Price.  The Purchase Price plus the Assumed Obligations shall be set forth on Exhibit "C" (the "**Allocation Statement**") and shall be allocated among the Acquired Assets in accordance with Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder (and any similar provision of state, local or foreign Law, as appropriate).  Buyer and Seller and their respective Affiliates shall report, act and file all Tax Returns (including Internal Revenue Service Form 8594 and all corresponding state or local tax forms) in all respects and for all purposes consistent with the Allocation Statement unless prohibited by applicable law.  Neither Buyer nor Seller, nor any of their respective Affiliates shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the information set forth on the Allocation Statement, unless required to do so by applicable Law, and in such event only after giving the other party at least twenty (20) days prior written notice prior to taking such position.

10.    Termination.

10.1  This Agreement may be terminated at any time on or prior to Closing:

(a)    with the written mutual consent of both Seller and Buyer;

(b)    by Buyer or Seller, if any court, including the Bankruptcy Court, or Governmental Authority has issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplate by the Agreement, and such order, decree, ruling or other action has become final and non-appealable, provided that this Agreement shall not be terminated unless the party terminating this Agreement has utilized its reasonable best efforts to oppose the issuance of such order, decree or ruling or the taking of such action;

(c)    by either Buyer or Seller, if the other party is in material breach of any representation, warranty, covenant or agreement contained in this Agreement and fails to cure such breach within fifteen (15) days of notice of such breach by the non-breaching party (provided, that no party may terminate the Agreement under this clause if such party is in material breach of its obligations under this Agreement);

(d)    by Buyer if, through no fault of Buyer, the Bankruptcy Court has not issued on or before August 1, 2023, the Sale Order, reasonably acceptable to Buyer, approving the transactions contemplated hereby;

(e)    by either Buyer or Seller, if the Closing has not occurred on or prior to September 1, 2023, for any reason other than the breach of any provision of this Agreement by the party terminating this Agreement.

In the event of any termination pursuant to this Section 10.1, written notice setting forth the reasons thereof shall forthwith be given by Buyer, if Buyer is the terminating party, to Seller, or by Seller, if Seller is the terminating party, to Buyer.

10.2  Effect of Termination; Remedies.

(a)    In the event of termination pursuant to Section 10.1 for any reason other than a material breach by Buyer, this Agreement shall become null and void and have no effect with no liability on the part of Seller or Buyer, or their respective directors, officers, employees, agents, or stockholders, with respect to this Agreement.

(b)    This Section 10 shall terminate upon Closing.

10.3  Buyer's Breach.  In the event Buyer defaults in performance of its obligations described in Sections 2.1, 2.2 and/or 8.3 of this Agreement and fails to cure breach within five business days after notice from Seller, then automatically and without further notice, Seller may terminate this Agreement and market and sell the Acquired Assets without notice to Buyer.

11.    Employees; Books & Records.

11.1.  Termination of All Employees by Seller.  Contemporaneous with the Closing, Seller shall terminate and/or "lay off" all employees of Seller (except only employees, if any, whose employment contracts are Assumed Contracts and which are assigned to Buyer at Closing).

11.2.  Buyer's Right to Offer Employment.  At any time, Buyer may offer to hire, on an "at will" basis or any other basis determined by Buyer in its sole discretion, any past or present employees of Seller (the "Former Employees").  Buyer is not required to offer or provide to the Former Employees the wage, salary and/or benefits paid or provided by Seller.

12.    Post-Closing Obligations.

12.1.  Further Assurances.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action, including the execution and delivery of additional

DocuSign Envelope ID: E3DF5275B-82BF-4928-A9C0-946F6B38A24D

instruments and documents, as the other Party reasonably may request, all at the sole cost and expense of the requesting Party.

12.2.  Litigation Support.   In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand regarding a third party(ies) in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction occurring on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, reasonably make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

12.3.  Access to Books and Records.   For a period of two years after the Closing, Buyer shall reasonably maintain, and shall provide Seller and its representatives with access to, the books and records of Seller that are possessed by Buyer at any time after Closing. Among other things, and at Seller's sole expense, Buyer shall cooperate with Seller and shall direct Buyer's accounting department and/or other employees, as applicable, to print such reports, locate such documents and provide copies of such of Seller's books and records as Seller deems necessary (a) to investigate, challenge and/or dispute claims against the Estate, and/or (b) in connection with the administration of the Estate.

13.    Miscellaneous.

13.1.  Fees and Expenses.   Each of Buyer, on the one hand, and Seller, on the other hand, shall bear its own fees and expenses incurred in connection with the transactions contemplated hereby. To the extent that Seller and its officers and agents have incurred any Obligation for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement, such payments shall be paid from Seller's bankruptcy estate, subject to Bankruptcy Court approval.

13.2.  Notices.  All notices, consents or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given (A) when delivered personally; (B) one (1) Business Day after being sent by a nationally recognized overnight delivery service, postage or delivery charges prepaid; or (C) four (4) Business Days after being sent by registered or certified mail, return receipt requested, postage charges prepaid.  Notices also may be given by facsimile and shall be effective on the date transmitted if confirmed within forty-eight (48) hours thereafter by a signed original sent by one of the methods provided in the preceding sentence.  A Party may change its address for notice and the address to which copies must be sent by giving notice of the new addresses to the other parties in accordance with this Section; *provided* that any such change of address notice shall not be effective unless and until received. Notices shall be sent to the addresses set forth below:

If to Seller, to:

Opulent Vacations, LLC
1960 Sidewinder Dr., Suite 212
Park City, UT 84060
Attn:  Jeff Jenson
Email:  jjenson@opulentvacations.com


With a copy (which shall not constitute notice) to:

Jeffrey L. Trousdale

DocuSign Envelope ID: F3DF5775-82BF-4928-A9C0-946F6B38A24D

111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Email:  jtrousdale@ck.law


With a copy (which shall not constitute notice) to:

D. Ray Strong
201 South Main Street, Suite 450
Salt Lake City, Utah 84111
Email:  rstrong@thinkbrg.com


If to Buyer, to:

c/o REBL Utah, LLC
2015 NW 39th Street, Suite 200
Lincoln City, OR 97367
Attn:  Jordan Grant
Email: Jordan.g@advancedlodging.com


With a copy (which shall not constitute notice) to:

Brad Miller
Brix Law LLP
75 SE Yamhill Street, Suite 202
Portland, OR 97214
Email:  bmiller@brixlaw.com


13.3.  <u>Entire Understanding</u>.   This Agreement, together with the Exhibits and Schedules hereto and the other Transaction Documents, states the entire understanding between the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous oral and written communications and agreements, with respect to the subject matter hereof, including all confidentiality letter agreements and letters of intent previously entered into by the Parties.  No amendment or modification of this Agreement shall be effective unless in writing and signed by the Party against whom enforcement is sought.

13.4.  <u>Assignment</u>.  This Agreement shall bind, benefit, and be enforceable by and against Buyer and Seller and their respective successors and permitted assigns.  Neither Party shall in any manner assign any of its rights or obligations under this Agreement without the express prior written consent of the other Party.

13.5.  <u>Waivers</u>.   Except as otherwise expressly provided herein, no waiver with respect to this Agreement shall be enforceable unless in writing and signed by the Party against whom enforcement is sought.  Except as otherwise expressly provided herein, no failure to exercise, exercise, delay in exercising, or single or partial exercise of any right, power or remedy by any Party, and no course of dealing between or among any of the Parties, shall constitute a waiver of, or shall preclude any other or further exercise of, any right, power or remedy.

13.6.  <u>Severability</u>.  If any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions hereof shall not be affected thereby and shall be enforceable without regard thereto. If any term or other provision of this

Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced under any applicable Law in any particular respect or under any particular circumstances, then, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party, (a) such term or provision shall nevertheless remain in full force and effect in all other respects and under all other circumstances, and (b) all other terms, conditions and provisions of this Agreement shall remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated hereby are fulfilled to the fullest extent possible.

13.7.  <u>Counterparts</u>.    This  Agreement  may  be  executed  in  any  number  of counterparts, each of which when so executed and delivered shall be an original hereof, and it shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart hereof.

13.8.  <u>Section Headings</u>.  Section and subsection headings in this Agreement are for convenience of reference only, do not constitute a part of this Agreement, and shall not affect its construction or interpretation.

13.9.  <u>References</u>.  All words used in this Agreement shall be construed to be of such number and gender as the context requires or permits.  The word "including" when used herein shall be deemed followed by the words "without limitation."

13.10. <u>Controlling Law</u>.    THIS  AGREEMENT  IS  MADE  UNDER,  AND  SHALL  BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF UTAH.

13.11. <u>Bulk Transfer Laws</u>.  Buyer acknowledges that Seller will not, and has no obligation in connection with this Agreement to, comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

13.12. <u>Jurisdiction and Process</u>.   The Bankruptcy Court in Utah has exclusive jurisdiction to hear and decide any Proceeding, and to settle any Disputes, which may arise out of or in connection with this Agreement ("**<u>Disputes</u>**"), and, for these purposes, each Party irrevocably submits to the jurisdiction of the Bankruptcy Court and  irrevocably waives any objection which it might at any time have to the Bankruptcy Court being nominated as the forum to hear and decide any Proceedings and to settle any Disputes and agrees not to claim that such Court is not a convenient or appropriate forum.   Process by which any Proceedings are begun in the Bankruptcy Court may be served on any of the Parties by being delivered to such Party's address set forth in <u>Section 13.3</u>.  Nothing contained in this <u>Section</u> shall affect the right to serve process in another manner permitted by law.

13.13. <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ALL RIGHT TO  TRIAL  BY  JURY  IN  ANY  PROCEEDING  (WHETHER  BASED  IN  CONTRACT,  TORT  OR OTHERWISE)  ARISING  OUT  OF  OR  RELATING  TO  OR  CONTEMPLATED  UNDER  THIS AGREEMENT,  OR  THE  ACTS  IN  THE  NEGOTIATION,  ADMINISTRATION,  PERFORMANCE  OR ENFORCEMENT HEREOF.

13.14. <u>Third-Party Beneficiaries</u>.  No provision of this Agreement is intended to or shall  be  construed  to  grant  or  confer  any  right,  express  or  implied,  to  enforce  this Agreement, or any remedy for Default under this Agreement, to or upon any Person other than the Parties hereto and their respective successors and permitted assigns.

13.15. <u>Delivery by Facsimile or Electronic Means</u>.  This Agreement and each other Transaction Document, and each other agreement or instrument entered into in connection

DocuSign Envelope ID: 53DF577B-82BF-492B-A9C0-846F6B38A24B6

herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other mutually agreed upon electronic means of delivery, shall be treated in all manner and respect as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No Party hereto or to any such agreement or instrument contemplated hereby shall raise the use of a facsimile machine or other mutually agreed upon electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other mutually agreed upon means of electronic transmittal as a defense to the formation or enforceability of a Contract and each such Party forever waives any such defense.

13.16. <u>Interpretation of Agreement</u>. The Parties hereto acknowledge and agree that this Agreement has been negotiated at arm's-length and among Parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties as set forth in this Agreement.

*[Signature Page Follows]*

The Parties have executed this Asset Purchase Agreement, intending to be legally bound hereby, as of the date first above written.

**SELLER:**

OPULENT VACATIONS, INC., a Utah corporation

By: _____

Name: Jeff Jenson

Title: Director and CEO

**BUYER:**

REBL UTAH, LLC, a Nevada limited liability company

By: _____

Name: Kyle Murphy

Title: Authorized signer

# EXHIBIT B

*Prepared and Submitted by:*

Jeffrey Trousdale (14814)
**Cohne Kinghorn, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone:  (801) 363-4300
E-mail:  jtrousdale@ck.law

*Attorneys for* debtor-in-possession
Opulent Vacations, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>**OPULENT VACATIONS, INC.,**<br><br>Debtor. | Bankruptcy No. 23-21941<br><br>Chapter 11<br>(Subchapter V)<br><br>Hon. Joel T. Marker |

**ORDER (A) AUTHORIZING THE SALE OF PARK CITY ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) WAIVING THE 14-DAY STAY PERIOD AND (D) GRANTING RELATED RELIEF**

This matter came before the Court on August 1, 2023, at 2:00 p.m. (the "**Approval Hearing**") upon the *Motion for an Order (A) Authorizing the Sale of the Debtor's Park City Assets Free and Clear of Liens, Claims and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Waiving the 14-Day Stay Period and (D) Granting Related Relief,* dated June 29, 2023 [Docket No. --] (the "**Motion**"), filed by Opulent Vacations, Inc., debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 bankruptcy case under subchapter V (the "**Case**").  At the Approval

Hearing, counsel for the Debtor and other counsel and parties-in-interest entered their appearances on the record.

The Motion requests, *inter alia*, entry of an order (the "**Approval Order**"): (a) authorizing the sale (the "**Sale**") to REBL Utah, LLC (as used herein, "**Buyer**") of substantially all of the Debtor's assets related to its Park City, Utah operations (collectively, the "**Assets**"),[1] as more particularly identified in the *Asset Purchase Agreement* (the "**Purchase Agreement**"),[2] subject to the Assumed Obligations[3] and free and clear of all other liens, claims, encumbrances and interests; (b) authorizing the assumption and assignment to of certain executory contracts and unexpired leases, *i.e.*, the Assumed Contracts; (c) waiving the 14-day stay otherwise applicable under Rules 6004(h) and 6006(d); and (d) granting related relief.

Based upon the evidence received at the Approval Hearing, the statements and representations of counsel and all persons who desired to be heard at the Approval Hearing, having carefully reviewed the Motion and other relevant pleadings and documents of record in the Case, having inquired into the legal sufficiency of the evidence adduced, having considered such other and further matters as the Court deemed appropriate, and good cause appearing, the Court hereby

**FINDS AND CONCLUDES** as follows:

A.      the Court has jurisdiction over the Case and the contested matter presented by the Motion pursuant to 28 U.S.C. §§ 157 and 1334;

B.      venue of the Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409;

---

[1]      The term "Acquired Assets" is defined in section 2.1(a) of the Purchase Agreement.  As used herein, the term "Assets" refers to the "Acquired Assets."  If not otherwise defined herein, capitalized terms used in this Order shall have the meaning provided in the Purchase Agreement or, if not defined therein, in the Motion.  Most such defined terms are listed and defined under Section 1 of the Purchase Agreement.

[2]      A copy of the Purchase Agreement is of record as Exhibit A to the Motion, as revised in the Notice of Supplemental Exhibit filed at Docket No. --.

[3]      The "Assumed Obligations" are set forth in section 2.3 of the Purchase Agreement.

C.      the Motion and the contested matter arising pursuant thereto is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O);.

D.      the statutory and legal predicates for the relief sought in the Motion are sections 105(a), 363(b), 363(f), 363(m), 363(n) and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), Federal Rules of Bankruptcy Procedure 2002, 6004, 6006, and 9014, and related Local Rules.

E.      as evidenced by the certificates of service on file with the Court [Docket No. --], and based on the representations of counsel at the Approval Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Auction, the proposed Sale, the Approval Hearing, and the assumption and assignment of the Assumed Contracts has been provided to all parties-in-interest in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014, (ii) such notice was good, sufficient and appropriate in the particular circumstances, and (iii) no other or further notice of the Motion, the Auction, the Sale, the Approval Hearing, or the assumption and assignment of the Assumed Contracts is or shall be required;

F.      the Debtor has articulated good and sufficient reasons for: (i) approving the Sale of the Assets subject only to the Assumed Obligations and "free and clear" of all other liens, claims, encumbrances and interests; (ii) authorizing the Debtor to assume and to assign to Buyer the Assumed Contracts; and (iii) waiving the fourteen-day stay otherwise applicable under Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d);

G.      the Debtor has marketed the Assets and conducted the Sale process reasonably, in good faith and in compliance with the Procedures Order;

H.      approval of the Purchase Agreement and consummation of the Sale at this time are in the best interests of the Debtor, its creditors, its estate and all other parties-in-interest;

I.      the Debtor has demonstrated both (1) a good, sufficient and sound business purpose and justification, and (2) compelling circumstances to proceed with the Sale prior to, and outside of, a plan of reorganization pursuant to section 363(b) of the Bankruptcy Code, in that, among other things –

(i)      given the Debtor's current financial and business condition, neither Buyer nor any other prospective buyer appears willing to proceed to acquire the Debtor's business unless the Sale can be consummated quickly,

(ii)      immediate consummation and closing of the Sale is important to the Buyer,

(iii)      the Debtor diligently and in good faith has marketed the Assets as reasonably calculated to secure the highest and best offer therefor by, among other things, (a) contacting persons the Debtor believed might have interest in the Assets, and (b) providing relevant due diligence information to potential purchasers,

(iv)      the Sale of the Assets at this time, pursuant to 11 U.S.C. § 363(b), is necessary to preserve, and to capture for the benefit of the Debtor's bankruptcy estate, the enterprise value of the Assets and to maximize the value of the Assets for the benefit of the Debtor's estate and all interested constituencies,

(v)      there is meaningful risk that delaying the Sale of the Assets will result in a diminution in the value of the Assets via, among other things, (a) accrual of operating losses and mounting unpaid administrative expenses, (b) an increase in the Debtor's potential liability for property taxes and/or use taxes assessed or to be assessed against the Assets, and (c) erosion of the Debtor's customer base and goodwill, and

(vi)      any delay of the Sale of the Assets may result in an alternative outcome that will achieve far less value for creditors;

J.      a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities;

K.      as used in this Order, the term **"Buyer"** refers to REBL Utah, LLC, or its designee(s), since no higher and better offer was submitted for the Assets by a qualified bidder prior to the expiration of the objection deadline for the Motion;

L.      the Purchase Agreement was negotiated, proposed and entered into by the Debtor and Buyer without collusion, in good faith and from arm's-length bargaining positions;

M.      Buyer has acted in "good faith," and will be acting in "good faith" in consummating the transactions contemplated by the Purchase Agreement and this Order, within the meaning and subject to the protections of section 363(m) of the Bankruptcy Code and, as such, any reversal or modification of this order on appeal shall not affect the validity of the Sale or the other transactions approved hereunder unless this Order and the Debtor's authority to consummate the Sale is stayed before the Debtor completes or otherwise consummates the Sale;

N.      there is no evidence of any collusion relating to the Sale process, the proposed Sale, or the price to be paid and delivered for the Assets by the Debtor, Buyer and/or any prospective bidder;

O.      neither the Debtor nor any other person, including Buyer, has engaged in any conduct that would cause or permit the Sale to be avoided under 11 U.S.C. § 363(n);

P.      a sound business purpose exists for the Sale of the Assets to Buyer on the terms and conditions of the Purchase Agreement, and the Debtor has exercised sound and reasonable business judgment in accepting said terms for the Sale;

Q.      the consideration to be paid and/or otherwise provided to the Debtor for the Assets (i) is fair and reasonable, (ii) is the highest and best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the State of Utah;

R.      the Sale must be approved and consummated promptly in order to preserve and maximize the value of the Assets;

S.      the transfer of the Assets to Buyer will be a legal, valid and effective transfer of the Assets, and will vest Buyer with all right, title and interest of the Debtor to the Assets;

T.      excepting only the Assumed Obligations, the Sale and transfer of the Asset to Buyer will vest Buyer with good and marketable title to the Assets, free and clear of all mortgages, deeds of trust, notices of interest, security interests, conditional sale or other title retention agreements, pledges, liens (as defined in 11 U.S.C. § 101(37)), claims (as defined in 11 U.S.C. § 101(5)), judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, interests, or restrictions of any kind (collectively, "**Interests**"), including, without limitation, Interests (1) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal or termination of the Debtor's or Ultimate Buyer's interest in the Assets, or any similar rights, and (2) relating to taxes arising under, out of, or in connection with the transfer of the Assets or in any way relating to the operation of the Debtor's business prior to the date (the "**Closing Date**") of the consummation of the Purchase Agreement (the "**Closing**");

U.      Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the Sale of the Assets to Buyer and the assignment of the Assumed Contracts to Buyer was not free and clear of all Interests of any kind or nature whatsoever (excepting only the Assumed Obligations), or if Buyer would, or in the future could, be liable for any debts of, obligations of, or claims against the Debtor (excepting only the Assumed Obligations);

V.      the Debtor may sell the Assets "free and clear" of all Interests of any kind or nature whatsoever (excepting only the Assumed Obligations) because, with respect to each Interest, one or more of the standards set forth in 11 U.S.C. § 363(f)(1) through (5) has been satisfied;

W.      more particularly and without limitation,

(i)      applicable nonbankruptcy law permits sale of the Assets free and clear of certain alleged Interests,

(ii)      the holders of Interests, including non-debtor parties to Assumed Contracts, who did not object, or who withdrew their objections, to the Sale or to the Motion, are deemed to have consented pursuant to sections 363(f)(2) and 365 of the Bankruptcy Code,

(iii)      certain alleged Interests are in bona fide dispute, and

(iv)      the holders of all Interests, including non-debtor parties to Assumed Contracts, who did timely object, could be compelled in a legal or equitable proceeding, to accept a money satisfaction of the Interest;

X.      neither (i) the transfer of the Assets to Buyer, nor (ii) the assumption and assignment to Buyer of the Assumed Contracts and Assumed Obligations, will subject Buyer to any liability whatsoever with respect to the operation of the Debtor's business prior to the Closing Date or by reason of such transfer based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of successor or transferee liability;

Y.      no ostensible holder of an Interest in or against the Assets timely filed an objection or response to the Motion, and no holder of an Interest proved the validity, priority enforceability and non-avoidability of its Interest at or prior to the Approval Hearing;

Z.      as such, no Interests shall attached to the Cash Payment or other proceeds paid and delivered to the Debtor in connection with the Sale, and all such cash and non-cash proceeds shall be held and possessed by the Debtor free and clear of any lien, claim, encumbrance or other Interest;

AA.      as to the Assumed Contracts, (i) proper, timely, adequate and sufficient notice of the assumption and assignment of the Assumed Contracts has been provided in accordance with

sections 102(1) and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6006 and 9014, and

the Procedures Order, (ii) such notice was good, sufficient and appropriate under the particular

circumstances, and (iii) no other or further notice of the assumption and assignment of the

Assumed Contracts is or shall be required;

BB.    the Debtor has demonstrated (i) that its determination to assume and assign the

Assumed Contracts to Buyer in connection with the consummation of the Sale is an exercise of

its sound business judgment, and (ii) that the assumption and assignment of the Assumed

Contracts is in the best interests of the Debtor, its estate and its creditors;

CC.    the Assumed Contracts being assigned to, and the liabilities being assumed by,

Buyer are an integral part of the Assets being purchased by Buyer and, accordingly, the

assumption and assignment of Assumed Contracts and Assumed Obligations (i) is reasonable,

and (ii) enhances the value of the Debtor's estate;

DD.    Buyer (i) has cured, or has provided adequate assurance of cure, or has obtained

consent from the counterparty regarding a stipulated cure amount, of any default existing prior to

the date hereof under any of the Assumed Contracts, within the meaning of 11 U.S.C.

§ 365(b)(1)(A), and (ii) has provided compensation or adequate assurance of compensation to any

party for any actual pecuniary loss to such party resulting from a default prior to the date hereof

under any of the Assumed Contracts, with the meaning of 11 U.S.C. § 365(b)(1)(B);

EE.    Buyer has provided adequate assurance of its ability to perform in the future under

the Assumed Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(C);

FF.    Buyer has demonstrated its financial ability to consummate the Sale and pay any

applicable cure amounts for Assumed Contracts;

GG.    cause exists to order that the fourteen day stay otherwise applicable under Federal

Rules of Bankruptcy Procedure 6004(h) and 6006(d) should be waived in that, among other

things, (i) all filed objections to the Motion have been withdrawn or waived and, therefore, no

party-in-interest has a right to appeal, (ii) the proposed sale is time sensitive, and (iii) further

delay of the Sale will negatively impact the Debtor and the estate by increasing the expense and

burden of the Assets to the estate and causing a decrease in the net proceeds after the Debtor

pays Property Taxes and certain other obligations payable by the Debtor at Closing;

HH.    all objections to the Motion, whether filed of record or raised in open court at the

Approval Hearing, that have not been formally withdrawn hereby are overruled with prejudice

and on the merits;

II.    the legal and factual bases set forth in the Motion establish good cause for the

relief granted herein;

JJ.    the relief granted herein is in the best interests of the Debtor, its estate, creditors

and other parties in interest;

KK.    the Motion is well taken, and should be granted; and

LL.    the Court stated other findings of fact and conclusions of law on the record during

the Approval Hearing, which findings and conclusions are incorporated herein by reference.

WHEREFORE, based upon the foregoing findings and conclusions, and good cause

appearing, it is hereby

**ORDERED** as follows:

<u>**GENERAL PROVISIONS**</u>

1.    The Motion shall be, and hereby is, GRANTED as further described herein.

2.    All objections to the Motion or to the relief requested therein that have not been

withdrawn, waived, or settled, and all reservations of rights identified in such objections, are

overruled with prejudice and on the merits (including objections regarding adequate assurance of

future performance related to Buyer's financial ability).

## APPROVAL OF THE PURCHASE AGREEMENT

3.      The Purchase Agreement between the Debtor and Buyer, and all of the terms and conditions thereof, shall be and hereby are APPROVED.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.      The Debtor is authorized and directed to execute and deliver, and is empowered to perform under, consummate and implement, the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer or reducing to possession the Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement.

## TRANSFER OF ASSETS

6.      The transfer of the Assets to Buyer pursuant to the Purchase Agreement constitutes a legal, valid and effective transfer of the Assets, and shall vest Buyer with all right, title and interest of the Debtor in and to the Assets.

7.      As described and contemplated in the Motion and the Purchase Agreement, the assets shall be sold and transferred to Buyer subject only to the Assumed Obligations, *to wit*: (a) the lien(s) of Toyota Financial Services, Inc., which secure both pre- and post-Petition Date obligations of Seller related to a 2022 Toyota Truck; and (b) any post-Closing date obligations owed to counterparties of Assumed Contracts.

8.      Except only as described in paragraph 7 of this Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Assets shall be transferred to Buyer and, as of the Closing Date, shall be free and clear of all Interests of any kind or nature whatsoever.

9.      Except only as described in paragraph 7 of this Order, all persons and entities (including, but not limited to, all equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors) holding claims or Interests of any kind or nature whatsoever in or against the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under, out of, in connection with, or in any way relating to the Debtor or the Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Assets to Buyer, shall be and hereby are forever barred and estopped from asserting against Buyer, its successors or assigns, its property, or the Assets, such persons' or entities' claims or Interests.

10.     At Closing, Buyer shall pay and deliver the Cash Payment and the other consideration constituting the Purchase Price, as described and in manner provided under the Purchase Agreement.

11.     Except only to the extent the Purchase Agreement expressly states that the Debtor shall pay clearly identified debts at Closing from the Cash Payment, the Debtor shall receive and hold the Cash Payment and other proceeds of the Sale free and clear of any and all liens or Interests.  No Interests, of any kind or nature whatsoever, shall attach to or arise in the proceeds of the Sale.

12.     At or before the Closing, Buyer may designate one or more designees to take title to the Assets.  References to Buyer in this Order, in the Purchase Agreement, and the Procedures Order shall apply to such designee(s); *provided however*, that any such designation shall not release Buyer from any of its duties or obligations under the Purchase Agreement or this Order.

## ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS

13.     The Assumed Contracts assumed by the Debtor and assigned to Buyer at Closing, pursuant to this Order, shall consist of those Assumed Contracts listed on Exhibit "1" to this Approval Order; *provided, however,* that Buyer shall have the right up through and including

Closing to remove and exclude any particular unexpired lease or executory contract, in which event (a) such lease or contract shall not be an Assumed Contract, and (b) the obligations under such lease or contract shall not be Assumed Obligations.

14.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the further terms of this Approval Order and the Closing of the Sale, the Debtor's assumption and assignment to Buyer and Buyer's assumption on the terms set forth in the Purchase Agreement of all Assumed Contracts is approved, and all requirements of section 365(b)(1) of the Bankruptcy Code are deemed satisfied.

15.    The Debtor is authorized and directed to (a) assume and assign to Buyer, or its designee, effective upon the Closing of the Sale, all Assumed Contracts  free and clear of all Interests of any kind or nature whatsoever, and (b) execute and deliver to Buyer, or its designee, such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to Buyer.  The Debtor further is authorized and directed to deliver to Buyer all information and records in the possession of the Debtor relating to such Assumed Contracts.

16.    Except as provided above, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Buyer in accordance with their respective terms, except as modified pursuant to agreement with the counterparties thereto, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to such Assumed Contracts after their assignment to and assumption by Buyer.

17.    All defaults or other obligations of the Debtor under the Assumed Contracts arising or accruing prior to the date of this Approval Order (without giving effect to any acceleration clauses and without giving effect to any penalty rate or penalty provisions of the

kind specified in section 365(b)(2)(D) of the Bankruptcy Code) and all compensation for damages with respect to the Assumed Contracts (the "**Cure Claims**") shall be cured by Buyer at the Closing of the Sale, or as soon thereafter as practicable, and Buyer shall have no other liability or obligation arising or accruing prior to the date of the Closing of the Sale, except as otherwise expressly provided in the Purchase Agreement, provided, however, that  Buyer's obligation to pay Cure Claims shall be subject to any agreements between Buyer and the non-debtor parties to such Assumed Contracts that permit the compromise of such Cure Claims for agreed payments, which agreements are hereby approved by this Court.  Such stipulations shall be executed by Buyer, the cure claimant, and, to the extent any relief is requested with respect to the Debtor, by the Debtor.

18.     The "Cure Amounts" listed on Exhibit "1", attached hereto and incorporated herein by reference, shall be, and hereby approved and finally determined, as the amount(s) to be paid to each non-debtor party to an Assumed Contract in full and complete satisfaction of the Cure Claim of such counter-party.

19.     Each non-debtor party to an Assumed Contract is forever barred and estopped from asserting against the Debtor, Buyer, or the property of either of them, any default existing as of the date of the Approval Hearing or, as against Buyer, any counterclaim, defense, setoff or any other claim asserted or assertable against the Debtor with respect to the Assumed Contract. Subsequent to the Closing, no Cure Claims or any other claims may be asserted against the Debtor with respect to the Assumed Contracts.

20.     The failure of the Debtor or Buyer to enforce, at any time, one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the Assumed Contracts.

## **ADDITIONAL PROVISIONS**

21.     On the date of Closing, each of the Debtor's creditors and any other persons that have filed or recorded any document asserting a lien or Interest in the Assets shall execute such documents and take all other reasonable actions as Buyer deems necessary to release such filed or recorded document, if any, against the Assets and to give Buyer clear title to the Assets.  If any person fails or refuses to do so after written request and delivery of a copy of this Order, such person shall be subject to possible monetary sanctions and/or other sanctions for civil contempt.

22.     This Approval Order (a) shall be effective as a determination that, as of Closing, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated (except only the Assumed Obligations and Assumed Obligations as expressly provided in paragraph 7 of this Order), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

23.     Each and every federal, state and local governmental agency or department hereby is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

24.     If any person or entity that has filed financing statements, deeds of trust, mortgages, mechanic's liens, lis pendens, notice of interest, or other documents or agreements evidencing Interests in the Assets shall not have delivered to the Debtor, prior to the Closing

Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Assets, then Buyer is authorized to file, register, or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Assets of any kind or nature whatsoever.

25.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to Buyer on the date of Closing.

26.    Except only as described in paragraph 7 of this Order, Buyer shall have no liability or responsibility for any debt, claim or obligation of the Debtor arising under or related to the Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Purchase Agreement, Buyer shall not be liable for any claims against the Debtor, or any of its predecessors or affiliates, except as set forth in the Purchase Agreement, and Buyer shall have no successor liability, transferee liability or vicarious liability of any kind or nature, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the transfer of the Assets or the operation of the Debtor's business.

27.    Except only as provided in paragraph 7 of this Order, all persons holding claims or Interests in or against the Debtor or the Assets, of any kind or nature whatsoever, shall be and hereby are forever barred and estopped from asserting, prosecuting, or otherwise pursuing such claims or Interests against Buyer, its property, its successors and assigns, or the Assets with respect to any claim or Interest of any kind or nature whatsoever such person or entity had, has, or may have in or against the Debtor, its estate, officers, directors, shareholders or the Assets.

Following the Closing Date, no holder of a claim or Interest in or against the Debtor shall interfere with Buyer's title to, or use and enjoyment of, the Assets based on or related to such claim or Interest.

28.    The Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction (a) to compel delivery of the Assets to Buyer, (b) to resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein, (c) to interpret, implement, and enforce the provisions of this Order, (d) to resolve any and all disputes regarding Assumed Contracts, and (e) to protect Buyer against any claims or Interests in or against the Debtor or the Assets, of any kind or nature whatsoever.

29.    Nothing contained in any plan of liquidation confirmed in this case or any order of this Court confirming such plan shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Approval Order.

30.    The transactions contemplated by the Purchase Agreement are undertaken by Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to Buyer, unless the Closing of the Sale is duly stayed pending such appeal and prior to Closing.  Buyer is a purchaser in good faith of the Assets, and is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

31.    The consideration provided by Buyer for the Assets under the Purchase Agreement is fair and reasonable.  There is no evidence of any collusion and/or that the sale price was controlled by agreement among potential bidders.  As such, the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

32.     The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, its creditors and equity security holders, Buyer and its respective affiliates, designees, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Buyer pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

33.     The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety. To the extent any provision of the Purchase Agreement is inconsistent with the terms of this Approval Order, the terms of this Order shall govern.

34.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

35.     This Order shall be effective and enforceable immediately upon entry.   The fourteen day stays applicable under Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) in the absence of an order to the contrary shall not, and do not, apply.

36.     The provisions of this Order are non-severable and mutually dependent.

37.     Except as provided in the Purchase Agreement, this Order or any other order of this Court, the Debtor and its estate shall have no further liabilities or obligations with respect to the Assumed Obligations after the Closing, and all holders of such claims are forever barred and

estopped from asserting such claims against the Debtor, its successors or assigns, its property or its assets.

--------------------------------- END OF DOCUMENT ---------------------------------

**EXHIBIT "1"**

**(List of Assumed Contracts and Cure Claims)**

### List of Contracts to be Assumed and Assigned

| Counter Party | Contract | Cure Amount |
|---|---|---|
|  |  |  |
|  |  |  |

## DESIGNATION OF PARTIES TO BE SERVED

Service of the foregoing Order shall be served to the parties and in the manner designated below:

**By Electronic Service:**  I certify that the parties of the record in this case as identified below, are registered CM/ECF users and will be served notice of entry of the foregoing Order through the CM/ECF system:

**By U.S. Mail:**  In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed R. Civ. P. 5(b):

/s/ Jeffrey Trousdale

{00178142.DOCX /}