Jeffrey Trousdale (14814)
**Cohne Kinghorn, P.C.**
111 E. Broadway, 11th Floor
Salt Lake City, UT  84111
Telephone: (801) 363-4300
Email: jtrousdale@ck.law

Attorneys for the Debtor-in-Possession,
Opulent Vacations, Inc.

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re | Bankruptcy Case No.  23-21941 (JTM) |
| OPULENT VACATIONS, INC., | Chapter 11 |
| Debtor. | (Subchapter V) |

---

## DEBTOR'S PLAN OF REORGANIZATION DATED OCTOBER 13, 2023

---

Opulent Vacations, Inc., the debtor and debtor-in-possession in this chapter 11 bankruptcy case (the "**Debtor**"), hereby proposes the following plan of reorganization pursuant to 11 U.S.C. § 1189.

### DISCLOSURES AND HISTORY OF THE DEBTOR

The Debtor is a high-end vacation home rental agency and property management company headquartered in Park City, Utah, which has operated since 2011. The Debtor manages properties primarily in Park City, Utah, and Lake Tahoe (Nevada and California). The Debtor also previously managed properties in La Jolla, California, Hawaii, and Arizona, but no longer operates in those locations. The Debtor has segregated bank accounts and separately tracks the income it receives from the various "regions" in which it operates, and generally treats the various regions as different divisions of its overall business operations.

For the guests that book rentals with properties managed by the Debtor (collectively, the "**Guests**"), the Debtor specializes in curating a selection of luxury homes, arranging "full service" rentals (*e.g.*, no "chore lists" for Guests or homeowners, offering concierge services for both homeowners and Guests, etc.), and providing other luxury amenities so that Guests and owners can relax and maximize their time on vacation.

For the homeowners with whom the Debtor has "**Service Rental Marketing Agreements**" or similar such contracts (collectively, the "**Owners**"), the Debtor offers expertise

in maximizing rental rates and reservation values for luxury properties, achieving higher revenues with lower occupancy, and minimizing risk and wear and tear on homeowners' properties.

In 2021, the Debtor hired a new President to oversee operations and growth (the "**Former President**"). The Former President was the former CEO of a major hospitality company and had experienced success in that role. Unfortunately, the Former President overspent, underperformed, and did the opposite of what the Debtor had hired him to do. After approximately a year at the Debtor's helm, the Debtor discovered that the Former President had put the Debtor in a substantial deficit regarding amounts owed to homeowners and failed to achieve the sales results or growth that the Debtor expected. Among the issues the Debtor discovered (over time) were: (i) the Former President hired a large and expensive group of employees from his former employer, whose salaries the Debtor did not have the revenues to maintain, and whose contributions to the Debtor were minimal; (ii) the Former President spent hundreds of thousands of dollars to "develop technology" that was supposed to improve operations, but only made operations less efficient; (iii) the Former President transitioned the Debtor from a fully integrated and automated financial system to a system that required complicated manual entries, auditing, and other time-intensive processes; (iv) the Former President spent hundreds of thousands of dollars on relatively pointless products, marketing, and technology; and (v) when the Debtor finally fired him, in November of 2022, the Former President held the Debtor hostage for $25,000 by refusing to turn over website control, passwords and other proprietary information.

The Former President's involvement with the Debtor came at the worst time possible. In 2021, the Debtor achieved gross revenues of approximately $17.5 million. But in 2022, the Debtor's gross revenues fell to approximately $14.2 million. Because the Former President had taken the Debtor from a fully-automated accounting system to a manual platform, the Debtor failed to "course correct" as quickly as it could have. Moreover, while the Debtor's accounting staff was able to keep up with the manual accounting processes implemented by the Former President until about June 2022, the accounting staff fell behind on reconciling financials after certain key employees left, putting the Debtor's accounting records further behind.

The Debtor's longest-running operations were in Park City, Utah. As of the Petition Date, the Debtor had Service Rental Marketing Agreements with approximately 40 Owners in Park City, Utah. The Debtor also has two leases (office and storage), miscellaneous personal property, such as linens and a vehicle, intellectual property, and other "going-concern" type assets related to Park City. As described in more detail in the Purchase Agreement, the Debtor's assets and operations related to Park City are defined herein as the "Park City Operations."

In March of 2021, the Debtor acquired assets from a property management company in Lake Tahoe (Nevada and California), including several Owner agreements and other going concern assets. The Debtor's Lake Tahoe assets and operations are defined herein as the "**Lake Tahoe Operations**." The Lake Tahoe Operations are run as a separate division of the Debtor and have remained profitable and sustainable both pre- and post-Petition Date. Except for the filing of this Case (which raised alarm bells for Owners in Lake Tahoe), the Debtor maintains a good reputation in Lake Tahoe and views the Lake Tahoe Operations as its most valuable asset.

Unfortunately, the Park City Operations suffered the most due to the Former President's various issues, and the Debtor owes substantial pre-Petition Date amounts to the Park City Owners. At the time of the Debtor's bankruptcy filing, the Debtor was subject to at least one lawsuit, as listed in the Statement of Financial Affairs, and anticipated several more lawsuits imminently. The bankruptcy case has afforded the Debtor a breathing spell and the opportunity to permit it to devote its limited financial and personnel resources to a reorganization of its business as a going concern.

## BRIEF DESCRIPTION OF PLAN

Broadly speaking, the Debtor's Plan proposes to pay holders of Allowed Claims the Debtor's "Disposable Income" for a period of five years, which will be distributed to such holders on a pro rata basis as provided in this Plan. The Debtor's projected Plan Payments are shown on **Exhibit A**, attached hereto. As shown therein, the Debtor will pay $12,500 per month in projected Disposable Income, to be distributed on a Quarterly Basis ($50,000 per Quarter). If holders of Allowed Secured Claims are entitled to receive payments under the Plan, such holders will be paid separately (not from the Debtor's Disposable Income), as set forth in the Plan.

The Debtor anticipates that it will generate the majority of its Disposable Income through its continued operation of the Lake Tahoe Operations, although the Debtor anticipates that some of the Park City Owners will continue to utilize its services as a marketing agency for their properties. Although the Debtor does not intend to actively market its Lake Tahoe Operations for sale, if the Debtor receives an offer or offers for its Lake Tahoe Operations that will provide at least as much for Holders of Claims (including but not limited to Holders of Class 2 General Unsecured Claims) as they are expected to receive from the Debtor's Plan Payments, then the Debtor reserves the right under this Plan to sell its operations as a going concern.

Provided that all other applicable requirements of the Bankruptcy Code are met, the Debtor's Plan may be confirmed even if every class of impaired Claims does not accept the Plan. See Bankruptcy Code § 1191(b). However, the Debtor hopes to achieve consensual confirmation under Bankruptcy Code § 1191(a). The Debtor submits that a consensual plan is preferable for at least the following reasons: (i) it will reduce administrative expense, including professional's fees, for the Debtor and creditors, which should result in an increased percentage of Plan Payments being paid to holders of Allowed General Unsecured Claims; (ii) it should reduce the amount of time required to achieve confirmation of the Plan, thus reducing the amount of time required for the Debtor to begin making payments under the Plan; and (iii) the Debtor's Plan represents the Debtor's good faith efforts to provide creditors with a better return than they would receive under any other scenario, including but not limited to a liquidation under Chapter 7 of the Bankruptcy Code.

## LIQUIDATION ANALYSIS

One of the requirements a plan of reorganization must meet to be confirmed is the "best interest of creditors" test set forth in Bankruptcy Code § 1129(a)(7). This statutory test requires that, in order for a plan to be confirmed, under the plan each holder of a claim in an impaired class must receive or retain property of a value, as of the effective date of the plan, "that is not

3

less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 [of the Bankruptcy Code] on such date." Put differently, creditors must receive at least as much under the Plan as they would if the Debtor's assets were sold today by a chapter 7 trustee and the net proceeds (after costs of sale, payment of Secured Claims, and payment of Administrative Expense Claims) were distributed to unsecured creditors. The Debtor believes that the Plan easily meets this test.

If the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee would be appointed to take control of and liquidate the Debtor's assets. The Debtor has very few, if any, assets that are not subject to Secured Claims that exceed those assets' values. In fact, both prior to the Petition Date and during the Case, the Debtor underwent extensive efforts to sell its Park City Operations and Lake Tahoe Operations as a going concern. The best offer the Debtor received was an offer to "take over" the Park City Operations in exchange for a payment of a percentage of the amounts owed to Park City Owners, and a purchase price of $1.3 million for the Lake Tahoe Operations. Because Secured Claims against the Debtor's assets total approximately $1 million, this proposed sale would have resulted in very little, if anything for unsecured creditors. Moreover, the sale was rejected by the Park City Owners, who did not agree to the terms offered by the buyer. The Debtor is confident that any sale process conducted by a Chapter 7 trustee would suffer from even lesser offers, because a trustee could not maintain operations in the interim period, and buyers would also know that the sale was a "fire sale" at best. Moreover, without maintained operations, it is highly likely that the Debtor's Owners would attempt to break their contracts and find an alternative property management company. In short, the Debtor's operations are where its value lies, and without ongoing operations, the Debtor would have virtually no value. As such, after the payment of administrative expenses and secured claims, creditors would likely receive nothing in a chapter 7 case.

The Debtor's Estate also holds potential Avoidance Actions and other Causes of Action that may have some value. Specifically, the Debtor believes that the Estate holds Causes of Action against two of its former employees, who started a competing business (Alpine Retreats LLC) in Park City, Utah, taking several of the Debtor's Park City Owners with them (despite the automatic stay under Bankruptcy Code § 362, and despite non-compete agreements signed by those former employees). The Debtor may also hold Avoidance Actions against certain insiders, including Jeff Jenson, its owner and CEO, although Jenson likely has defenses to those potential Avoidance Actions.

A "liquidation analysis" is set forth in <u>Exhibit B</u>, hereto, which compares what creditors are expected to receive under the Plan in contrast to a liquidation. Therefore, the Debtor submits that the Plan easily satisfies the "best interest of creditors" test. In short, the Debtor asks that creditors **VOTE TO ACCEPT THE PLAN** because it provides the best prospective return for Holders of Claims compared to any other alternative.

## <u>ARTICLE 1</u>

## DEFINITIONS AND RULES OF INTERPRETATION

**1.1**    <u>Rules of Interpretation</u>.  For purposes of the Plan, the following terms shall have the meanings specified in this Article I. Any term used but not defined herein that is defined in the Bankruptcy Code or Rules shall have the meaning ascribed to that term in the Bankruptcy Code or Rules.  Wherever from the context it appears appropriate, each defined term shall include both the singular and the plural, and pronouns shall include the masculine, feminine and neuter.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular article, paragraph, or clause of the Plan. The rules of construction contained in 11 U.S.C. § 102 shall apply to the terms of this Plan.  The headings in the Plan are for reference only and shall not limit or otherwise affect the provisions hereof.

**1.2**    "<u>Administrative Expense Claim</u>" shall mean a Claim under 11 U.S.C. § 503(b) and that is entitled to priority under 11 U.S.C. § 507(a)(2) including, without limitation, Claims for fees and expenses of Professionals.

**1.3**    "<u>Allowed</u>" shall mean, with reference to any Claim:

(a)    a Claim (i) that has been listed in the Schedules, (ii) is not listed as disputed, contingent or unliquidated and (iii) as to which no proof of claim has been filed and no objection has been filed on or before the applicable deadline;

(b)    a Claim as to which a timely proof of claim has been filed by the Bar Date and no objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery, has been filed on or before the applicable deadline;

(c)    a Claim the extent to which it has been allowed (whether in whole or in part) by a Final Order after the filing of an objection thereto, or application to estimate, equitably subordinate or otherwise limit recovery;

(d)    a Claim that is an Administrative Expense Claim for which a request for payment has been filed and approved by the Court, after notice and a hearing, or an Administrative Expense Claim of a Professional that has been approved by the Bankruptcy Court;

(e)    a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; or

(f)    any Claim expressly allowed under this Plan or pursuant to the Confirmation Order or other order of the Bankruptcy Court.

Except as otherwise specified in the Plan or any Final Order of the Bankruptcy Court, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claim(s), the amount of an Allowed Claim shall not include any attorneys' fees, costs, penalties, or interest on such Claim occurring or incurred from and after the Petition Date.

4876-4519-7695, v. 3

**1.4** "Avoidance Actions" shall mean Causes of Action arising or held by the Estate under Sections 502, 510, 541, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws.

**1.5** "Bankruptcy Case" or "Case" shall mean the Debtor's case pending in the Bankruptcy Court under case number 23-21941.

**1.6** "Bankruptcy Code" shall mean title 11 of the United States Code, as amended from time to time, as applicable to the Bankruptcy Case.

**1.7** "Bankruptcy Court" and "Court" shall mean the United States Bankruptcy Court for the District of Utah in which the Bankruptcy Case is pending and, to the extent of any reference under 28 U.S.C. § 157, the unit of such District Court specified pursuant to 28 U.S.C. § 151.

**1.8** "Bankruptcy Rules" and "Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, any local rules of the Bankruptcy Court, and any interim rules enacted for the purpose of enabling SBRA.

**1.9** "Bar Date" shall mean: (i) July 25, 2023 with respect to a Claim against the Estate other than a Claim of a governmental unit; (ii) November 13, 2023 with respect to a Claim of a governmental unit against the Estate; and (iii) if this Plan and/or an order of the Bankruptcy Court establishes a different bar date for a specific claim or category of Claims (e.g., rejection damages Claims or other post-Petition Date Claims), the date established by the Plan or order of the Court.

**1.10** "Business Day" shall mean any day other than a Saturday, Sunday or legal holiday recognized in the State of Utah.

**1.11** "Cash" shall mean lawful currency of the United States of America (including wire transfers, cashier's checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks and money orders).

**1.12** "Causes of Action" shall mean, without limitation, any and all actions, causes of action, defenses, liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, claims or proceedings to recover money or property and demands of any nature whatsoever, whether known or unknown, in law, equity or otherwise, including, without limitation, Avoidance Actions.

**1.13** "Claim" shall mean a claim against the Debtor or its property including, without limitation, (i) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**1.14** "Class" shall mean those classes designated in Article 3 of this Plan.

**1.15**    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim.

**1.16**    "Confirmation Date" shall mean the date on which the Confirmation Order is entered in the Bankruptcy Case.

**1.17**    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code.

**1.18**    "Contingent or Unliquidated Claim" shall mean any Claim for which a proof of claim was filed with the Bankruptcy Court but which was not filed in a sum certain or which is dependent upon a future event that has not occurred or may never occur, and which has not been Allowed.

**1.19**    "Debtor" shall mean and refer to Opulent Vacations, Inc. and shall include the Reorganized Debtor from and after the Effective Date.

**1.20**    "Disallowed" shall mean and refer to any Claim that is not Allowed.

**1.21**    "Disposable Income" shall mean the projected "disposable income" of the Debtor calculated as of the date of this Plan, as defined in and calculated pursuant to the requirements of Section 1191(d) of the Bankruptcy Code. The Debtor's projected Disposable Income, which shall be used to funds Plan Payments, is set forth in **Exhibit A**, attached hereto.

**1.22**    "Disputed Claim" shall mean:

(a)      if no proof of claim relating to a Claim has been filed, a Claim that is listed in the Schedules as unliquidated, disputed or contingent; or

(b)      if a proof of claim relating to a Claim has been filed, a Claim as to which a timely objection or request for estimation, or request to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Bankruptcy Rules, has been made, or which is otherwise disputed by the Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery, or dispute has not been withdrawn or determined by Final Order; or

(c)      a Claim that is a Contingent or Unliquidated Claim.

**1.23**    "Distribution Date" shall mean fourteen (14) days after the last day of each full Quarter following the Effective Date, up to and including the Final Distribution Date, or if the fourteenth day following the last day of any Quarter is not a Business Day, the first Business Day immediately thereafter.

**1.24**    "Effective Date" shall mean the first Business Day of the month that is after the Confirmation Date; provided, however, that if, as of such date, all conditions precedent to the occurrence of the Effective Date set forth in Paragraph 9.1 of the Plan have not been satisfied or waived, then the Effective Date shall be the first Business Day immediately following the day upon which all such conditions have been satisfied or waived.

**1.25**   "Equity Interest" shall mean any member interest in the Debtor, and all options, warrants and rights, contractual or otherwise, to acquire any such member interests, as such interests exist immediately prior to the Effective Date.

**1.26**   "Estate" shall mean the estate of the Debtor created pursuant to Section 541 of the Bankruptcy Code and, if applicable, Section 1186 of the Bankruptcy Code.

**1.27**   "Final Distribution Date" shall mean the earlier of (i) the Distribution Date immediately following the five-year anniversary of the Effective Date; or (ii) the last Distribution Date by which the Plan Payments have been distributed in full.

**1.28**   "Final Order" shall mean an order, decree, or judgment that is not subject to (i) a stay pursuant to Bankruptcy Rule 3020(e), (ii) a stay applicable by order of the Bankruptcy Court or by order of another Court with jurisdiction to stay an order entered in this Case, or (iii) an otherwise applicable stay.  If an order is not subject to a stay, the possibility that it may be modified, amended or reversed upon appeal, pursuant to a motion under Federal Rules of Civil Procedure 59 or 60, or otherwise shall not cause such order not to be a Final Order.

**1.29**   "General Unsecured Claim" shall mean a Claim that is not a Secured Claim and that is not entitled to priority of payment under Section 507 of the Bankruptcy Code.

**1.30**   "Guest(s)" shall mean any Person that has booked a stay at an Owner Property whose stay was pending from the Petition Date forward.

**1.31**   "Initial Distribution Date" shall be the Distribution Date first occurring after the Effective Date.

**1.32**   "Interim Distribution Date" shall mean each Distribution Date other than the Final Distribution Date.

**1.33**   "Lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code; except that a Lien that has been avoided in accordance with Sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien.

**1.34**   "Owner(s)" shall mean any counterparty to a Service Rental Marketing Agreement with the Debtor, *i.e.*, any owner of a home within the collection of properties that the Debtor offers to Guests (or potential Guests) for booking as part of its business operations.

**1.35**   "Owner Property[ies]" shall mean property, in the singular, or properties, in the plural, owned by Owners and offered by the Debtor to Guests (or potential Guests) for booking.

**1.36**   "Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental unit or political subdivision thereof.

**1.37**   "Petition Date" shall mean May 15, 2023.

**1.38** "Plan" shall mean this plan of reorganization, including, without limitation, the exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time.

**1.39** "Plan Payments" shall mean the payments to be made by the Debtor under the Plan, except for payments to holders of Allowed Secured Claims on account of such Allowed Secured Claims, which Plan Payments shall total the Debtor's projected Disposable Income, determined as of the date of the filing of this Plan, for the period of time that is five years after the Effective Date.

**1.40** "Plan Period" shall mean the period of time commencing on the Effective Date and ending on the Final Distribution Date; provided, however, that if the treatment of a particular Claim or creditor relates to periods of time preceding the Effective Date (including payments made or received between the Petition Date and the Effective Date), then the Plan Period shall commence on the Petition Date with respect to that particular Claim or creditor.

**1.41** "Prime Rate" shall mean the per annum rate of interest published from time to time in the Wall Street Journal, under the section entitled "Money Rates," denoted as the United States "Prime Rate."

**1.42** "Priority Claims" shall mean any and all Claims (or portions thereof) entitled to priority under Section 507(a) of the Bankruptcy Code other than Administrative Expense Claims and Priority Tax Claims and except to the extent a Claim otherwise entitled to priority is a Secured Claim, in which case it shall be deemed to be a Secured Claim and not a Priority Claim.

**1.43** "Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under Section 507(a)(8) of the Bankruptcy Code that is not a Secured Claim.

**1.44** "Pro Rata" shall mean a proportionate share of the total distribution made at any particular time under this Plan to the holders of Allowed Claims in a Class, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of such Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class to the total of all Allowed Claims and Disputed Claims in such Class.

**1.45** "Professionals" shall mean (i) those Persons employed or retained by the Debtor pursuant to an order of the Bankruptcy Court in accordance with Sections 327 or 1103 of the Bankruptcy Code and to be compensated for services pursuant to Sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) those Persons for which compensation and reimbursement is allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

**1.46** "Quarter" means and refers to the calendar quarters ending, respectively, on March 31, June 30, September 30 and December 31.

**1.47** "Quarterly" means on the basis of once each calendar quarter.

**1.48** "Reorganized Debtor" shall mean the Debtor on and after the Effective Date.

9

**1.49**    The "SBA" means the United States Small Business Administration.

**1.50**    The "SBA Default Balance" shall mean all amounts owed to the SBA under the SBA Loan Documents as of the Effective Date.

**1.51**    The "SBA Collateral" shall mean and refer to any Collateral securing the SBA's Allowed Claims as described in the SBA Loan Documents.

**1.52**    The "SBA Loan Documents" shall mean and refer to the loan documents governing the SBA's Claim(s).

**1.53**    "SBRA" shall mean the Small Business Reorganization Act of 2019, as amended and codified in the Bankruptcy Code, primarily under Subchapter V of Chapter 11 thereof.

**1.54**    The "SBRA Trustee" shall mean D. Ray Strong or any other trustee appointed under Bankruptcy Code § 1183.

**1.55**    "Schedules" shall mean the schedules of assets and liabilities, and the statement of financial affairs filed by the Debtor under Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements have been or may be supplemented or amended from time to time.

**1.56**    "Secured Claim" shall mean any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code and/or Bankruptcy Rule 3012 or, in the event that such Claim is a claim of setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff.

**1.57**    "Service Rental Marketing Agreement(s)" shall mean any contract between the Debtor and any Owner.

**1.58**    "Subordinated Claim" shall mean any unsecured Claim that is subordinated in right of payment to General Unsecured Claims by reason of either (a) voluntary agreement or consent by the holder of the Claim, or (b) a Final Order of the Bankruptcy Court.

**1.59**    The "Tahoe Lease" shall mean the Debtor's lease of real property located at approximately 839 Tallac Ave., South Lake Tahoe, CA 96150.

**1.60**    The "Toyota Collateral" shall mean that certain 2022 Toyota Tacoma SR5, with the last 8 VIN numbers of NM124528, securing Toyota's Allowed Secured Claim, as described in the Toyota Loan Documents.

**1.61**    "Toyota Financial" shall mean Toyota Motor Credit Corporation, d/b/a Toyota Financial.

**1.62**    The "Toyota Lease" shall mean that certain lease agreement between the Debtor and Toyota Financial for the lease of a 2022 Toyota Tacoma short-bed truck, with the last 8 VIN numbers of NM458405.

**1.63**    The "<u>Toyota Loan Documents</u>" shall mean the loan documents governing Toyota Financial's Secured Claim.

## ARTICLE 2

### TREATMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS

**2.1**    <u>Certain Claims Not Classified</u>.  In accordance with Bankruptcy Code § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims are not classified for the purposes of voting on, or receiving distributions under, the Plan. All Administrative Expense Claims and Priority Tax Claims are treated in accordance with the terms in this Article 2.

**2.2**    <u>Administrative Expense Claims</u>

(a)    <u>General</u>.  Except as otherwise agreed to by the Debtor and the holder of an Allowed Administrative Expense Claim, and subject to Paragraph 2.2(b) below, each such holder shall be paid in full in Cash, from pro rata distributions of the Debtor's Plan Payments, to be made on Interim Distribution Dates until such Claims are paid in full, as authorized pursuant to Bankruptcy Code § 1191(e). Plan payments to holders of Allowed Administrative Expense Claims shall be paid in accordance with the priorities set forth in Section 5.4 of this Plan.

(b)    <u>SBRA Trustee and Professional Compensation and Expense Reimbursement Claims</u>.

(1)  The SBRA Trustee and each Professional shall file a final application for the allowance of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date within thirty (30) days after the Effective Date.  Any award granted by the Bankruptcy Court shall be paid, after the application of any retainer held by such professional, through pro rata application of Plan Payments in the order of priority set forth in Section 5.4 of this Plan.

(2)  All fees and expenses of Professionals of the Reorganized Debtor or— if the Plan is confirmed under Bankruptcy Code § 1191(b) and the SBRA Trustee makes payments to creditors under the Plan—the SBRA Trustee and the SBRA Trustee's Professionals, for services rendered or incurred after the Effective Date shall be paid through pro rata application of Plan Payments in the order of priority set forth in Section 5.4 of this Plan, upon the Reorganized Debtor's receipt of reasonably detailed invoices therefor in such amounts and on such terms as such Professional and the Reorganized Debtor may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**2.3**    <u>Priority Tax Claims</u>.  The holders of Allowed Priority Tax Claims shall receive a total value, as of the Effective Date, equal to the Allowed amount of such Claims, plus interest from and after the Effective Date at the rate prescribed by Bankruptcy Code § 511.  Unless they

11

have agreed to different treatment, the holders of Priority Tax Claims shall be paid in full from Plan Payments on or before the end of the fifth anniversary of the Petition Date in five annual installments equal to one-fifth of the total amount of the Allowed Claim.  In any event, the holders of Priority Tax Claims shall be paid regular annual installment payments as follows: the first payment on the later of (a) forty-five days after the Effective Date or (b) the one year anniversary of the Petition Date; the second payment on the second anniversary of the Petition Date; the third payment on the third anniversary of the Petition Date; the fourth payment on the fourth anniversary of the Petition Date; and the fifth and final payment on the fifth anniversary of the Petition Date.

## ARTICLE 3

### CLASSIFICATION OF CLAIMS

**3.1**     <u>Claims Provided for in the Plan</u>.  The Plan treats all Claims against the Debtor, against the Debtor's property, and against the Estate.  Only Allowed Claims receive any distribution under this Plan.  All Claims that are not Allowed are deemed Disallowed by the Plan and will not receive any distributions under the Plan.

**3.2**     <u>Limitation on Inclusion in a Class</u>.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that class.  A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that class.

**3.3**     <u>Classified Claims and Interests</u>.  Claims other than Administrative Expense Claims and Priority Tax Claims are classified for all purposes, including voting on, confirmation of, and distribution pursuant to the Plan, as follows:

(a)     <u>Class 1 – Priority Claims</u>.  Class 1 consists of all Allowed Priority Claims, except for the Allowed Priority Tax Claims and Allowed Administrative Expense Claims.

(b)     <u>Class 2 – Allowed General Unsecured Claims</u>.  Class 2 consists of Allowed General Unsecured Claims.

(c)     <u>Class 3 – Allowed Secured Claim of the SBA.</u>  Class 3 consists of the Allowed Secured Claim of the SBA.

(d)     <u>Class 4 – Allowed Secured Claims of Toyota Financial</u>.  Class 4 consists of the Allowed Secured Claims of Toyota Financial.

(f)     <u>Class 5 – Allowed Secured Claims of the USTC</u>.  Class 5 consists of the Allowed Secured Claims of the USTC.

(g)     <u>Class 6 – Miscellaneous Secured Claims</u>.  Class 6 consists of all Allowed Claims that are secured by property of the Debtor that are not otherwise classified or treated under this Plan.

(h)     <u>Class 7 – Equity Interests</u>.  Class 7 consists of all Equity Interests in the Debtor.

12

## ARTICLE 4
## TREATMENT OF CLASSIFIED CLAIMS

**4.1**     Class 1 – Priority Claims

(a)     Impairment and Voting.  Class 1 is impaired under the Plan.  Each holder of an Allowed Class 1 Claim (if any) shall be entitled to vote to accept or reject the Plan.

(b)     Payment.  The holders of Allowed Class 1 Claims shall be paid pro rata from Plan Payments. Plan Payments will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Class 1 Claims will not receive distributions until the holders of claims with higher priority (listed in Section 5.4 of the Plan) have been paid or reserved in full.

(c)     Distributions.  Subject to the priorities set forth in Section 5.4 of this Plan, the holders of Allowed Class 1 Claims shall be paid, pro rata, beginning on the Initial Distribution Date and continuing for each of the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available from Plan Payments on such dates, until the earlier that (i) such claims are paid in full, or (ii) the Final Distribution Date.

**4.2**     Class 2 – General Unsecured Claims

(a)     Impairment and Voting.  Class 2 is impaired under the Plan.  Each holder of an Allowed Class 2 Claim shall be entitled to vote to accept or reject the Plan.

(b)     Payment.  The holders of Allowed Class 2 Claims shall be paid pro rata from Plan Payments.  Plan Payments will be paid, first, to the holders of Allowed Claims having greater priority in distribution.  Specifically, the holders of Allowed Class 2 Claims will not receive distributions until the holders of claims with higher priority (listed under Section 5.4 of the Plan) have been paid or reserved in full.

(c)     Distributions.  Subject to the priorities set forth in Section 5.4 of this Plan, the holders of Allowed Class 2 Claims shall be paid, pro rata, beginning on the Initial Distribution Date and continuing for each of the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available from Plan Payments on such dates, until the earlier that (i) such claims are paid in full, or (ii) the Final Distribution Date.

**4.3**     Class 3 – Secured Claim of the SBA

(a)     Impairment and Voting.  Class 3 is impaired under the Plan.  Each holder of an Allowed Secured Class 3 Claim shall be entitled to vote to accept or reject the Plan.

(b)     Treatment of Claim.  The Allowed Secured Class 3 Claim shall be treated in accordance with non-default terms of the SBA Loan Documents. The Debtor shall make payments to the holder of the Allowed Secured Class 3 Claim consistent with the schedule, amount, and non-default interest rate set forth in the SBA Loan Documents, commencing with the first regularly scheduled payment beginning after the Effective Date. After the Debtor

4876-4519-7695, v. 3

completes all regularly scheduled payments to the SBA under the SBA Loan Documents, the SBA Default Balance will be paid in monthly installments at the same amount at the Debtor's regular non-default payments under the SBA Loan Documents.

(c)     Except as otherwise ordered by the Court, the holder of the Allowed Secured Class 3 Claim shall retain its Lien in the Collateral securing the Class 3 Claim until its Allowed Secured Class 3 Claim is paid in full.  The Debtor may sell the Collateral securing the Class 3 Claim under the terms of the Plan, provided that the Claim of the SBA secured by such Collateral is paid at full at the time of the sale, except to the extent that the SBA otherwise agrees.

**4.4**     Class 4 – Secured Claims of Toyota Financial

(a)     Impairment and Voting.  Class 4 is impaired under the Plan.  Each holder of an Allowed Class 4 Claim shall be entitled to vote to accept or reject the Plan.

(b)     Treatment of Claim.  The Allowed Secured Class 4 Claim shall be treated in accordance with the non-default terms of the Toyota Financial Loan Documents.  The Debtor shall make payments to the holder of the Allowed Secured Class 4 Claim consistent with the schedule, amount, and non-default interest rate set forth in the Toyota Financial Loan Documents, commencing with the first regularly scheduled payment beginning after the Effective Date. To the extent that an unpaid balance exists under the Toyota Financial Loan Documents as of the Effective Date, such unpaid balance will be paid in monthly installments at the same amount at the Debtor's regular non-default payments under the SBA Loan Documents

(c)     Except as otherwise ordered by the Court, the holder of the Allowed Secured Class 4 Claims shall retain its Lien in the Toyota Collateral securing the Class 4 Claim until its Allowed Secured Class 4 Claim is paid in full.

**4.5**     Class 5 – Secured Claims of USTC

(a)     Impairment and Voting.  Class 5 is impaired under the Plan.  Each holder of an Allowed Class 5 Claim shall be entitled to vote to accept or reject the Plan.

(b)     Treatment.  The holders of Allowed Secured Class 5 Claims shall be treated as Priority Tax Claims as set forth in Section 2.3 of this Plan. The holder of the Allowed Secured Class 5 Claims shall retain its Lien in the Collateral securing the Class 5 Claim until its Allowed Secured Class 5 Claim is paid in full.

**4.6**     Class 6 – Miscellaneous Secured Claims

(a)     Impairment and Voting.  Class 6 is impaired under the Plan.  Each holder of an Allowed Class 6 Claim shall be entitled to vote to accept or reject the Plan.

(b)     Payment.  Holders of Allowed Secured Class 6 Claims, if any, shall be paid, at the election of the Debtor, either:

14

(i) equal monthly installment payments totaling (a) the full amount of its Allowed Secured Claim [up to, but not exceeding, the value of its interest in the Collateral securing its Claim] as of the Petition Date, plus (b) interest from the Petition Date through the Effective Date at the rate of 6% per annum, less (c) any installment payments by the Debtor after the Petition Date, plus (d) interest from and after the Effective Date at the rate of 6% per annum; or

(ii) upon the sale of the Collateral securing its Allowed Claim, the net proceeds of such sale up to the amount of its Allowed Claim; or

(iii) the Debtor shall abandon such Collateral to the holder of the Class 6 Claim secured by such Collateral, and such holder shall be entitled to its Collateral in full satisfaction of its Secured Class 6 Claim.

(c)      Except as otherwise ordered by the Court, the holders of Allowed Secured Class 6 Claims shall retain their Liens until their Allowed Secured Class 6 Claims are paid in full.

**4.7**    Class 7 - Equity Interests.

(a)      Impairment and Voting.  Class 7 is unimpaired under the Plan.  Each holder of an Allowed Class 7 Equity Interest in the Debtor shall be deemed to accept the Plan, and shall not be entitled to vote to accept or reject the Plan.

(b)      Distributions.  Each record holder of an Equity Interest in the Debtor shall retain its interest in the Debtor.  Subject to the limitations and priorities described in section 5.4, the holders of Allowed Class 7 Equity Interests shall receive pro rata distributions, (a) from time to time, but in any event at least on the Initial Distribution Date and the subsequent Interim Distribution Dates, to the extent that a full or partial distribution of Cash is available to the holder of such interest on such dates, and (b) on the Final Distribution Date.

**4.7**    Satisfaction of Claims and Release.  As of the Effective Date, all Claims against the Debtor shall be satisfied and released except as provided in the Plan.

**4.8**    No Assumed Liability.  Except as otherwise expressly set forth in the Plan, the Reorganized Debtor shall not assume or be liable for any Claims.

**4.9**    Disputed Claims.  Notwithstanding any other provision of this Plan, no cash, stock or other property shall be distributed under the Plan on account of any Disputed Claim or Lien until the objection or other challenge to the Claim or Lien is resolved, and the Claim is Allowed.  The Reorganized Debtor or the SBRA Trustee, as applicable, shall establish a reserve ("Disputed Claims Reserve") with respect to Disputed Claims.  Cash, stock and other property to be distributed on account of Disputed Claims shall be held by the Reorganized Debtor or SBRA Trustee until such Claims are Allowed or Disallowed by Final Order.  If held by the Reorganized Debtor, at the option of the Reorganized Debtor, Cash held in the Disputed Claim Reserve may be held in the Debtor's current operating account, may be deposited into one or more segregated, interest-bearing bank accounts that satisfy the requirements of 11 U.S.C. § 345, or may be used

15

to purchase a short term certificate of deposit or another short term investment.  Upon the later of (a) the date on which the holder of such Claim otherwise is entitled to receive a distribution under the Plan, or (b) thirty days after a Disputed Claim becomes Allowed, the holder shall receive a distribution from the Disputed Claims Reserve, based upon the Allowed amount of the Claim and, thereafter, shall participate in any further distributions under the Plan as the holder of an Allowed Claim.  As and to the extent a Disputed Claim is Disallowed, in whole or in part, the Reorganized Debtor may, in their exclusive election, either (i) distribute the amounts previously reserved for the Disputed Claim to the holders of Allowed Claims or Interests entitled thereto, or (ii) continue to hold such cash or property in the Disputed Claims Reserve until the resolution of all disputes by Final Order.

**4.10**   No Penalties.  Except as expressly stated in the Plan or specifically allowed by the Bankruptcy Court, no penalty or late charge incurred or accrued after the Petition Date shall be Allowed as part of any Allowed Claim.

**4.11**   All Defaults Cured and Waived; All Notes and Obligations Decelerated and Reinstated.  Pursuant to Sections 1123(a)(5)(G) and 1124(2) of the Bankruptcy Code, among others, and except as provided by this Plan, all defaults that existed or that may have existed under any promissory note, loan document, unexpired lease, executory contract or other written agreement of or by the Debtor shall be deemed cured and waived as of the Effective Date.  All notes, instruments or obligations for which payment obligations were accelerated pre-petition and/or pre-confirmation (if any) shall be decelerated as of the Effective Date and treated as set forth in this Plan.  All judicial and non-judicial foreclosure actions and proceedings that were instituted pre-petition and/or pre-confirmation (if any) shall be canceled, terminated and/or deemed withdrawn and rescinded as of the Effective Date.

**4.12**   Prepayment Allowed.  Notwithstanding anything to the contrary herein, the Debtor may prepay any obligations under the Plan, including the Plan Payments and payments owed to any Allowed Secured Claim, provided that such prepayment(s) must comply with priorities of payments set forth in Section 5.4 of this Plan.

## ARTICLE 5

## MEANS FOR EXECUTING THE PLAN

**5.1**   Revesting of Property.  Except as otherwise provided in this Plan, the Reorganized Debtor, as of the Effective Date, shall be vested with all of the property and assets of the Debtor and its Estate.  If the Plan is confirmed under Bankruptcy Code § 1191(b), property of the Estate that is included as property of the Estate by operation of Bankruptcy Code § 1186 shall be vested in the Reorganized Debtor as of the Effective Date.

(a)   Management of Reorganized Debtor.  Except as otherwise expressly provided in this Plan, the Reorganized Debtor shall have exclusive and absolute authority to conduct its business, manage its assets, and otherwise determine and direct its financial affairs. The Reorganized Debtor shall be managed by Jeff Jenson, its current President and CEO. In exchange for his management services, Jeff Jenson shall be paid an annual salary of $90,000.00, subject to annual increases if the Reorganized Debtor is otherwise

16

complying with the terms of the Plan, provided, however, that Jeff Jenson's salary shall not exceed $120,000.00 during the Plan Period.

      (b)    <u>Borrowing and Pledging Collateral</u>.  The Reorganized Debtor may borrow funds on such terms and conditions as it deems appropriate and may pledge assets as collateral therefor.

      **5.2**    <u>Avoidance Actions and Other Claims</u>.  Without limiting the foregoing, the Reorganized Debtor shall be vested with all claims and causes of action of the Debtor and the Estate including, without limitation, those claims arising under Sections 510, 541, 544, 547, 548, 549, 550 and 553 of the Bankruptcy Code. Specifically, Avoidance Actions vested in the Reorganized Debtor shall include, without limitation: (i) any and all "preference" actions under Bankruptcy Code § 547; (ii) any other Avoidance Actions, including fraudulent transfer causes of action under Bankruptcy Code §§ 544 and 548; and (iii) all Avoidance Actions listed on the Debtor's Statement of Financial Affairs, filed on the Docket in the Case. In addition to Avoidance Actions, the Reorganized Debtor shall be vested with all claims and causes of action held by the Debtor and its Estate against (i) Alpine Retreats, LLC, Heather Gardner, Alexander Silverthorne, and any other property management company or other Person that interfered with or may have interfered with the Debtor's Service Rental Marketing Agreements in violation of the automatic stay under Bankruptcy Code § 362 or other applicable law; (ii) Swipe Credit; and (iii) any and all Owners (or former Owners) that terminated their Service Rental Marketing Agreement(s) without permission of the Bankruptcy Court or by operation of applicable law.

      **5.3**    <u>SBRA Trustee</u>.  The SBRA Trustee's role, to a certain extent, depends on whether the Plan is confirmed as a "consensual" Plan under Bankruptcy Code § 1191(a), or as a "cramdown" Plan under Bankruptcy Code § 1191(b).

      (a)    <u>Duties Cease on Substantial Consummation of Consensual Plan</u>.  If the Bankruptcy Court confirms the Plan under Bankruptcy Code § 1191(a), the duties of the SBRA Trustee shall cease upon substantial consummation of the Plan. Unless otherwise ordered by the Court, substantial consummation of the Plan shall occur on the Effective Date.

      (b)    <u>Duties in Event of Non-Consensual Confirmation</u>.  If the Bankruptcy Court confirms the Plan under Bankruptcy Code § 1191(b) and either: (i) the Bankruptcy Court determines that the provisions of subchapter V of title 11 of the Code, including section 1194(a), mandate that the SBRA Trustee fulfill that role and function, or (ii) the Bankruptcy Court, for cause, orders that the SBRA Trustee shall be, and shall serve as, the party responsible for making Plan Payments, then the SBRA Trustee shall continue to serve in the Bankruptcy Case for the purpose of making Plan Payments under the Plan. For the avoidance of doubt, notwithstanding if the Plan is confirmed under Bankruptcy Code § 1191(b), the Debtor shall make the Plan Payments except as otherwise provided in this Section, and the SBRA Trustee shall be discharged from its duties as of the Effective Date.

**5.4**    <u>Priorities in Distributions from Plan Payments</u>.  Notwithstanding anything else in this Plan to the contrary, Cash available to be distributed to holders of Claims as Plan Payments shall be distributed (or, if applicable, reserved) according to the following priorities in distribution:

(a)    <u>Payment of Administrative Expense Claims</u> [507(a)(2)] – first, in payment of Allowed Administrative Expenses, including compensation to the attorneys and other Professionals of the Debtor and the SBRA Trustee and her or his Professionals, as contemplated under Section 2.2 of the Plan;

(b)    <u>Payment of (and Reserve for) Post-Effective Date Administrative Expenses</u> [507(a)(2)] – second, payment of (or a reserve for payment of) Post-Effective Date Administrative Expenses of the Reorganized Debtor or the SBRA Trustee or their Professionals, if applicable, arising or coming due after the Effective Date;

(c)    <u>Payment of Priority Claims</u> [507(a)(3) through (a)(7)] – third, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(3) through (a)(7) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

(d)    <u>Priority Tax Claims</u> [507(a)(8)] – fourth, after the foregoing amounts are paid or reserved, the payments due to the holders of Priority Tax Claims entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, as described in section 2.3 of this Plan;

(e)    <u>Payment of Priority Claims</u> [507(a)(9) through (a)(10)] – fifth, after the foregoing amounts are paid or reserved, payment of Allowed Priority Claims entitled to priority in payment pursuant to sections 507(a)(9) through (a)(10) of the Bankruptcy Code in order of the priority prescribed in section 507(a) of the Code, with all such Claims of equal priority paid pro rata, with a pro rata reserve for any disputed Priority Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

(f)    <u>Payment of Class 2 General Unsecured Claims</u>– seventh, after the foregoing amounts are paid or reserved, payment pro rata of Allowed Class 2 General Unsecured Claims, with a pro rata reserve for any Disputed Claims that, as of the date of distribution, have neither been Allowed nor disallowed, until such Claims have been paid (or reserved for) in full;

(g)    <u>Remainder Returned to Reorganized Debtor</u> – eighth, after the foregoing amounts are paid or reserved in full, any remaining Cash shall be returned to the Reorganized Debtor to use in its discretion.

18

**5.5**     Satisfaction of Liens upon Sales of Collateral.  If the Reorganized Debtor sells its property or assets that are subject to a Lien other than a disputed Lien, then the Reorganized Debtor may pay or satisfy the Lien immediately from the proceeds of the sale without notice, opportunity for hearing or order of the Bankruptcy Court.

**5.6**     Bankruptcy Case Administration.  Except as otherwise provided in this Plan, from and after the Effective Date and continuing through the date on which a final decree closing the Bankruptcy Case is entered pursuant to Section 350 of the Bankruptcy Code and Bankruptcy Rule 3022, the Reorganized Debtor shall possess the rights of a party in interest pursuant to Section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Bankruptcy Case.  In addition to the foregoing, for all matters arising under or related to the Bankruptcy Case, the Reorganized Debtor shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction, (ii) be entitled to notice and opportunity for hearing, (iii) participate in all matters brought before the Bankruptcy Court, including but not limited to adversary proceedings, and (iv) receive notice of all applications, motions and other papers and pleadings before the Bankruptcy Court.

**5.7**     Continuation of Ordinary Course Transactions.  From and after the Effective Date of the Plan, the Reorganized Debtor is authorized to continue to engage in ordinary course transactions, as it would otherwise do so in its business, and enter into such transactions as they deem advisable, free of any restriction or limitation imposed under any provision of the Bankruptcy Code, except to the extent otherwise provided in the Plan.

**5.8**     The Reorganized Debtor May Consummate Certain Transactions without Court Approval.  The Reorganized Debtor may engage in any of the following transactions without providing notice or opportunity for hearing or obtaining entry of an order by the Court:

(a)     Resolution of Avoidance Actions.  The Reorganized Debtor may abandon, voluntarily dismiss, settle, or choose not to pursue, on such terms and conditions that it deems appropriate in its exclusive discretion, any Avoidance Actions of the Estate.

(b)     Incur Debt. Except as otherwise provided in this Plan, the Reorganized Debtor may incur debt after the Effective Date on a secured or unsecured basis without further notice, opportunity for hearing or order.

**5.9**     Option for Orderly Liquidation of the Reorganized Debtor's Remaining Assets. If the Reorganized Debtor determines not to conduct its business operations as authorized and anticipated under this Plan, the Reorganized Debtor may conduct an orderly liquidation of its remaining property and assets.  The Reorganized Debtor is not required to conduct a liquidation sale of property and assets, but may market and sell them over such absorption period as it deems reasonable and likely to maximize their value.

(a)     Sales Price. If the Reorganized Debtor determines to sell its remaining property and assets, the Reorganized Debtor shall market and sell the property and assets of the Reorganized Debtor for their full market value, or on such other price terms as it deems reasonable and prudent.

19

(b)     <u>Brokers and Finders</u>. Without notice, opportunity for hearing or order of the Court, the Reorganized Debtor may retain brokers, finders, auctioneers and other persons specializing in the marketing or sale of assets on terms it deems appropriate.

(c)     <u>Sales Free and Clear of Liens, Claims, and Interests</u>. All sales by the Reorganized Debtor shall, pursuant to the Order confirming this Plan, expressly be free and clear of liens, claims and interests pursuant to sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code, with any applicable Liens or interests to attach to the Cash proceeds of the sale, provided, however, that the Reorganized Debtor must provide notice, opportunity for a hearing, and obtain a further order from the Bankruptcy Court for such sales to be free and clear with the protection of sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code.

(d)     <u>Relief Under Section 506(c)</u>. Without the need for notice, hearing or Order, the Reorganized Debtor shall be authorized and entitled to recover from the proceeds of sale and to pay at closing the actual closing costs, broker's commissions (up to six percent of the gross sales price) and other ordinary and reasonable expenses incurred by the Reorganized Debtor in connection with marketing an asset for sale and closing the sale ("Costs of Sale").  The Debtor may seek entry of an order authorization additional surcharge, or carve-out, amounts pursuant to section 506(c) of the Bankruptcy Code.

(e)     <u>Satisfaction of Liens upon Sales of Collateral</u>. If the Reorganized Debtor sells property or assets of the Reorganized Debtor that are subject to a Lien other than a Disputed Lien, then the Reorganized Debtor may pay or satisfy the Lien immediately from the proceeds of the sale without notice, opportunity for hearing or order of the Court.

(f)     <u>Proceeds of Assets Treated as Plan Payments</u>. If any property or asset of the Debtor which exists as of the Confirmation Date is sold by the Reorganized Debtor under this section 5.9, then the net proceeds of such sale shall be treated as "Plan Payments," subject to the priorities in distribution pursuant to section 5.4 of this Plan, along with a report of sale filed with the Bankruptcy Court detailing the gross proceeds, identifying the recipients of any portion of the gross proceeds, and a calculation of the resulting net proceeds to be paid as Plan Payments.

**5.10**    <u>Continuation of Anti-Discrimination Provisions of Bankruptcy Code</u>.  A governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, the Reorganized Debtor, or another Person with whom the Debtor or the Reorganized Debtor has been or is associated or affiliated, solely because of the commencement, continuation, or termination of the Bankruptcy Case or because of any provision of the Plan or the legal effect of the Plan, and the Confirmation Order will constitute an express injunction against any such discriminatory treatment by a governmental unit.

**5.11**    <u>Relief Under Section 506(c)</u>. Without the need for notice, hearing or Order, the Reorganized Debtor shall be authorized and entitled to recover from the proceeds of sale and to pay at closing the actual closing costs, broker's commissions (up to six percent of the gross sales price) and other ordinary and reasonable expenses incurred by the Reorganized Debtor in connection with marketing an asset for sale and closing the sale ("Costs of Sale").  The Debtor

20

may seek entry of an order authorization additional surcharge, or carve-out, amounts pursuant to section 506(c) of the Bankruptcy Code.

> (a)     Automatic Relief.  Without the need for notice, hearing or Order, the Reorganized Debtor shall be authorized and entitled to recover from the proceeds of sale and to pay at closing the actual closing costs, broker's commissions (up to six percent of the gross sales price) and other ordinary and reasonable expenses incurred by the Reorganized Debtor in connection with marketing an asset for sale and closing the sale.

> (b)     Additional Relief.  The Reorganized Debtor may seek recovery of additional reasonable, necessary costs and expenses of preserving, or disposing of, property pursuant to Bankruptcy Code § 506(c), either before or after the Effective Date, upon notice and opportunity for hearing pursuant to Local Rule 9013-2.  Notice shall be appropriate and sufficient if mailed to the holders of all Claims secured or allegedly secured by the property at least fourteen (14) days before the date conditionally available for hearing, and if the notice gives the holders of Liens ten (10) calendar days from the date of mailing of the notice to file an objection.

**5.12**    Employment of Professionals. The Reorganized Debtor may employ attorneys, accountants, or other professionals as it may deem appropriate and pay such professionals reasonable fees and expenses.  Professionals employed by the Reorganized Debtor after the Effective Date shall not be subject to Bankruptcy Court approval, their compensation shall not be subject to Bankruptcy Court approval, and their employment shall not be subject to the disinterestedness requirements of the Bankruptcy Code. Professionals employed by the Reorganized Debtor or, if applicable, the SBRA Trustee, for purposes arising under or related to the Plan or the Bankruptcy Case shall be entitled to be paid from Plan Payments as Post-Effective Date Administrative Expenses.

## ARTICLE 6

### IMPLEMENTATION OF THE PLAN

**6.1**    Method of Distributions under the Plan

> (a)     In General (Distributions by Reorganized Debtor).  Subject to Bankruptcy Rule 9010 and unless otherwise provided herein, all distributions under the Plan to be made by the Reorganized Debtor to the holder of an Allowed Claim shall be mailed by first class mail, postage prepaid, to the address of such holder as listed on the Schedules as of the Effective Date, unless (i) the Debtor is notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules, or (ii) the Debtor and such holder(s) mutually agree that payments may be made by electronic transfer or alternative means. The Debtor shall have no obligation to locate holders whose distributions or notices are properly mailed but nevertheless returned.

4876-4519-7695, v. 3

(b)     Distributions by SBRA Trustee.  If the Plan is confirmed by the Bankruptcy Court pursuant to Bankruptcy Code § 1191(b), then the SBRA Trustee will collect and disburse the Reorganized Debtor's Plan Payments for the benefit of holders of Allowed Claims under the Plan, as set forth in Bankruptcy Code § 1194(b). In such event, the SBRA Trustee shall use such methods of distribution as he or she deems prudent. For the avoidance of doubt, the Reorganized Debtor shall directly pay holders of Allowed Secured Claims on such claims, regardless of whether the Plan is confirmed under Bankruptcy Code § 1191(a) or (b).

(c)     Form of Distributions.  Any payment of Cash made by the Reorganized Debtor pursuant to the Plan shall be made by regular check; *provided, however,* that the Reorganized Debtor shall not be obligated to make any Cash payment under the Plan unless the payment exceeds twenty dollars ($20); *provided, further,* that Cash equal to 100% of the distributions to which the holder of a such a Claim would otherwise be entitled to receive under the Plan shall be held for the benefit of such holder until an aggregate of at least twenty dollars is payable to such holder and at such time the holder shall receive a payment equal to 100% of the distributions to which it would otherwise be entitled; *provided, further*, that the Reorganized Debtor may make Plan payments by electronic transfer or other means if the recipient of such payment(s) and the Reorganized Debtor so agree.

(c)     Withholding Taxes on Distributions.  The Reorganized Debtor shall withhold from any Cash or property distributed under the Plan such amounts as the Reorganized Debtor is obligated under non-bankruptcy law to withhold and transmit to taxing authorities (if any).

**6.2**     Objections to Claims**.**  Any objections to Claims against the Estate may be prosecuted by the Debtor or the Reorganized Debtor or any other party in interest.  Except as otherwise provided by order of the Bankruptcy Court, the Debtor (or Reorganized Debtor) or any other party in interest may file an objection to any Claim until 180 days after the Effective Date. Upon motion filed within one hundred eighty (180) days after the Effective Date, the Bankruptcy Court may extend the period within which to object to a Claim for a reasonable period of time, not to exceed an additional one hundred eighty (180) days. With respect to the alleged Claims asserted by the Utah State Tax Commission, the Debtor will continue to challenge the amount of such Claims through appropriate litigation or dispute procedures outside of the Bankruptcy Court or by way of an objection to the Utah State Tax Commission's Claim before the Bankruptcy Court.

**6.3**     Estimation of Claims.  The Debtor or the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall have jurisdiction to estimate such Claim at any time, including, without limitation, during litigation concerning such Claim or an objection to such Claim.  The Debtor and the Reorganized Debtor shall be entitled to request that the Bankruptcy Court determine either the Allowed amount of such Claim or a maximum limitation on such Claim.  If the Bankruptcy Court determines the maximum limitation of such Claim, such determination shall not preclude the Debtor or Reorganized Debtor from pursuing any additional

22

proceedings to object to any ultimate Allowed amount or payment of such Claim.  If the Bankruptcy Court determines the Allowed amount of such Claim, the amount so determined shall be deemed the amount of the Disputed Claim for all purposes under this Plan.  All such proceedings are cumulative and not exclusive remedies.

**6.4**    No Distributions to the Holders of Disallowed Claims.  Any Claim which is not Allowed as of the Effective Date shall be Disallowed, forever barred as against the Debtor, and shall receive no payments or distribution under this Plan; provided, however, that any Claim which is a Disputed Claim solely by reason of an objection or other legal challenge that is pending on the Effective Date shall be treated as a Disputed Claim and may receive payments or distributions to the extent it later becomes Allowed, in whole in part, upon resolution of such objection or challenge.

**6.5**    Late-Filed Claims Forever Barred.  No Claim that is late-filed (*i.e.*, filed after the applicable Bar Date) shall be treated or paid as an Allowed Claim under this Plan unless the tardiness is excused and the late-filing of such Claim specifically is permitted pursuant to a Final Order entered prior to the Effective Date.

**6.6**    Cash Payments and Time Bar.  Cash distributions made by the Reorganized Debtor shall be by checks drawn on a domestic bank, and promptly mailed, postage prepaid. Unless a change of address has been filed with the Bankruptcy Court, distribution payment may be mailed to the address on the claim form or, if no proof of claim has been filed, to the address listed in the Schedules.  Any check issued to pay an Allowed Claim will be null and void if such check is not negotiated within ninety (90) days of its issuance.  All Claims that the Reorganized Debtor attempts to pay with a check that becomes void hereunder will be barred and disallowed, and all rights to such distribution by such Creditor shall be forfeited.  The Reorganized Debtor will retain the funds resulting from such void checks for the benefit of other creditors and will distribute such funds to such other creditors under the Plan.

**6.7**    Retention and Preservation of Claim Objections and Causes of Action.  Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, upon entry of the Confirmation Order, the Debtor's and Reorganized Debtor's rights to object to all Claims asserted against the Estate, and all of the Debtor's or Estate's Causes of Action, shall vest in the Estate, including without limitation: (1) the Debtor's Causes of Action asserted in any adversary proceeding, U.S. District Court litigation, state court proceeding, or any other proceeding that is pending as of the Confirmation Date; (2) all of the Debtor's claims or Causes of Action disclosed in the Schedules; (3) all of the Debtor's claims or Causes of Action described in any pleading filed with the Court; (4) any of the Debtor's claims or Causes of Action asserted in any contested matter pending on the Confirmation Date; and (5) any and all other claims and Causes of Action that the Debtor holds prior to the Confirmation Date, including, but not limited to, claims for unpaid accounts receivable.  Notwithstanding anything in the Plan to the contrary, no provision in this Plan is intended or shall be construed to preclude or otherwise bar the Debtor or Reorganized Debtor from pursuing any claims arising under chapter 5 of the Bankruptcy Code or under other applicable law.  Among other things, no Person sued pursuant to Sections 547, 548, 549, 550, 553 of the Bankruptcy Code or otherwise may argue that confirmation of this Plan precludes such claim on grounds of res judicata, issue preclusion or otherwise.

23

**6.8**     No Release or Waiver.  Unless a Claim or Cause of Action against any Person is expressly waived or released in the Plan or any Final Order of the Bankruptcy Court, the Debtor expressly reserves such Claim or Cause of Action for later adjudication (including without limitation, Claims and Causes of Action not specifically identified or which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts and circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claims preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such Claims or Causes of Action have been expressly released in the Plan or any other Final Order of the Bankruptcy Court.

## ARTICLE 7

## VOTING ON THE PLAN

**7.1**     Voting of Claims.  Each holder of an Allowed Claim in an impaired Class that retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and to indicate such vote on a duly executed and delivered ballot, consistent with any order entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

**7.2**     Nonconsensual Confirmation.  The Plan may be confirmed by the Bankruptcy Court even if every impaired Class entitled to vote does not accept the Plan by the requisite statutory majorities provided in Sections 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, so long as all of the applicable requirements of Bankruptcy Code § 1129(a), other than paragraphs (8), (10), and (15) of that section, are met, and so long as the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. The determination of whether the Plan is "fair and equitable" with respect to non-accepting Classes of Claims shall be made in accordance with Bankruptcy Code § 1191(c).

## ARTICLE 8

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**8.1**     Assumption of Executory Contracts and Leases.  The following executory contracts or unexpired leases (collectively, the "Assumed Contracts") (if any) are assumed on the Effective Date pursuant to Section 365 of the Bankruptcy Code in accordance with their terms, unless (a) alternative terms are agreed to by the non-Debtor party or parties to such executory contract or unexpired lease or (b) alternative terms are specified in the Plan:

      (a)     the Toyota Lease;

      (b)     any and all insurance contracts of the Debtor;

(c)      all Service Rental Marketing Agreements and executory contracts of a similar nature between the Debtor and Owners, including but not limited to those identified at Docket No. 21 in the Bankruptcy Case;

(d)      unless canceled or terminated prior to the Effective Date, all Vacation Rental Agreements or similar agreements between the Debtor and any Guests, including but not limited to those identified at Docket No. 20 in the Bankruptcy Case; and

(e)      the Tahoe Lease.

Either before or after the Effective Date, the Debtor may file a motion and, subject to notice and opportunity for a hearing, obtain entry of an order pursuant to Section 365 of the Bankruptcy Code and/or this Paragraph 8.1 authorizing the Debtor to "assume" any executory contract or unexpired lease that is not, and does not become, a Rejected Contract.

**8.2**     Rejection of Executory Contracts.  All Executory Contracts and unexpired leases that have not been either assumed and assigned or rejected prior to the Effective Date are rejected by the Debtor (the "**Rejected Contracts**"), and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

**8.3**     Rejection Damages Claims.  If the rejection of an executory contract or unexpired lease by the Debtor pursuant to Paragraph 8.2 hereof results in a Claim for damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Estate, or its respective properties or agents, successors, or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor within forty-five (45) days following the Confirmation Date.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims for which proofs of claim timely are filed will be treated as General Unsecured Claims subject to the provisions of the Plan.  The Debtor shall have the right to object to any such rejection damage Claim filed in accordance with this Paragraph.

**8.4**     Cure Amounts for Assumed Contracts.  Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default, as well as any nonmonetary defaults, shall be satisfied, to the extent required under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor, as applicable, upon assumption thereof, subject to the conditions provided in this Plan. Unless a counterparty to an executory contract or unexpired lease files an objection on or before the date scheduled for the hearing on confirmation of the Plan, the proposed, reasonable and appropriate Cure Amount for each executory contract and unexpired Lease shall be zero dollars ($0).

**8.5**     Post-Petition Agreements Unaffected By Plan.  Except as otherwise expressly provided herein, nothing contained in the Plan shall alter, amend or supersede any agreements or contracts entered into by the Debtor after the Petition Date that are otherwise valid, effective and enforceable against the Debtor as of the Confirmation Date.  The Reorganized Debtor shall be deemed to be substituted for the Debtor in such contract or agreement, as applicable, and the

25

Reorganized Debtor shall have all right, title and interest of the Debtor under such contract or agreement as if the Reorganized Debtor had been the original contracting party thereunder.

## ARTICLE 9

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

**9.1**     <u>Conditions Precedent to Plan Effectiveness</u>.  The Plan shall not become effective, and the Effective Date shall not occur, unless and until each of the following conditions has been satisfied or waived:

(a)     the Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(b)     one day shall have passed since the Confirmation Date;

(c)     all actions, other documents and agreements necessary to implement the Plan (if any) shall have been executed, delivered and, if necessary, properly recorded, and shall have become effective;

(d)     the Court shall have entered orders (or there shall be agreements satisfactory to the Debtor) concerning Claims and any Liens asserted by holders of Claims (which may be orders included within the Confirmation Order) that, in the sole discretion of the Debtor, are required for the feasibility and implementation of the Plan; and

(e)     the Estate shall have sufficient Cash to meet all Cash funding obligations under the Plan required to be made on the Effective Date.

**9.2**     <u>Failure of Conditions Precedent</u>.  Notwithstanding anything in this Plan to the contrary, the conditions set forth in Paragraph 9.1 above must be satisfied or waived on or before the first Business Day of the second month following the Confirmation Date.  In the event that the conditions set forth in Paragraph 9.1 above are not satisfied on or before such date, then the Plan shall be deemed revoked and withdrawn, the Confirmation Order shall be deemed vacated, and Paragraph 11.1 of the Plan shall apply.

**9.3**     <u>Waiver of Conditions</u>.  The Debtor may waive one or more of the conditions precedent to the effectiveness of the Plan set forth in Paragraph 9.1 above, except that the Debtor may not waive the condition that the Estate will have sufficient Cash to meet all payment and funding obligations required to be made on the Effective Date.

## ARTICLE 10

## RETENTION OF JURISDICTION; CASE CLOSURE

**10.1**     <u>**Retention of Jurisdiction**</u>.  After the Effective Date, the Bankruptcy Court shall have original jurisdiction of all matters arising in, arising under or related to the Bankruptcy Case

4876-4519-7695, v. 3

or Plan pursuant to and for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, including but not limited to the following specific matters:

(a)     Executory Contracts.  The Court shall retain jurisdiction (a) to hear and determine any and all pending applications for the rejection or assumption of any executory contracts or unexpired leases, and (b) to hear and determine any and all Claims resulting from the rejection of any executory contract or unexpired lease and any objections to such Claims.

(b)     Compensation.  The Court shall retain jurisdiction to hear and determine all applications by Professionals and others for compensation and reimbursement of expenses.

(c)     Distributions.  The Court shall retain jurisdiction to resolve disputes concerning distributions to holders of Allowed Claims as provided herein.

(d)     Tax Claims.  The Court shall retain jurisdiction to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code.

(e)     Objections to Claims.  The Court shall retain jurisdiction (a) to hear and determine any objections to Claims filed both before and after the Confirmation Date, (b) to allow or disallow any Claim in whole or in part, (c) to decide any controversies as to the classification of any Claims, and (d) to estimate any Disputed Claim.

(f)     Litigation.  The Court shall retain jurisdiction to hear and determine any and all adversary proceedings, applications, contested matters and other litigated matters pending on the Confirmation Date or filed in the Bankruptcy Court thereafter, including any and all claims that might be filed by the Reorganized Debtor under chapter 5 of the Bankruptcy Code.

(g)     Determine Claims Arising Post-Confirmation.  The Court shall retain jurisdiction to determine any Claim or liability to a governmental unit, any party-in-interest and/or any third-party which may be asserted as a result of the transactions contemplated herein.

(h)     Determination of Claims Relating to Effective Date Transactions.  The Court shall retain jurisdiction to hear and decide any Claims or litigation that arise under, arise from or relate to the transactions contemplated and approved under this Plan.  To the extent that any litigation contemplated by this Paragraph 10.1(h) is filed in any state or federal court other than the Bankruptcy Court, the Debtor and any other party-in-interest (a) may remove the action as permitted by 28 U.S.C. 1452, and (b) may seek to transfer venue of such action to the Bankruptcy Court in the District of Utah.

(i)     Stay or Reversal of Confirmation.  The Court shall retain jurisdiction to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated.

27

(j)      <u>Plan Modification</u>.  The Court shall retain jurisdiction to hear applications, if any, to modify the Plan in accordance with § 1193 of the Bankruptcy Code.  After Confirmation of the Plan, the Reorganized Debtor may also, so long as it does not adversely and materially affect the interests of creditors, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order in such manner as may be necessary to carry out the purpose and effect of the Plan.

(k)      <u>Plan Disputes</u>.  The Court shall retain jurisdiction to hear and determine disputes arising in connection with the Plan or its implementation, including without limitation disputes relating to the execution of agreements, documents or instruments required to be executed pursuant to the terms of the Plan, or arising under or relating to the interpretation of agreements, documents or instruments executed in connection with the Plan.  Among other things, the Court shall have jurisdiction to hear and decide any claim or allegations that a transaction contemplated under and/or consummated in connection with this Plan was or is ultra vires, a fraudulent transfer, a fraudulent conveyance or avoidable on any basis in law or equity.

(l)      <u>Plan Implementation</u>.  The Court shall retain jurisdiction to construe and to take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan.

(m)      <u>Enforce Plan Injunction</u>.  The Court shall retain jurisdiction to enforce the releases, exculpatory provisions and/or injunctions described or provided under this Plan including, without limitation, those described or summarized under Article 12.  Among other things, the Court shall retain jurisdiction to enter temporary restraining orders, preliminary injunctions, permanent injunctions, contempt sanctions and other appropriate orders and remedies, including to stay and prevent litigation filed or pending before another court or tribunal.

(n)      <u>Plan Corrections</u>.  The Court shall retain jurisdiction to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan.

(o)      <u>Creditor Disputes</u>.  The Court shall retain jurisdiction to take any action to resolve any disputes arising out of or relating to any Claim, to hear and determine other issues presented by or arising under the Plan, and to take any action to resolve any disputes of creditors with respect to their Claims.

(p)      <u>Other Matters</u>.  The Court shall retain jurisdiction to determine such other matters and for such other purposes as may be provided in the Confirmation Order or that are not inconsistent with Chapter 11 of the Bankruptcy Code.

**10.2**    <u>Exclusive Jurisdiction</u>.  The retention of jurisdiction provided for in this Plan shall be exclusive with respect to all matters set forth in Paragraph 10.1 hereof so as to preserve for

the Reorganized Debtor the benefits of the Plan, subject to the Court's power under Section 305 of the Bankruptcy Code or 28 U.S.C. § 1334(c) to abstain as to all or part of any proceeding.

**10.3** <u>Effectuating Orders</u>.  The Bankruptcy Court shall enter all judgments, partial judgments, and orders necessary to effectuate or enforce the Plan, any material term therein or as reasonably requested by any party intended as a direct beneficiary of a material provision of the Plan.  Such orders and decrees may include a permanent injunction effectuating all actions, releases, assignments, transfers and waivers required by the Plan.

**10.4** <u>Exclusive Venue</u>.  Unless waived by the Reorganized Debtor, in its sole and absolute discretion, the Bankruptcy Court shall be the sole and exclusive venue for the litigation of any dispute involving the Reorganized Debtor or involving any of the transactions contemplated under the Plan and/or any of the other matters described in Paragraph 10.1 of this Plan.

**10.5** <u>Closure of the Case</u>

(a) <u>Closing the Bankruptcy Case</u>.  As soon as the Reorganized Debtor determines that there is no further need for administration of the Case by the Bankruptcy Court, the Reorganized Debtor shall seek an order closing the Case pursuant to 11 U.S.C. § 350 upon (i) the filing of a final report, (ii) after twenty-eight (28) days' notice to parties-in-interest, and (iii) the entry of an appropriate final decree and/or order of the Court closing the Case.  The Debtor intends to do so as soon as possible, likely on the Effective Date, notwithstanding that payment obligations may remain under the Plan.  Absent an order extending the time for entry of a final decree entered after notice and opportunity for hearing, a final decree closing the Bankruptcy Case shall be entered not later than 1 year after the Confirmation Date.  The Debtor will comply with Local Rule 3022-1 in seeking entry of a final decree.

(b) <u>Reopening Case</u>.  At any time, the Reorganized Debtor (and/or any other party-in-interest) may obtain entry of an order reopening the Bankruptcy Case to obtain any relief or order from the Bankruptcy Court consistent with Paragraph 10.1.  Although the Debtor may seek such relief on an ex parte basis, the Debtor shall give notice of its motion or other request to the US Trustee.

# **ARTICLE 11**
## **MODIFICATION OF THE PLAN**

**11.1** <u>Revocation or Withdrawal of the Plan</u>.  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtor revokes or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any claims by or against the Estate or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Estate.

**11.2**    <u>Amendments Prior to Confirmation</u>.  Subject to the applicable requirements of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan as modified complies with Bankruptcy Code § 1193(a).

**11.3**    <u>Amendments After Confirmation</u>.  Subject to the applicable requirements of the Bankruptcy Code, the Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that (a) the Plan, as altered, amended or modified, satisfies the requirements of the Bankruptcy Code, including without limitation Bankruptcy Code § 1193(b) and (c), and (b) the Bankruptcy Court approves such modifications after such notice, and under such circumstances, as the Court determines to be fair, equitable and/or necessary.

**11.4**    <u>Deemed Acceptance of the Plan</u>.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if (a) such Person fails timely to object to the proposed alteration, amendment or modification, or (b) in the event an objection is timely filed, the Court determines the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor may correct any defect or omission in this Plan and any exhibit hereto without notice to holders of Claims insofar as it does not materially and adversely affect the interests of any such holders.

**11.5**    <u>Effect of Modification</u>.  Every modification of the Plan will supersede all previous versions of the Plan to the extent provided in such modification as and when such modification becomes effective.  Previous superseded versions of the Plan will be deemed to be in the nature of a withdrawn or rejected settlement proposal, and will be of no evidentiary or substantive effect for any purpose whatsoever.

<u>**ARTICLE 12**</u>
**STAYS, INJUNCTIONS AND RELEASES**

**12.1**    <u>Continuation of Injunctions or Stays until Effective Date</u>.  All injunctions or stays provided for in the Bankruptcy Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date shall remain in full force and effect until the Effective Date.  Further, unless the Plan provides otherwise, any injunctions or stays ordered by the Bankruptcy Court shall continue in effect through and after the Effective Date.

**12.2**    <u>Injunction Relating to the Plan</u>.  As of the Effective Date, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Reorganized Debtor, the Debtor or the Estate, on account of, or respecting any Claims, debts, rights, Causes of Action or liabilities discharged or treated pursuant to the Plan, except to the extent expressly permitted under the Plan.  Upon entry of the Confirmation Order, all holders of Claims and other parties in interest, along with their respective present, future, or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Further, except as otherwise

30

expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtor, or who have held, hold or may hold any debt or interest relating to the Debtor, are permanently enjoined, from and after the Effective Date, to the maximum extent permitted by law, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or interest against Reorganized Debtor, or (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the immediate or any mediate transferee of any property distributed pursuant to the Plan or of any putative securities, based upon a claim that the transferor's receipt of such property constituted a fraudulent conveyance, preference, violation of bulk sales or other law, or based upon any other claim that receipt and or distribution of property by transfer pursuant to the Plan is wrongful, whether in law or equity.

**12.3** <u>Broad Injunction</u>. The intent of Paragraph 12.2 above is to provide the broadest possible injunction permitted by law and, to the extent permitted by law, to expand the scope of that injunction for the benefit of the Reorganized Debtor to the extent that, at any time after the Effective Date, the law is clarified or changed to permit such broader injunction. The injunction in the Confirmation Order shall provide that, except as otherwise authorized by the Plan or the Confirmation Order, the holders of Claims shall be enjoined from commencing or continuing any such specified action or proceeding against Reorganized Debtor with respect to any Claim or property of the Estate, including Claims based in whole or in part on an allegation: (i) that the Debtor breached any contract with or any duty or obligation to such holder or creditor; (ii) that the Debtor was the alter ego or instrumentality of another Person; (iii) that the Debtor made any preferential or fraudulent transfer or any other voidable transfer or payment to any Person; or (iv) that the Debtor is liable for any act or omission. In addition, to the extent that 11 U.S.C. § 524(e) or other applicable law imposes a limit on the scope of the injunction against any holder of Claims, such holder shall be required to marshal such Claims and to exhaust all of the holder's legal and equitable remedies against all other Persons who are jointly or severally liable on such Claims before attempting to enforce such claims against Reorganized Debtor.

**12.4** <u>Discharge</u>.    Based on the confirmation of the Plan under Bankruptcy Code § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before the entry of the Confirmation Order, to the extent specified in Bankruptcy Code § 1141(d)(1)(A) and the terms of this Plan.

**12.5** <u>Exculpation</u>. The Reorganized Debtor, the SBRA Trustee, and their attorneys, accountants and agents shall not incur or have any liability to any creditor for any act or omission in connection with or arising out of their administration of the Plan or the property to be distributed under the Plan, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and shall be fully protected in acting or in refraining from acting in accordance with such advice, except for gross negligence or willful misconduct.

**12.6** <u>Release of Claims</u>. Except as expressly and specifically provided under this Plan, the rights afforded to holders of Claims in the Plan shall be in exchange for a complete release, accord and satisfaction, and discharge of all Claims against the Debtor (including any debts related to or arising from such Claims), and acceptance of such distributions under the Plan shall

31

be deemed irrevocably to release any and all claims of any type, kind or nature against the Debtor and Reorganized Debtor. Persons deemed to have released claims pursuant to this paragraph shall be forever precluded from asserting against the Debtor or the Reorganized Debtor or its assets any Claim, including any Claim of the type released or deemed released herein.

**12.7**    Setoffs.  Except as otherwise provided in this Plan, nothing contained in this Plan shall constitute a waiver or release by the Estate of any rights of setoff the Estate may have against any Person.

# ARTICLE 13
## DEFAULT AND REMEDIES

**13.1**    Default of Plan; Notice Required.  In the event of any material default of a provision of this Plan, a creditor or party in interest aggrieved by such default shall provide written notice to the Reorganized Debtor and its counsel of record (a "Default Notice").  The Default Notice must describe with specificity the nature of the default alleged and the steps required of the Debtor to cure such default.

**13.2**    Opportunity to Cure.  The Reorganized Debtor shall have thirty (30) days after receipt of a written Default Notice to cure such default.  The aggrieved Person shall take no further action until at least thirty (30) days have passed and the Reorganized Debtor has not cured or substantially complied with the Default Notice.  Even after the thirty-day period has expired, the Reorganized Debtor may cure a default at any time, even after an application or motion has been filed by an aggrieved party.

**13.3**    Remedies in the Event of Default

(a)    Application to Compel Compliance.  If a material default has occurred and the Reorganized Debtor does not cure such default within thirty (30) days after receipt of a Default Notice, a creditor or party in interest aggrieved by such a material default may apply to the Bankruptcy Court to compel compliance with the applicable provisions of the Plan.  Such application must be accompanied by a sworn declaration specifying the default, the applicant's compliance with the notice requirements, and the Reorganized Debtor's failure to cure the same within the period provided herein.

(b)    Service of Application.  The application to compel compliance must be served upon (a) the Debtor, (b) Debtor's counsel, (c) the United States SBRA Trustee, (d) the holders of Allowed Secured Claims, and (e) the Debtor's twenty largest unsecured creditors.

(c)    Determination and Relief by Bankruptcy Court.  The Bankruptcy Court, after notice and a hearing, shall determine whether a default has occurred, whether it was and is material, and if a material whether such default has been cured.  If the Court determines that a material default has occurred and has not been cured, the Court shall determine an appropriate remedy in light of the applicable default, including an order

32

compelling compliance with the pertinent provisions of the Plan.  In determining an appropriate remedy, the Court should consider and impose the least severe remedy that will appropriately compensate the aggrieved party or address the default.  Neither this paragraph nor any other provision of this Plan, however, provides or shall be construed to provide a creditor or other Person with the right to recover any attorneys' fees from the Debtor, in the event of a material default or otherwise.

## <u>ARTICLE 14</u>
## MISCELLANEOUS

**14.1** <u>Severability</u>.  If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, if requested by the Debtor, alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alternation or interpretation.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.

**14.2** <u>Binding Effect</u>.  The rights, duties and obligations of any Person named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.  Pursuant to 11 U.S.C. § 1141(a), the provisions of this Plan bind the Reorganized Debtor, any Person issuing securities under the Plan, any Person acquiring property or receiving distributions under the Plan, the counter-parties to any executory contracts or unexpired leases with the Debtor, any and all creditors of the Debtor, and any and all other Persons referred to or contemplated in this Plan, whether or not the Lien, Claim, or other right of such Person is impaired under the Plan and whether or not such Person has accepted the Plan.  To the extent the Bankruptcy Case is converted to a Chapter 7 case or the Reorganized Debtor files a future bankruptcy case, the Claims, Liens, and rights of creditors and other Persons, as determined and modified by this Plan, shall be final and shall determine the allowed amounts of such claims and interests in the subsequent Chapter 7 case or future bankruptcy case.

**14.3** <u>Further Assurances</u>.  Each Person receiving any payment or other benefit under the Plan, including any holder of any Allowed Claim, shall execute such documents and shall take such other actions (or omit to take actions) as may be necessary or reasonable in order to effectuate the Plan.

**14.4** <u>Notices</u>.  Except as otherwise provided herein, all notices, requests and demands to or upon the Debtor or Reorganized Debtor shall only be effective if in writing and delivered, via registered mail, hand-delivery, or overnight courier, to the Debtor and their counsel addressed as follows:

<u>If to the Reorganized Debtor</u>:

Opulent Vacations, Inc.
c/o Jeff Jenson
2292 South Redwood Rd.
West Valley City, UT 84119

*with a copy to:*

Jeffrey Trousdale
Cohne Kinghorn, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111

Notice shall be deemed to have been duly given or made when actually delivered to and received by the Debtor.

     **14.5**   <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, the rights and obligations arising under this Plan shall be governed by, construed and enforced in accordance with, the internal laws of the State of Utah, without giving effect to the principles of conflicts of law of such jurisdiction.

     **14.6**   <u>Post-Confirmation Fees, Final Decree</u>.  The Debtor shall be responsible for the filing of required post-confirmation reports, until a final decree and/or order closing the Bankruptcy Case is entered.

     **14.7**   <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtor shall file with the Bankruptcy Court any agreements or other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

     **14.8**   <u>Computation of Time</u>.  In computing any period of time prescribed or allowed in the Plan, Bankruptcy Rule 9006(a) shall apply.

4876-4519-7695, v. 3

**14.9**   <u>Inconsistency</u>.  In the event of any inconsistency between the Plan and the Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the terms of the Plan shall govern, but the terms of the Confirmation Order shall govern over any inconsistent provisions in the Plan.

DATED this 13th day of October, 2023.

| **Opulent Vacations, Inc.** | **Cohne Kinghorn, P.C.** |
|---|---|
| | /s/ Jeffrey Trousdale |
| **By:** Jeff Jenson | Jeffrey Trousdale |
| **Its:** President and CEO | Attorneys for the Debtor |

35

**Exhibit "A"**
**(Plan Payments and Cash Projections)**

**Opulent Vacations, Inc.**
**Cash Flow Projections**
**For the Period of October 2023 Through October 2028**

| | Year | **2023** | **2024** | | | | **2025** |
|---|---|---|---|---|---|---|---|
| | Period | **Q4** | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** |
| **Cash Beginning of Period** | | 393,741 | 398,060 | 417,366 | 384,049 | 358,342 | 355,903 |
| **INCOME & RECEIPTS** | | | | | | | |
| OWNER INCOME | | 234,933 | 365,022 | 263,094 | 273,682 | 300,514 | 378,418 |
| COMMISSION REVENUE | | 107,300 | 158,012 | 114,957 | 120,190 | 140,985 | 165,912 |
| HOUSEKEEPING INCOME | | 17,174 | 27,630 | 18,820 | 21,125 | 23,147 | 28,644 |
| CONCIERGE FEES | | 10,854 | 17,660 | 11,925 | 13,425 | 14,742 | 18,308 |
| ADDITIONAL RESERVATION INCOME | | 5,427 | 8,715 | 5,962 | 6,713 | 7,371 | 9,034 |
| DAMAGE INSURANCE SALES | | 5,400 | 5,400 | 5,400 | 5,400 | 5,400 | 5,598 |
| PROPERTY MANAGEMENT INCOME | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,367 |
| SALES TAX RECEIPTS | | 52,727 | 81,372 | 55,632 | 62,632 | 68,772 | 84,358 |
| **TOTAL  RECEIPTS** | | **443,814** | **673,811** | **485,791** | **513,167** | **570,930** | **700,641** |
| **EXPENSES & DISBURSEMENTS** | | | | | | | |
| COST OF GOODS, including Homewner Payments | | 235,977 | 366,566 | 264,208 | 274,880 | 301,866 | 380,029 |
| RENT | | 17,650 | 6,000 | 6,000 | 6,000 | 6,000 | 6,120 |
| EMPLOYEE SALARIES | | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 62,202 |
| EMPLOYEE BENEFITS | | 800 | 800 | 800 | 800 | 800 | 829 |
| OWNER/OFFICER SALARIES | | 22,500 | 22,500 | 22,500 | 22,500 | 22,500 | 23,326 |
| OWNER/OFFICER BENEFITS | | - | 900 | 900 | 900 | 900 | 933 |
| HEALTH INSURANCE | | 9,393 | 9,393 | 9,393 | 9,393 | 9,393 | 9,738 |
| COST OF HOUSEKEEPING | | 13,740 | 22,104 | 15,056 | 16,900 | 18,518 | 22,915 |
| COST OF DAMAGE INSURANCE | | 3,600 | 3,600 | 3,600 | 3,600 | 3,600 | 3,732 |
| SALES TAXES | | 52,727 | 81,372 | 55,632 | 62,632 | 68,772 | 84,358 |
| INCOME TAXES [1] | | - | - | - | - | - | - |
| VEHICLE EXPENSES | | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,244 |
| SUPPLIES | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| UTILITIES | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,555 |
| ACCOUNTING FEES | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,592 |
| ADVERTISING/PROMOTIONS | | 900 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| BANK SERVICE FEES | | 300 | 300 | 300 | 300 | 300 | 300 |
| DUES & SUBSCRIPTIONS | | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| SOFTWARE FEES | | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| TRAVEL EXPENSES | | 1,500 | 1,750 | 1,500 | 1,750 | 1,500 | 1,814 |
| U.S. SMALL BUSINESS ADMINISTRATION | | - | 7,311 | 7,311 | 7,311 | 7,311 | 7,311 |
| TOYOTA FINANCIAL SERVICES - LOAN | | 2,395 | 2,395 | 2,395 | 2,395 | 2,395 | 2,395 |
| TOYOTA FINANCIAL SERVICES - LEASE | | 1,614 | 1,614 | 1,614 | 1,614 | 1,614 | - |
| PLAN PAYMENTS: | | | | | | | |
| PROFESSIONAL FEES [2] | | - | 50,000 | 50,000 | - | - | - |
| OTHER ALLOWED CLAIMS | | - | - | - | 50,000 | 50,000 | 50,000 |
| OTHER (ATTACH LIST) | | - | - | - | - | - | - |
| **TOTAL DISBURSEMENTS** | | **439,495** | **654,505** | **519,108** | **538,874** | **573,368** | **674,094** |
| **NET CASH FLOW** | | **4,320** | **19,306** | **(33,317)** | **(25,707)** | **(2,438)** | **26,547** |
| **(RECEIPTS LESS DISBURSEMENTS)** | | | | | | | |
| **Estimated Cash End of Period** | | **398,060** | **417,366** | **384,049** | **358,342** | **355,903** | **382,451** |
| Estimated Ending Cash, Held in Trust | | 362,241 | 366,216 | 383,977 | 353,325 | 329,674 | 327,431 |
| Estimated Ending Cash, Less Amounts Held in Trust | | 35,819 | 51,151 | 72 | 5,017 | 26,229 | 55,019 |

Footnotes

[1] Management estimates the Debtor will not have any income tax liabilities through October 2028 as the value of its carry forward net operating losses was just over $1 million as of December 31, 2021.

[2] Estimated professional fees includes fees and costs to be paid to the Subchapter V Trustee.

**Opulent Vacations, Inc.**
Cash Flow Projections
For the Period of October 2023 Through October 2028

| | Year | 2025 | | | 2026 | | |
|---|---|---|---|---|---|---|---|
| | Period | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| **Cash Beginning of Period** | | 382,451 | 353,874 | 333,255 | 337,035 | 369,523 | 344,265 |
| **INCOME & RECEIPTS** | | | | | | | |
| OWNER INCOME | | 272,750 | 283,727 | 311,543 | 392,306 | 282,760 | 294,139 |
| COMMISSION REVENUE | | 120,705 | 126,199 | 148,034 | 174,208 | 126,741 | 132,509 |
| HOUSEKEEPING INCOME | | 19,510 | 21,900 | 23,996 | 29,695 | 20,226 | 22,704 |
| CONCIERGE FEES | | 12,363 | 13,918 | 15,283 | 18,980 | 12,816 | 14,429 |
| ADDITIONAL RESERVATION INCOME | | 6,181 | 6,959 | 7,641 | 9,366 | 6,408 | 7,214 |
| DAMAGE INSURANCE SALES | | 5,598 | 5,598 | 5,598 | 5,804 | 5,804 | 5,804 |
| PROPERTY MANAGEMENT INCOME | | 10,367 | 10,367 | 10,367 | 10,747 | 10,747 | 10,747 |
| SALES TAX RECEIPTS | | 57,673 | 64,930 | 71,296 | 87,454 | 59,790 | 67,313 |
| **TOTAL  RECEIPTS** | | **505,148** | **533,599** | **593,758** | **728,561** | **525,292** | **554,860** |
| **EXPENSES & DISBURSEMENTS** | | | | | | | |
| COST OF GOODS, including Homewner Payments | | 273,912 | 284,976 | 312,954 | 393,988 | 283,973 | 295,443 |
| RENT | | 6,120 | 6,120 | 6,120 | 6,242 | 6,242 | 6,242 |
| EMPLOYEE SALARIES | | 62,202 | 62,202 | 62,202 | 64,485 | 64,485 | 64,485 |
| EMPLOYEE BENEFITS | | 829 | 829 | 829 | 860 | 860 | 860 |
| OWNER/OFFICER SALARIES | | 23,326 | 23,326 | 23,326 | 24,182 | 24,182 | 24,182 |
| OWNER/OFFICER BENEFITS | | 933 | 933 | 933 | 967 | 967 | 967 |
| HEALTH INSURANCE | | 9,738 | 9,738 | 9,738 | 10,095 | 10,095 | 10,095 |
| COST OF HOUSEKEEPING | | 15,608 | 17,520 | 19,197 | 23,756 | 16,181 | 18,163 |
| COST OF DAMAGE INSURANCE | | 3,732 | 3,732 | 3,732 | 3,869 | 3,869 | 3,869 |
| SALES TAXES | | 57,673 | 64,930 | 71,296 | 87,454 | 59,790 | 67,313 |
| INCOME TAXES [1] | | - | - | - | - | - | - |
| VEHICLE EXPENSES | | 1,244 | 1,244 | 1,244 | 1,290 | 1,290 | 1,290 |
| SUPPLIES | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| UTILITIES | | 1,555 | 1,555 | 1,555 | 1,612 | 1,612 | 1,612 |
| ACCOUNTING FEES | | 2,592 | 2,592 | 2,592 | 2,687 | 2,687 | 2,687 |
| ADVERTISING/PROMOTIONS | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| BANK SERVICE FEES | | 300 | 300 | 300 | 300 | 300 | 300 |
| DUES & SUBSCRIPTIONS | | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| SOFTWARE FEES | | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| TRAVEL EXPENSES | | 1,555 | 1,814 | 1,555 | 1,881 | 1,612 | 1,881 |
| U.S. SMALL BUSINESS ADMINISTRATION | | 7,311 | 7,311 | 7,311 | 7,311 | 7,311 | 7,311 |
| TOYOTA FINANCIAL SERVICES - LOAN | | 2,395 | 2,395 | 2,395 | 2,395 | 2,395 | 2,395 |
| TOYOTA FINANCIAL SERVICES - LEASE | | - | - | - | - | - | - |
| PLAN PAYMENTS: | | | | | | | |
| PROFESSIONAL FEES [2] | | - | - | - | - | - | - |
| OTHER ALLOWED CLAIMS | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| OTHER (ATTACH LIST) | | - | - | - | - | - | - |
| **TOTAL DISBURSEMENTS** | | **533,725** | **554,217** | **589,978** | **696,074** | **550,550** | **571,794** |
| **NET CASH FLOW** | | **(28,577)** | **(20,618)** | **3,780** | **32,487** | **(25,258)** | **(16,934)** |
| **(RECEIPTS LESS DISBURSEMENTS)** | | | | | | | |
| **Estimated Cash End of Period** | | **353,874** | **333,255** | **337,035** | **369,523** | **344,265** | **327,330** |
| Estimated Ending Cash, Held in Trust | | 351,855 | 325,564 | 306,595 | 310,072 | 339,961 | 316,724 |
| Estimated Ending Cash, Less Amounts Held in Trust | | 2,019 | 7,692 | 30,440 | 59,450 | 4,304 | 10,607 |

**Opulent Vacations, Inc.**
Cash Flow Projections
For the Period of October 2023 Through October 2028

| | | **2026** | | **2027** | | | **2028** |
|---|---|---|---|---|---|---|---|
| Year | | | | | | | |
| Period | | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| **Cash Beginning of Period** | | 327,330 | 336,102 | 377,254 | 357,914 | 347,279 | 363,468 |
| **INCOME & RECEIPTS** | | | | | | | |
| OWNER INCOME | | 322,976 | 406,704 | 293,137 | 304,934 | 334,830 | 421,630 |
| COMMISSION REVENUE | | 155,436 | 182,918 | 133,078 | 139,135 | 163,207 | 192,064 |
| HOUSEKEEPING INCOME | | 24,877 | 30,785 | 20,969 | 23,537 | 25,790 | 31,915 |
| CONCIERGE FEES | | 15,844 | 19,677 | 13,287 | 14,959 | 16,425 | 20,399 |
| ADDITIONAL RESERVATION INCOME | | 7,922 | 9,710 | 6,643 | 7,479 | 8,213 | 10,066 |
| DAMAGE INSURANCE SALES | | 5,804 | 6,017 | 6,017 | 6,017 | 6,017 | 6,237 |
| PROPERTY MANAGEMENT INCOME | | 10,747 | 11,142 | 11,142 | 11,142 | 11,142 | 11,551 |
| SALES TAX RECEIPTS | | 73,912 | 90,664 | 61,984 | 69,783 | 76,625 | 93,991 |
| **TOTAL RECEIPTS** | | **617,518** | **757,616** | **546,256** | **576,986** | **642,248** | **787,854** |
| **EXPENSES & DISBURSEMENTS** | | | | | | | |
| COST OF GOODS, including Homewner Payments | | 324,449 | 408,459 | 294,403 | 306,294 | 336,367 | 423,461 |
| RENT | | 6,242 | 6,367 | 6,367 | 6,367 | 6,367 | 6,495 |
| EMPLOYEE SALARIES | | 64,485 | 66,851 | 66,851 | 66,851 | 66,851 | 69,305 |
| EMPLOYEE BENEFITS | | 860 | 891 | 891 | 891 | 891 | 924 |
| OWNER/OFFICER SALARIES | | 24,182 | 25,069 | 25,069 | 25,069 | 25,069 | 25,989 |
| OWNER/OFFICER BENEFITS | | 967 | 1,003 | 1,003 | 1,003 | 1,003 | 1,040 |
| HEALTH INSURANCE | | 10,095 | 10,466 | 10,466 | 10,466 | 10,466 | 10,850 |
| COST OF HOUSEKEEPING | | 19,902 | 24,628 | 16,775 | 18,830 | 20,632 | 25,532 |
| COST OF DAMAGE INSURANCE | | 3,869 | 4,011 | 4,011 | 4,011 | 4,011 | 4,158 |
| SALES TAXES | | 73,912 | 90,664 | 61,984 | 69,783 | 76,625 | 93,991 |
| INCOME TAXES [1] | | - | - | - | - | - | - |
| VEHICLE EXPENSES | | 1,290 | 1,337 | 1,337 | 1,337 | 1,337 | 1,386 |
| SUPPLIES | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| UTILITIES | | 1,612 | 1,671 | 1,671 | 1,671 | 1,671 | 1,733 |
| ACCOUNTING FEES | | 2,687 | 2,785 | 2,785 | 2,785 | 2,785 | 2,888 |
| ADVERTISING/PROMOTIONS | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| BANK SERVICE FEES | | 300 | 300 | 300 | 300 | 300 | 300 |
| DUES & SUBSCRIPTIONS | | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 |
| SOFTWARE FEES | | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 |
| TRAVEL EXPENSES | | 1,612 | 1,950 | 1,671 | 1,950 | 1,671 | 2,021 |
| U.S. SMALL BUSINESS ADMINISTRATION | | 7,311 | 7,311 | 7,311 | 7,311 | 7,311 | 7,311 |
| TOYOTA FINANCIAL SERVICES - LOAN | | 2,271 | - | - | - | - | - |
| TOYOTA FINANCIAL SERVICES - LEASE | | - | - | - | - | - | - |
| PLAN PAYMENTS: | | | | | | | |
| PROFESSIONAL FEES [2] | | - | - | - | - | - | - |
| OTHER ALLOWED CLAIMS | | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| OTHER (ATTACH LIST) | | - | | | | | |
| **TOTAL DISBURSEMENTS** | | **608,746** | **716,464** | **565,597** | **587,621** | **626,059** | **740,084** |
| **NET CASH FLOW** | | **8,772** | **41,152** | **(19,341)** | **(10,635)** | **16,190** | **47,770** |
| **(RECEIPTS LESS DISBURSEMENTS)** | | | | | | | |
| **Estimated Cash End of Period** | | **336,102** | **377,254** | **357,914** | **347,279** | **363,468** | **411,238** |
| Estimated Ending Cash, Held in Trust | | 301,144 | 309,214 | 347,074 | 329,281 | 319,496 | 334,391 |
| Estimated Ending Cash, Less Amounts Held in Trust | | 34,958 | 68,041 | 10,840 | 17,998 | 43,972 | 76,847 |

**Opulent Vacations, Inc.**
Cash Flow Projections
For the Period of October 2023 Through October 2028

| | Year | | 2028 | |
|---|---|---|---|---|
| | Period | Q2 | Q3 | October |
| **Cash Beginning of Period** | | 411,238 | 395,636 | 389,138 |
| | | | | |
| **INCOME & RECEIPTS** | | | | |
| OWNER INCOME | | 303,895 | 316,125 | 115,706 |
| COMMISSION REVENUE | | 139,731 | 146,091 | 57,123 |
| HOUSEKEEPING INCOME | | 21,738 | 24,401 | 8,912 |
| CONCIERGE FEES | | 13,774 | 15,507 | 5,676 |
| ADDITIONAL RESERVATION INCOME | | 6,887 | 7,754 | 2,838 |
| DAMAGE INSURANCE SALES | | 6,237 | 6,237 | 2,079 |
| PROPERTY MANAGEMENT INCOME | | 11,551 | 11,551 | 3,850 |
| SALES TAX RECEIPTS | | 64,259 | 72,345 | 26,479 |
| **TOTAL  RECEIPTS** | | **568,074** | **600,012** | **222,663** |
| | | | | |
| **EXPENSES & DISBURSEMENTS** | | | | |
| COST OF GOODS, including Homewner Payments | | 305,216 | 317,545 | 116,241 |
| RENT | | 6,495 | 6,495 | 2,165 |
| EMPLOYEE SALARIES | | 69,305 | 69,305 | 23,102 |
| EMPLOYEE BENEFITS | | 924 | 924 | 308 |
| OWNER/OFFICER SALARIES | | 25,989 | 25,989 | 8,663 |
| OWNER/OFFICER BENEFITS | | 1,040 | 1,040 | 347 |
| HEALTH INSURANCE | | 10,850 | 10,850 | 3,617 |
| COST OF HOUSEKEEPING | | 17,391 | 19,521 | 7,130 |
| COST OF DAMAGE INSURANCE | | 4,158 | 4,158 | 1,386 |
| SALES TAXES | | 64,259 | 72,345 | 26,479 |
| INCOME TAXES [1] | | - | - | - |
| VEHICLE EXPENSES | | 1,386 | 1,386 | 462 |
| SUPPLIES | | 1,000 | 1,000 | 333 |
| UTILITIES | | 1,733 | 1,733 | 578 |
| ACCOUNTING FEES | | 2,888 | 2,888 | 963 |
| ADVERTISING/PROMOTIONS | | 1,500 | 1,500 | 500 |
| BANK SERVICE FEES | | 300 | 300 | 100 |
| DUES & SUBSCRIPTIONS | | 1,200 | 1,200 | 400 |
| SOFTWARE FEES | | 9,000 | 9,000 | 3,000 |
| TRAVEL EXPENSES | | 1,733 | 2,021 | 578 |
| U.S. SMALL BUSINESS ADMINISTRATION | | 7,311 | 7,311 | 7,311 |
| TOYOTA FINANCIAL SERVICES - LOAN | | - | - | - |
| TOYOTA FINANCIAL SERVICES - LEASE | | - | - | - |
| PLAN PAYMENTS: | | | | |
| PROFESSIONAL FEES [2] | | - | - | - |
| OTHER ALLOWED CLAIMS | | 50,000 | 50,000 | 9,175 |
| OTHER (ATTACH LIST) | | | | |
| **TOTAL DISBURSEMENTS** | | **583,676** | **606,509** | **212,835** |
| | | | | |
| **NET CASH FLOW** | | **(15,602)** | **(6,498)** | **9,828** |
| **(RECEIPTS LESS DISBURSEMENTS)** | | | | |
| | | | | |
| **Estimated Cash End of Period** | | **395,636** | **389,138** | **398,966** |
| | | | | |
| Estimated Ending Cash, Held in Trust | | 378,339 | 363,985 | 358,007 |
| Estimated Ending Cash, Less Amounts Held in Trust | | 17,297 | 25,153 | 40,959 |

**Exhibit "B"**
**(Liquidation Analysis, Including Summary of Claims)**

4876-4519-7695, v. 3

**Opulent Vacations, Inc.**
Liquidation Analysis
Estimate as of October 1, 2023

| Description | Estimated Value | Recovery % Low | Recovery % High | Liquidation Value Low | Liquidation Value High | FN | Chapter 11 Plan $ | Chapter 11 Plan % |
|---|---|---|---|---|---|---|---|---|
| **Quick Assets** | | | | | | | | |
| Cash on hand | $ 393,741 | 100.0% | 100.0% | $ 393,741 | $ 393,741 | | | |
| Less: cash held in trust | (384,654) | 100.0% | 100.0% | (384,654) | (384,654) | | | |
| Accounts receivable | - | | | - | - | [1] | | |
| **Net quick assets** | 9,087 | | | 9,087 | 9,087 | | | |
| **Tangible Assets** | | | | | | | | |
| Inventory | | | | | | | | |
| Linens | 250 | 50.0% | 95.0% | 125 | 238 | [2] | | |
| Amenities | 50 | 50.0% | 95.0% | 25 | 48 | [2] | | |
| Housekeeping supplies | 200 | 50.0% | 95.0% | 100 | 190 | [2] | | |
| Office equipment | | | | | | | | |
| Office furniture | 700 | 50.0% | 95.0% | 350 | 665 | [2] | | |
| Computers | 500 | 50.0% | 95.0% | 250 | 475 | [2] | | |
| Less: transportation costs to auction | | | | (1,768) | (1,768) | [3] | | |
| Less: sales commissions and fees (15% of sale price) | | | | (128) | (242) | [4] | | |
| Net office equipment | 1,200 | | | - | - | | | |
| Vehicles | | | | | | | | |
| 2022 Toyota Truck | 42,000 | 85.0% | 100.0% | 35,700 | 42,000 | | | |
| Less: Toyota Financial Services (secured lienholder) | | | | (27,931) | (27,931) | | $ 27,931 | 100.0% |
| Less: transportation costs to auction | | | | (2,200) | (2,200) | [3] | | |
| Less: sales commissions and fees (15% of sale price) | | | | (5,355) | (6,300) | [4] | | |
| Net vehicles | 42,000 | | | 214 | 5,569 | | | |
| **Net tangible assets** | 43,200 | | | 214 | 5,569 | | | |
| **Intellectual Property** | | | | | | | | |
| Internally developed software | - | | | - | - | | | |
| Copyrights, trademarks and trade secrets | 100 | 0.0% | 100.0% | - | 100 | | | |
| Domain names, websites, and online stores | 1,000 | 0.0% | 100.0% | - | 1,000 | | | |
| **Net intellectual property** | 1,100 | | | - | 1,100 | | | |
| **Contingent and Unliquidated Assets** | | | | | | | | |
| Potential cause of action against Swipe | - | | | - | - | | | |
| Employee retention credits | 240,000 | 0.0% | 0.0% | - | - | [5] | | |
| Settlement overpayment | 5,000 | 100.0% | 100.0% | 5,000 | 5,000 | | | |
| **Net contingent and unliquidated assets** | 245,000 | | | 5,000 | 5,000 | | | |
| **Other Assets** | | | | | | | | |
| Employee advances | 14,832 | 0.0% | 100.0% | - | 14,832 | | | |
| Security deposits | 39,520 | 0.0% | 0.0% | - | - | [6] | | |
| Monarch Luxury Homes and Villas | - | | | - | - | | | |
| Investment in Buckingham Homeowner Contracts | 400,000 | 0.0% | 0.0% | - | - | [7] | | |
| **Net other assets** | 454,352 | | | - | 14,832 | | | |
| **Total** | $ 752,739 | | | $ 14,301 | $ 35,588 | N/A | | |

**Distribution of Gross Proceeds**

**Professional Fees**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Chapter 7 Trustee Fees | | | | $ 2,180 | $ 4,309 | [8] | $ - | |
| Other Chapter 7 Professional Fees | | | | - | - | [8] | | |
| Chapter 11 Professional fees | | | | | | | | |
| Cohne Kinghorn | Chapter 7, Approx. $26,000-31,000 | | | - | - | [8] | 60,000 | |
| Rocky Mountain Advisory | Chapter 7, Approx. $19,000-22,000 | | | - | - | [8] | 27,000 | |
| Subchapter V Trustee | | | | - | - | [8] | 13,000 | |
| **Remaining Proceeds Available for Claimholders** | | | | 12,121 | 31,280 | | | |

**Opulent Vacations, Inc.**
Liquidation Analysis
Estimate as of October 1, 2023

| Description | Estimated Value | Recovery % Low | Recovery % High | Liquidation Value Low | Liquidation Value High | FN | Chapter 11 Plan $ | Chapter 11 Plan % |
|---|---|---|---|---|---|---|---|---|
| **Administrative Claims** | | | | | | | | |
| Arizona Department of Revenue | 1,500 | 0.0% | 0.0% | - | - | [9] | 1,500 | 100.0% |
| **Secured Claims, Not Included Above** | | | | | | | | |
| U.S. Small Business Administration | 547,427 | 2.2% | 5.7% | 12,121 | 31,280 | | 547,427 | 100.0% |
| Utah State Tax Commission | 68,834 | 0.0% | 0.0% | - | - | [9] | 68,834 | 100.0% |
| Remaining Proceeds Available for Unsecured Claimholders | | | | - | - | | | |
| **Priority Unsecured Claims** | | | | | | | | |
| Priority Unsecured Wage Claims | 37,820 | 0.0% | 0.0% | - | - | | 37,820 | 100.0% |
| Priority Unsecured Tax Claims | 649,479 | 0.0% | 0.0% | - | - | [9] | 649,479 | 100.0% |
| Remaining Proceeds Available for General Unsecured Claimholders | | | | - | - | | | |
| **General Unsecured Claims** | | | | | | | | |
| Secured Deficiency Claims | 616,261 | | | - | - | [10] | - | |
| Other Unsecured Claims | 5,526,093 | 0.0% | 0.0% | - | - | [11] | - | 0.0% |
| Total general unsecured claims | 6,142,353 | | | - | - | | | |
| **Estimated Recovery Percentage for General Unsecured Claimholders** | | | | **0.0%** | **0.0%** | [12] | **0.0%** | |
| **Total distributions, net of interest** | | | | $ 54,353 | $ 94,799 | | $ 1,432,991 | |

Estimated interest to be paid under the Chapter 11 Plan of Reorganization $ 497,831

Total Distributions under the Chapter 11 Plan of Reorganization $ 1,930,822

Footnotes

[1] Accounts receivable, as recorded by the Debtor, is wholly comprised of remaining amounts owed by customers for reservations to be completed in the future.

[2] Inventory and Office Equipment are based on forced liquidation value, discounted by 5% (high) and 50% (low), due to the sale of a large amount of items all at once.

[3] Costs to transport to auction were estimated by management and could exceed these estimates.  The largest factor is the destination as the items are mainly located in Park City, Utah and Lake Tahoe, California.

[4] Commissions for sales at auction are typically 15% of the sales price.

[5] In September 2023, the Internal Revenue Service announced a moratorium on the processing of new Employee Retention Credit ("ERC") claims through at least the end of 2023. At this time, the Debtor has not filed its claims for ERC and it is unknown if the IRS will process such claims at a future date.

[6] Debtor anticipates all security deposits will be offset against claims for lease rejection damages.

[7] The Investment in Buckingham Homeowner Contracts only have value while the Debtor operates as a going concern. The value would be reduced to zero if the Debtor were to discontinue operations and liquidate its assets.

[8] Estimates of professional fees (Chapter 7 and Chapter 11) do not include the costs associated with bringing avoidance actions. Similarly, estimated proceeds also do not included potential recoveries.

[9] These claims include estimated, unliquidated balances. The Debtor expects to see a reduction in the claim of the Utah State Tax Commission, whether through a consensual resolution, the claims objection process, or through other means. To the extent that the Debtor successfully lowers the claim of the Utah State Tax Commission, distributions to other creditors should increase or be made more quickly than projected.

[10] Additional unsecured deficiency claims based on the  difference between secured claims and estimated net proceeds from collateral.

[11] The estimated amount of general unsecured claims assume certain claims will be disallowed or reduced.

[12] Estimated recovery percentage under Chapter 11 depends on successful reduction of general unsecured claims. Results may differ.

**Opulent Vacations, Inc.**
Summary of Claims
As of October 9, 2023

| | | | | | |
|---|---|---|---|---|---|
| | | | **Proposed** | | |
| | **Total Claim** | | | **Monthly** | |
| **Name** | **Amount** | | **Interest Rate** | **Installment** | **FN** |
| **Professional Fees** | | | | | |
| Cohne Kinghorn, P.C. | $ | 60,000.00 | | | [1] |
| Rocky Mountain Advisory, LLC | | 27,000.00 | | | [1] |
| Subchapter V Trustee | | 13,000.00 | | | [1] |
| Total Professional Fees | | 100,000.00 | | | |
| **Administrative Claims** | | | | | |
| Arizona Department of Revenue | | 1,500.00 | 3.75% | | [2][3] |
| **Secured Claims** | | | | | |
| U.S. Small Business Administration | | 547,426.65 | 3.75% | 2,437.00 | |
| Toyota Financial Services | | 27,930.93 | 7.67% | 798.21 | [4] |
| Utah State Tax Commission | | 68,834.14 | 5.00% | | [2][5] |
| Total Secured Claims | | 644,191.72 | | | |
| **Priority Unsecured Wage Claims** | | | | | |
| Colby R. Peck | | 3,520.00 | | | |
| Jennifer Hegemier | | 15,150.00 | | | |
| Sarah McDevitt | | 15,150.00 | | | |
| Tyler Wyman | | 4,000.00 | | | |
| Total Priority Unsecured Wage Claims | | 37,820.00 | | | |
| **Priority Unsecured Tax Claims** | | | | | |
| Arizona Department of Revenue | | 4,050.00 | 3.75% | | [2][3] |
| Charles Lomeli, Tax Collector | | 5,337.33 | 3.75% | | [3] |
| City of La Quinta | | 6,923.02 | 3.75% | | [3] |
| City of Lake Tahoe | | 22,022.55 | 3.75% | | [3] |
| City of Palm Desert | | 4,617.23 | 3.75% | | [3] |
| City of Palm Springs | | 1,334.58 | 3.75% | | [3] |
| City of Park City | | 16,263.51 | 3.75% | | [3] |
| City of South Lake Tahoe | | 11,881.72 | 3.75% | | [3] |
| Colorado Department of Revenue | | 1,689.00 | 3.75% | | [3] |
| Department of Treasury - Internal Revenue Service | | 34,815.74 | 3.75% | | [2][3] |
| El Dorado County Tax Collector | | 80.29 | 3.75% | | [3] |
| Gallatin County Treasurer | | 2,239.06 | 3.75% | | [3] |
| Hawaii Department of Taxation | | 28,836.18 | 3.75% | | [3] |
| Placer County Tax Collector | | 2,676.08 | 3.75% | | [3] |
| Riverside County Tax Collector | | 14,650.76 | 3.75% | | [3] |
| Summit County | | 100,279.70 | 3.75% | | [3] |
| Utah State Tax Commission | | 318,612.71 | 5.00% | | [2][5] |
| Wasatch County Treasurer | | 65,615.22 | 3.75% | | [3] |
| Washoe County Treasurer | | 7,554.55 | 3.75% | | [3] |
| Total Priority Unsecured Tax Claims | | 649,479.23 | | | |
| **General Unsecured Claims** | | | | | |
| Various | | 5,526,092.62 | | | |
| **Grand Total** | $ | **6,959,083.57** | | | |

Footnotes
[1] Professional fees are estimated through completion of the Chapter 11 Plan.
[2] The Proof of Claim amount is unliquidated at this time.
[3] Interest is estimated at 3.75% per annum. Actual interest may vary.
[4] Principal balance owed as of August 11, 2023.
[5] The Debtor expects to see a reduction in the claim of the Utah State Tax Commission, whether through a consensual
    resolution, the claims objection process, or through other means. To the extent that the Debtor successfully lowers the
    claim of the Utah State Tax Commission, distributions to other creditors should increase or be made more quickly than
    projected.

**Opulent Vacations, Inc.**
**Proposed Distributions for Allowed Claims**
**For the Period of December 2023 Through November 2028**
**As of October 9, 2023**

| | Professional Fees | Administrative Claims [1] | Secured Claims SBA | Secured Claims Toyota | Secured Claims USTC [2] | Priority Wage Claims | Priority Tax Claims [3] | General Unsecured Claims | Grand Total |
|---|---|---|---|---|---|---|---|---|---|
| **Balance Owed** | $ 100,000 | $ 1,500 | $ 547,427 | $ 27,931 | $ 68,834 | $ 37,820 | $ 649,479 | $ 5,526,093 | $ 6,959,084 |
| **Payment Schedule** | | | | | | | | | |
| Dec-23 | | | - | 798 | | | | | 798 |
| Jan-24 | 50,000 | - | 2,437 | 798 | - | - | - | - | 53,235 |
| Feb-24 | | | 2,437 | 798 | | | | | 3,235 |
| Mar-24 | | | 2,437 | 798 | | | | | 3,235 |
| Apr-24 | 50,000 | - | 2,437 | 798 | - | - | - | - | 53,235 |
| May-24 | | | 2,437 | 798 | | | | | 3,235 |
| Jun-24 | | | 2,437 | 798 | | | | | 3,235 |
| Jul-24 | - | 1,566 | 2,437 | 798 | 48,434 | - | - | - | 53,235 |
| Aug-24 | | | 2,437 | 798 | | | | | 3,235 |
| Sep-24 | | | 2,437 | 798 | | | | | 3,235 |
| Oct-24 | - | | 2,437 | 798 | 24,734 | 25,266 | - | - | 53,235 |
| Nov-24 | | | 2,437 | 798 | | | | | 3,235 |
| Dec-24 | | | 2,437 | 798 | | | | | 3,235 |
| Jan-25 | - | - | 2,437 | 798 | - | 12,554 | 37,446 | - | 53,235 |
| Feb-25 | | | 2,437 | 798 | | | | | 3,235 |
| Mar-25 | | | 2,437 | 798 | | | | | 3,235 |
| Apr-25 | - | | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| May-25 | | | 2,437 | 798 | | | | | 3,235 |
| Jun-25 | | | 2,437 | 798 | | | | | 3,235 |
| Jul-25 | - | | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| Aug-25 | | | 2,437 | 798 | | | | | 3,235 |
| Sep-25 | | | 2,437 | 798 | | | | | 3,235 |
| Oct-25 | - | | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| Nov-25 | | | 2,437 | 798 | | | | | 3,235 |
| Dec-25 | | | 2,437 | 798 | | | | | 3,235 |
| Jan-26 | - | - | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| Feb-26 | | | 2,437 | 798 | | | | | 3,235 |
| Mar-26 | | | 2,437 | 798 | | | | | 3,235 |
| Apr-26 | - | - | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| May-26 | | | 2,437 | 798 | | | | | 3,235 |
| Jun-26 | | | 2,437 | 798 | | | | | 3,235 |
| Jul-26 | - | | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| Aug-26 | | | 2,437 | 798 | | | | | 3,235 |
| Sep-26 | | | 2,437 | 798 | | | | | 3,235 |
| Oct-26 | - | | 2,437 | 798 | - | - | 50,000 | - | 53,235 |
| Nov-26 | | | 2,437 | 798 | | | | | 3,235 |
| Dec-26 | | | 2,437 | 675 | | | | | 3,112 |
| Jan-27 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| Feb-27 | | | 2,437 | - | | | | | 2,437 |
| Mar-27 | | | 2,437 | - | | | | | 2,437 |
| Apr-27 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| May-27 | | | 2,437 | - | | | | | 2,437 |
| Jun-27 | | | 2,437 | - | | | | | 2,437 |
| Jul-27 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| Aug-27 | | | 2,437 | - | | | | | 2,437 |
| Sep-27 | | | 2,437 | - | | | | | 2,437 |
| Oct-27 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| Nov-27 | | | 2,437 | - | | | | | 2,437 |
| Dec-27 | | | 2,437 | - | | | | | 2,437 |
| Jan-28 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| Feb-28 | | | 2,437 | - | | | | | 2,437 |
| Mar-28 | | | 2,437 | - | | | | | 2,437 |
| Apr-28 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| May-28 | | | 2,437 | - | | | | | 2,437 |
| Jun-28 | | | 2,437 | - | | | | | 2,437 |
| Jul-28 | - | | 2,437 | - | | - | 50,000 | - | 52,437 |
| Aug-28 | | | 2,437 | - | | | | | 2,437 |
| Sep-28 | | | 2,437 | - | | | | | 2,437 |
| Oct-28 | - | - | 2,437 | - | - | - | 9,175 | - | 11,612 |
| Nov-28 | | | 2,437 | - | | | | | 2,437 |
| **Total Payments** | $ 100,000 | $ 1,566 | $ 143,783 | $ 29,410 | $ 73,168 | $ 37,820 | $ 746,621 | $ - | $ 1,132,368 |

| | |
|---|---|
| Estimated remainder to be paid to the Small Business Administration through April 22, 2050 | $ 798,454 |
| Total Distributions under the Chapter 11 Plan of Reorganization | $ 1,930,822 |

Footnotes
[1] At this time, there is only one administrative claim for estimated tax liabilities. The interest rate payable on this claim was estimated at 3.75%.
[2] At this time, the secured claim of the Utah State Tax Commission includes estimated amounts. The Debtor expects to see a reduction in the claim of the Utah State Tax Commission, whether through a consensual resolution, the claims objection process, or through other means. To the extent that the Debtor successfully lowers the claim of the Utah State Tax Commission, distributions to other creditors should increase or be made more quickly than projected.
[3] At this time, several of the priority tax claims include estimated amounts. The interest rate payable on the claim of the Utah State Tax Commission is 5.0%. All others were estimated at 3.75%.